# EXHIBIT B TO THE AFFIRMATION

Transaction Agreement, dated October 23, 2002

EX-10.3 5 dex103.htm TRANSACTION AGREEMENT, DATED OCTOBER 23, 2002

Exhibit 10.3

DATED 23 October 2002

## CDT ACQUISITION CORP.

and

## CAMBRIDGE DISPLAY TECHNOLOGY LIMITED

and

## OPSYS LIMITED

and

## OPSYS UK LIMITED

and

## THE WARRANTORS

and

## OPSYS US CORPORATION

and

## OPSYS 2 CORPORATION

---

## TRANSACTION AGREEMENT

---

Transaction Agreement, dated October 23, 2002

| 1. | Interpretation | 3 |
| 2. | Subscription in Opsys UK | 13 |
| 3. | Opsys UK Options | 13 |
| 4. | Conditions to Subscription | 17 |
| 5. | Consideration | 18 |
| 6. | Completion | 18 |
| 7. | Management of Opsys UK | 19 |
| 8. | Opsys UK Shareholders Arrangements | 21 |
| 9. | Opsys Limited Option | 22 |
| 10. | Dilution and Reorganisation | 28 |
| 11. | Hive Down | 29 |
| 12. | NewCo and NewCo IP Licence | 29 |
| 13. | Opsys IP Licence | 29 |
| 14. | CDT UK IP Licences and Licence Agreements | 29 |
| 15. | Board Observer | 29 |
| 16. | Warranties and Covenants | 30 |
| 17. | CDT's remedies and Opsys' and CDT's limitations on liability | 33 |
| 18. | Conduct of business before Completion | 35 |
| 19. | Covenants and Undertakings | 35 |
| 20. | Employment indemnities | 37 |
| 21. | Restrictions on business activities | 40 |
| 22. | Intellectual Property and Business Information | 43 |
| 23. | Transitional Services | 43 |
| 24. | Access, Books and Records | 43 |
| 25. | Effect of Completion | 43 |
| 26. | Remedies and waivers | 44 |
| 27. | Assignment | 44 |
| 28. | Further assurance | 44 |
| 29. | Entire agreement | 45 |
| 30. | Notices | 45 |
| 31. | Announcements | 46 |
| 32. | Confidentiality | 47 |
| 33. | Costs and expenses | 47 |
| 34. | Counterparts | 48 |
| 35. | Contracts (Rights of Third Parties) Act 1999 | 48 |
| 36. | Choice of governing law | 48 |
| 37. | Jurisdiction | 48 |

Schedules
Schedule 1    (Conditions to Completion)
Schedule 2    (Completion Arrangements)
Schedule 3    (Warranties)
Schedule 4    (Limitations on liability)
Schedule 5    (Conduct of business before Completion)
Schedule 6    (Basic information about the Opsys Group)
Schedule 7    (Acquired Employees)
Schedule 8    (Property)
Schedule 9    (CDT's Warranties)
Schedule 10   (Agreements for the issue of shares)
Schedule 11   (Opsys shareholder warranties)

i

Transaction Agreement, dated October 23, 2002

List of Agreed Form Documents

| | |
|---|---|
| Document 1 | (Opsys IP Licence) |
| Document 2 | (Opsys UK Loan Agreement) |
| Document 3 | (Opsys UK Articles) |
| Document 4 | (University Licences in agreed form) |
| Document 5 | (Investor Rights Agreement) |
| Document 6 | (Letter from each shareholder of Opsys repeating warranty 43 of Schedule 3) |
| Document 7 | (Hive Down Agreement) |
| Document 8 | (NewCo Shareholders Agreement) |
| Document 9 | (NewCo IP Licence) |
| Document 10 | (Joinder Agreement) |
| Document 11 | (Management Accounts for Opsys Group) |
| Document 12 | (Shareholder and Board Minutes for Opsys) |
| Document 13 | [Intentionally Left Blank] |
| Document 14 | (CDT-USCO IP Licence Agreement) |
| Document 15 | (CDT-NewCo IP Licence Agreement) |
| Document 16 | (Opsys CDT Licence) |
| Document 17 | (NewCo Articles) |

ii

Transaction Agreement, dated October 23, 2002

THIS AGREEMENT is made on 23 October 2002

BETWEEN:

1. CDT Acquisition Corp. of Corporation Trust Center, 11551 Mandarin Forest Drive, Jacksonville, Florida 32223, a company organised under the laws of the State of Delaware in the United States of America ("**CDT**");

AND

2. Cambridge Display Technology Limited, a private limited company incorporated in England with registered number 2672530 and registered office at Greenwich House, Madingley Rise, Madingley Road, Cambridge CB3 OHJ, England ("**CDT UK**");

AND

3. Opsys Limited, a private limited company incorporated in England with registered number 03426174 and registered office at Unit 8 Begbroke Business & Science Park, Sandy Lane, Yarton, Kidlington, Oxfordshire, OX5 1PF, England ("**Opsys**");

AND

4. Opsys UK Limited, a private limited company incorporated in England, registered number 04421247 with registered office at 2 Temple Beck, East Temple Quay, Bristol, BS1 6EG, England ("**Opsys UK**");

AND

5. Alexis Zervoglos of 40 Sloane Court West, London, SW3 4TB, England;

AND

6. Michael Holmes of 3 Capel Close, Oxford, OX2 7LA, England;

   (Alexis Zervoglos and Michael Holmes together being the "**Warrantors**")

AND

7. Opsys US Corporation of 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808, County of New Castle, a company organised under the laws of the State of Delaware in the United States of America ("**USCO 1 Corporation**");

4

Transaction Agreement, dated October 23, 2002

AND

8.    Opsys 2 Corporation of 1013 Centre Road, Wilmington, Delaware 19805, County of New Castle, a company organised under the laws of the State of Delaware in the United States of America ("**USCO 2 Corporation**").

WHEREAS:

(A)    Particulars of Opsys UK are set out in Part 2 of Schedule 6 (Basic information about the Opsys Group).

(B)    CDT has agreed to subscribe for and Opsys UK has agreed to issue the Opsys UK Subscription Shares (as defined in this agreement) in each case on the terms and subject to the conditions of this agreement.

(C)    Opsys and Opsys UK desire to retain the services of CDT UK to manage the assets and business of Opsys UK and CDT UK is willing to provide such services to Opsys under a management arrangement on the terms and subject to the conditions of this agreement.

(D)    CDT and Opsys have agreed to enter into put and call options over the whole of the issued share capital of Opsys UK held by Opsys from time to time and CDT have agreed to grant Opsys Shareholders a put option over the whole of the issued share capital of Opsys, on and subject to the terms of this agreement.

(E)    It is the intention that, after the date of this agreement, Opsys will be restructured so that its subsidiaries (USCO 1 Corporation and USCO 2 Corporation) and any other operations located in the United States of America and all liabilities or obligations of any kind relating to such operations including liabilities relating to all employees retained by such business are divested into a newly incorporated company.

(F)    CDT and Opsys have agreed that all of the assets used by Opsys in the course of or required to operate its business in the United Kingdom including all intellectual property owned or exclusively licenced by Opsys, the benefit of licence and research agreements with Oxford University, St. Andrews University and Durham University, the benefit of service contracts with all the Acquired Employees, the benefit of the existing property leases in Oxford, all existing customer and supplier contracts and all laboratory and other equipment, whether leased or owned, in each case pertaining to the Opsys UK Business shall be transferred to Opsys UK, on and subject to the terms of a hive down agreement to be entered into between Opsys and Opsys UK.

2

5

Transaction Agreement, dated October 23, 2002

NOW IT IS HEREBY AGREED as follows:

1.    **Interpretation**

1.1    In this agreement and the Schedules to it:

**"Account Balance"**                      has the meaning given in sub-clause 19.4;

**"Accounts"**                             means the audited financial statements of Opsys and of each Subsidiary, and the audited
                                           consolidated financial statements of those companies, prepared in accordance with the Companies
                                           Acts or other applicable law, for each of the three consecutive accounting reference periods the
                                           last of which ended on the Accounts Date, together with the directors' report and the auditors'
                                           certificate on such year end statements by Opsys Accountants, including in each case a balance
                                           sheet, a profit and loss account, a statement of cash flow and accompanying notes;

**"Accounts Date"**                        means 30 September, 2001;

**"Acquired Employees"**                   means the employees listed in Schedule 7 Part 1 (Acquired Employees);

**"Acquired Consultants"**                 means the individuals listed in Schedule 7 Part 2 (Acquired Consultants);

**"Associated Company"** or                means in respect of a company an undertaking in which that company has a participating interest
**"Associated Companies"**                 (as defined in section 260 Companies Act 1985) which is not a subsidiary of that company;

**"Books and Records"**                    means all notices, correspondence, orders, inquiries, drawings, plans, books of account and other
                                           documents and all computer disks or tapes or other machine legible programs or other records;

**"Business Day"**                         means a day (other than a Saturday or a Sunday) on which banks are open for business (other than
                                           solely for trading and settlement of currency) in London and New York;

**"Business Information"**                 means all information, know-how and records (whether or not confidential and in whatever form
                                           held) including all formulas, designs, specifications, drawings, data, manuals and instructions and
                                           all customer lists, sales information, business plans and forecasts, and all technical or other
                                           expertise and all computer software and all accounting and tax records, correspondence, orders
                                           and inquiries;

3

6

Transaction Agreement, dated October 23, 2002

| | |
|---|---|
| **"By-Laws"** | means the Amended and Restated By-Laws of CDT, as adopted on July 26, 1999, as they may be amended from time to time; |
| **"CDT Shares"** | means Class A Common Stock, par value $0.01 per share, in the capital of CDT; |
| **"CDT-NewCo IP Licence Agreement"** | means the agreement to licence certain intellectual property rights to NewCo in the agreed form between CDT UK and Opsys; |
| **"CDT's Accountants"** | means Ernst & Young LLP; |
| **"CDT's Accounts"** | means the audited financial statements of CDT and its subsidiaries, comprising the balance sheet and statement of CDT, together in each case with the notes thereon, directors' report and auditors' certificate, as at and for the financial period ended on the CDT's Accounts Date; |
| **"CDT's Accounts Date"** | means 31 December, 2001; |
| **"CDT's Disclosure Letter"** | means the letter of today's date together with the attachments thereto addressed from CDT to Opsys and the Opsys Shareholders for the purposes of sub-clause 17.11 (CDT remedies and Opsys' and CDT's limitations on liability); |
| **"CDT's Group"** | means CDT, its subsidiaries and subsidiary undertakings, any holding company of CDT and all other subsidiaries of any such holding company from time to time; |
| **"CDT's Solicitors"** | means Debevoise & Plimpton, Tower 42, Old Broad Street, London, EC2N 1HQ, England; |
| **"CDT-USCO IP Licence Agreement"** | means the agreement to licence certain intellectual property rights between CDT UK and USCO 1 Corporation in the agreed form; |
| **"Code"** | means the U.S. Internal Revenue Code of 1986, as amended; |
| **"Companies Acts"** | means the Companies Act 1985, the Companies Consolidation (Consequential Provisions) Act 1985, the Companies Act 1989 and Part V of the Criminal Justice Act 1993; |

4

Transaction Agreement, dated October 23, 2002

| | |
|---|---|
| **"Completion"** | means completion of CDT's subscription for shares in Opsys UK under this agreement; |
| **"Completion Date"** | means the day on which the last of those conditions listed in Schedule 1 (Conditions to Completion) shall have been satisfied, waived or deferred or such other date as the parties may agree in writing but, in any event, no later than the Long Stop Date; |
| **"Conditions"** | has the meaning given in sub-clause 4.1 (Conditions); |
| **"Confidential Business Information"** | means Business Information which is confidential and relates to the business of Opsys; |
| **"Disclosure Letter"** | means the letter of today's date together with the attachments thereto addressed from the Warrantors to CDT for the purposes of sub-clause 17.2 (CDT remedies and Opsys and CDT limitations on liability) and delivered to the CDT's Solicitors before the execution of this agreement together with the supplementary disclosure letter delivered on or prior to the Hive Down Date in respect of the Warranties contained in Part 3 of Schedule 3; |
| **"DuPont"** | means E.I. DuPont De Nemours and Company; |
| **"DuPont Agreement"** | means the Emitter Technology Cross-Licence Agreement between DuPont and Opsys dated 7 June, 2002; |
| **"Durham Licence"** | means the agreement between the University of Durham and Opsys dated in August, 2001; |
| **"Environment"** | has the meaning given in paragraph 32 of Part 2 of Schedule 3 (Warranties); |
| **"Environmental Laws"** | has the meaning given in paragraph 32 of Part 2 of Schedule 3 (Warranties); |
| **"Environmental Matters"** | has the meaning given in paragraph 32 of Part 2 of Schedule 3 (Warranties); |

5

Transaction Agreement, dated October 23, 2002

| | |
|---|---|
| **"Excluded Individuals"** | means any employee, consultant or other individual who works for the Opsys Group on any basis, other than the Acquired Employees, the Acquired Consultants and the Redundant Individuals and including the individuals listed in Schedule 7 Part 3 (Excluded Individuals); |
| **"Framework Agreement"** | means the framework agreement for the sponsorship of a research programme dated 14 February, 2002 among the Chancellor, Masters and Scholars of the University of Oxford (**"Oxford"**), the University Court of the University of St Andrews (**"St Andrews"**), Opsys and Isis Innovation Limited (**"Isis"**) and the framework agreement for the sponsorship of a research programme dated 22 April, 2002, among Oxford, the Company and Isis; |
| **"Hive Down Agreement"** | means the hive down agreement to be entered into between Opsys UK and Opsys dated on or around the date hereof in the agreed form; |
| **"Hive Down Reorganisation"** | means the transfers, transactions and arrangements effected by or contemplated in the Hive Down Agreement; |
| **"Hive Down Date"** | means the date on which the Hive Down Reorganisation is completed; |
| **"ICTA 1988"** | means the Income and Corporation Taxes Act 1988; |
| **"Information Technology"** | means computer hardware, software, networks and/or other information technology (whether embedded or otherwise); |
| **"Initial Public Offering"** | means an initial public offering of common stock of CDT after which an established trading market exists for common stock; |
| **"Insolvency Event"** | means in relation to any person, (i) an order being made, petition presented, resolution passed or meeting convened for its winding up (or other process whereby its business is terminated and its assets are distributed amongst its creditors and/or shareholders or other contributories) or proceedings being initiated against it under any applicable insolvency, reorganization, or similar laws in any relevant jurisdiction; (ii) a receiver (including an administrative receiver), liquidator, trustee, administrator, custodian or similar official being appointed in any jurisdiction in respect of the whole or any material part of its business or assets; |

6

9

Transaction Agreement, dated October 23, 2002

---

| | |
|---|---|
| **"Intellectual Property"** | means patents, trade marks, and service marks rights in designs, trade or business names, trade secrets, know-how, copyrights, topography rights and rights in databases (whether or not any of these is registered and including applications for registration of any such thing) and all rights or forms of protection of a similar nature or having equivalent or similar effect to any of these which may subsist anywhere in the world; |
| **"Investor Rights Agreement"** | means the investor rights agreement in the agreed form; |
| **"Joinder Agreement"** | means the joinder agreement to the Registration Rights Agreement in the agreed form; |
| **"Kodak Licence"** | means the OLED Licensing agreement between Opsys and Kodak dated 31 March, 2001; |
| **"Leases"** | means the lease for each Relevant Property; |
| **"Long Stop Date"** | means 1 December, 2002; |
| **"Management Accounts"** | the unaudited management accounts as of and for each member of the Opsys Group for the period from the Accounts Date, to 30 June 2002 in the agreed form; |
| **"NewCo"** | has the meaning given in clause 12 (NewCo); |
| **"NewCo Articles"** | means the articles of association of NewCo in the agreed form; |
| **"NewCo IP Licence"** | the licence of certain intellectual property rights from Opsys UK to NewCo in the agreed form; |
| **"NewCo Shareholders' Agreement"** | means the shareholders agreement to be entered into among the shareholders of NewCo in the agreed form; |
| **"Novated Agreements"** | has the meaning given in the Hive Down Agreement |
| **"Novation Agreements"** | has the meaning given in the Hive Down Agreement |
| **"Opsys Account"** | has the meaning given in sub-clause 19.4 (Covenants and Undertakings); |

7

Transaction Agreement, dated October 23, 2002

---

| | |
|---|---|
| **"Opsys Accountants"** | means Arthur Andersen of 180 Strand, London WC2R 1BL or their successor appointed by Opsys; |
| **"Opsys CDT Licence"** | means the licence of certain intellectual property rights from Opsys to CDT UK in the agreed form; |
| **"Opsys Group"** | means Opsys and its Subsidiaries; |
| **"Opsys IP"** | means all Intellectual Property owned or exclusively licenced by or to Opsys at the date of this agreement; |
| **"Opsys IP Licence"** | means the licence in the agreed form entered into between Opsys UK and USCO 1 Corporation on or around the Completion Date; |
| **"Opsys Option"** | has the meaning given in sub-clause 9.1 (Opsys Limited Option); |
| **"Opsys UK Articles"** | means the new articles of association of Opsys UK in the agreed form; |
| **"Opsys UK Business"** | means the business of research and development of novel light emitting materials and other opto-electronic technologies for eventual application in organic electroluminescent displays and lighting carried on by Opsys at the date of this agreement including but not limited to active and passive matrix displays; |
| **"Opsys UK Call Option"** | has the meaning given in sub-clause 3.1 (Opsys UK Options); |
| **"Opsys UK Limited"** | means Opsys UK Limited, a company incorporated in England and Wales with registered number 04421247; |
| **"Opsys UK Loan Agreement"** | means the loan agreement in agreed form to be entered into on Completion between CDT UK and Opsys UK; |
| **"Opsys UK Option"** | has the meaning given in sub-clause 3.1; |
| **"Opsys UK Option Shares"** | all the issued shares in the capital of Opsys UK at the time of exercise of the Opsys UK Option other than those shares already held by CDT at such time; |
| **"Opsys UK Put Option"** | has the meaning given in sub-clause 3.1 (Opsys UK Options); |

8

11

Transaction Agreement, dated October 23, 2002

| | |
|---|---|
| **"Opsys Shares"** | means the issued share capital of Opsys from time to time; |
| **"Opsys Shareholder"** | means a shareholder of Opsys from time to time; |
| **"Opsys UK Subscription Shares"** | means the shares referred to in sub-clause 2.1 (Subscription in Opsys UK); |
| **"Opsys Solicitors"** | means Ashurst Morris Crisp of Broadwalk House, 5 Appold Street, London EC2A 2HA; |
| **"Option Exercise Date"** | means the date of receipt of notice of exercise in respect of the Opsys UK Option or the Opsys Option as applicable or the date of automatic exercise if earlier; |
| **"Option Exercise Price"** | has the meaning given in sub-clause 3.5; |
| **"Pension Scheme"** | means the group pension scheme with Clerical Medical on behalf of Opsys and any member of the Opsys Group in respect of its employees and former employees or any other person; |
| **"Proceedings"** | means any proceeding, suit or action arising out of or in connection with this agreement; |
| **"Property"** or **"Properties"** | means freehold, leasehold or other immovable property in any part of the world; |
| **"Property Owner"** | means, in relation to any Relevant Property, the person referred to as "owner" in Schedule 8 (Property); |
| **"Redundant Individuals"** | means Steven Latham, Nazir Mustafa, Patrick Rundle and Alexei Safonov; |
| **"Registration Rights Agreement"** | means the registration rights agreement dated as of July 27, 1999 as amended among CDT and certain other parties which addresses the registration of certain shares of CDT (Registration Rights Agreement); |
| **"Relevant Property"** | means the Property or Properties referred to in Schedule 8 (Property); |
| **"Retained Shares"** | has the meaning given in sub-clause 3.9 when used in clause 3 and the meaning given in sub-clause 9.16 when used in clause 9; |

9

Transaction Agreement, dated October 23, 2002

| | |
|---|---|
| **"Sale"** | means the transfer (including any transfer through a single transaction or a series of transactions) of shares in CDT as a result of which any person (other than an existing shareholder of CDT or a person or entity owned or controlled by one or more existing shareholders of CDT) would have the legal or beneficial ownership over that number of shares in the capital of CDT which in the aggregate would confer more than 50% or more of the voting rights normally exercisable at general meetings of CDT; |
| **"Securities Act"** | means the Securities Act of 1933, as amended, and the rules and regulations of the U.S. Securities and Exchange Commission thereunder; |
| **"Subsidiary"** | means at any relevant time any subsidiary or subsidiary undertaking of Opsys; |
| **"Signing"** | means the signing of this agreement by the parties hereto; |
| **"Tax/tax" or "Taxation"** | all forms of taxation and statutory, governmental, state, federal, provincial, local government or municipal charges, duties, imposts, contributions, levies, withholdings or liabilities in the nature of taxation wherever chargeable and whether of the UK or any other jurisdiction and any penalty, fine, surcharge, interest, charges or costs payable in relation thereto; |
| **"Taxation Authority"** | means the Inland Revenue, Customs & Excise, Department of Social Security and any other governmental or other authority whatsoever competent to impose any Taxation whether in the United Kingdom or elsewhere; |
| **"TCGA 1992"** | means the Taxation of Chargeable Gains Act 1992; |
| **"Toppan"** | means Toppan Printing Company Limited (No. FC011774) care of Kenji Kawamura Gilliam House, 38-44, Gillingham Street, London, SW1V 1HU; |
| **"Toppan Subscription Agreement"** | means the subscription agreement in the agreed form between Toppan and CDT executed on or about the date hereof; |

10

Transaction Agreement, dated October 23, 2002

| | |
|---|---|
| **"Transaction Documents"** | has the meaning given in sub-clause 29.1 (Entire agreement); |
| **"Treasury"** | means the Commissioners of Her Majesty's Treasury; |
| **"Umbrella Licence"** | means the licence between Isis Innovation Limited (1) University of Oxford (2) University of St Andrews (3) and Opsys (4) dated 21 January, 2002; |
| **"University Payables"** | shall have the meaning given in sub-clause 16.16 (Warranties and Covenants); |
| **"US Business Plan"** | means the business plan for USCO dated 19 April, 2002; |
| **"USCO"** | means USCO 1 Corporation and USCO 2 Corporation and any of Opsys' other existing operations located in the United States of America whether or not conducted through USCO 1 Corporation or USCO 2 Corporation and any and all rights and obligations related thereto including the US Lease; |
| **"USCO 1 Corporation"** | has the meaning given in the introduction hereto; |
| **"USCO 2 Corporation"** | has the meaning given in the introduction hereto; |
| **"US Lease"** | means the Lease dated 7 March, 2001 between Opsys and Sunnyside Development Company LLC; |
| **"VAT"** | means value added tax; |
| **"VATA 1994"** | means the Value Added Tax Act 1994; |
| **"Warranties"** | means the warranties set out in Schedule 3 (Warranties) given by the Warrantors and **"Warranty"** shall be construed accordingly; |
| **"Warrantors"** | means Alexis Zervoglos and Michael Holmes; |
| **"Working Hours"** | means 9.30 a.m. to 5.30 p.m. on a Business Day; and |
| **"Works"** | has the meaning given in paragraph 32 of Schedule 3 (Warranties). |
| **"179 Election"** | has the meaning given in sub-clause 3.4; |
| **"179 Charge"** | means a tax liability arising under 179 TCGA 1992. |

11

Transaction Agreement, dated October 23, 2002

1.2    In this agreement, unless otherwise specified:

(a)    references to clauses, sub-clauses, paragraphs, sub-paragraphs and Schedules are to clauses, sub-clauses, paragraphs, sub-paragraphs of, and Schedules to, this agreement;

(b)    a reference to any statute or statutory provision shall be construed as a reference to the same as it may have been, or may from time to time be, amended, modified or re-enacted;

(c)    references to a "**company**" shall be construed so as to include any company, corporation or other body corporate, wherever and however incorporated or established;

(d)    references to a "**person**" shall be construed so as to include any individual, firm, company, government, state or agency of a state or any joint venture, association or partnership (whether or not having separate legal personality);

(e)    references to "**indemnify**" and "**indemnifying**" any person against any circumstance include indemnifying and keeping him harmless from all actions, claims and proceedings from time to time made against that person and all loss or damage and all payments, costs (including legal costs and registration or administrative costs or fees) or expenses whether or not arising from a third party claim reasonably made or incurred by that person as a consequence of or which would not have arisen but for that circumstance;

(f)    the expressions "**accounting reference date**", "**accounting reference period**", "**allotment**", "**body corporate**", "**current assets**", "**debentures**", "**holding company**", "**paid up**", "**profit and loss account**", "**subsidiary**", "**subsidiary undertaking**" and "**wholly-owned subsidiary**" shall have the meaning given in the Companies Acts;

(g)    a person shall be deemed to be connected with another if that person is connected with another within the meaning of section 839 ICTA 1988;

(h)    references to times of the day are to London time;

(i)    headings to clauses and Schedules are for convenience only and do not affect the interpretation of this agreement;

(j)    the recitals are for information and convenience only and are not meant to be legally binding on any of the parties hereto;

12

Transaction Agreement, dated October 23, 2002

(k)     the Schedules form part of this agreement and shall have the same force and effect as if expressly set out in the body of this agreement, and any reference to this agreement shall include the Schedules;

(l)     reference to £ are to UK pounds sterling, the legal currency of the United Kingdom from time to time;

(m)    reference to dollars or $ are to U.S. dollars, the legal currency of the United States of America from time to time;

(n)     the words "**include**", "**includes**" and "**including**" shall be deemed to be followed by the phrase "**without limitation**";

(o)     general words shall not be given a restrictive meaning: (i) if they are introduced by the word "other" by reason of the fact that they are preceded by words indicating a particular class of act, matter or thing; or (ii) by reason of the fact that they are followed by particular examples intended to be embraced by those general words;

(p)     any document "**in the agreed form**" means in a form agreed by the parties on or before the date of this agreement and for identification purposes signed by them or on their behalf by their solicitors;

(q)     a reference to a party includes its successors in title and permitted assigns;

(r)     words in the singular include the plural and vice versa and words in one gender include any other gender; and

(s)     the obligations of the Warrantors shall be several.

2.      **Subscription in Opsys UK**

2.1     CDT hereby subscribes in cash for 160 ordinary shares of £1.00 each (the "**Opsys UK Subscription Shares**") at $15,625 per share giving an aggregate subscription price of $2.5 million and Opsys UK shall, and Opsys shall procure that Opsys UK shall, issue such shares to CDT.

3.      **Opsys UK Options**

3.1     Opsys hereby grants a call option to CDT (the "**Opsys UK Call Option**") and CDT hereby grants a put option to Opsys (the "**Opsys UK Put Option**") (either the Opsys UK Call Option or the Opsys UK Put Option) (the "**Opsys UK Option**") on the exercise of which CDT shall purchase and Opsys shall sell all the issued shares of Opsys UK other than the Opsys UK Subscription Shares acquired by CDT hereunder and referred to in sub-clause 2.1. In further consideration for the grant of the Opsys UK Call Option, CDT shall pay an option grant price of $500,000 in cash to Opsys on the date of this agreement.

13

Transaction Agreement, dated October 23, 2002

3.2    The Opsys UK Put Option may be exercised by Opsys by 60 days prior written notice to CDT at any time following Completion subject to and conditional upon Opsys filing jointly with Opsys UK the election referred to in sub-clause 3.4 and conditional on the Completion of the subscription referred to in sub-clause 2.1 above.

3.3    At any time following Completion, the Opsys UK Call Option shall be automatically exercised immediately prior to an Insolvency Event of Opsys and otherwise the Opsys UK Call Option may be exercised by CDT by giving 90 days prior written notice to Opsys on any of the following circumstances:

A.    if there is an Initial Public Offering of CDT;

B.    if there is a Sale of CDT, where the consideration on sale payable to Opsys thereunder will be liquid or a sufficient proportion will be liquid to allow Opsys to pay the 179 Charge payable (if any) ;

C.    at any time on or after the sixth anniversary of the effective date of the Hive Down Reorganisation; or

D.    if the 179 Charge becomes payable by Opsys UK,

where in (A) and (B) above such notice shall expire no earlier than the first anniversary of the date of this agreement.

3.4    If any 179 Charge becomes payable by Opsys UK or the Opsys UK Option is exercised, Opsys and Opsys UK shall and CDT and Opsys shall procure that Opsys UK shall enter into and submit to the Inland Revenue a joint tax election under Section 179A TCGA 1992 with the intention of ensuring that any 179 Charge is assumed by and falls upon Opsys and not on Opsys UK (the "179 Election").

3.5    Subject to sub-clause 3.6 the exercise price payable by CDT on exercise of the Opsys UK Option, or an exercise of the Opsys Option referred to in sub-clause 9.1 shall be 1,326,837 as adjusted in accordance with sub-clause 10 (Dilution and Reorganisation), sub-clauses 16.7 and 16.8 and sub-clauses 16.15 and 16.16 (Warranties and Covenants) (the "**Option Exercise Price**").

3.6    If the 179 Charge falls upon Opsys UK, the Option Exercise Price payable to Opsys on exercise of the Opsys UK Option shall be 464,396 CDT Shares as adjusted in accordance with sub-clause 10 (Dilution and Reorganisation) and sub clauses 16.7, 16.8, 16.15 and 16.16 (Warranties and Covenants).

3.7    Subject to sub-clauses 3.9 and 3.10 on the Option Exercise Date CDT shall issue such number of CDT Shares and shall deliver to Opsys certificates

14

Transaction Agreement, dated October 23, 2002

representing the Option Exercise Price registered in the name of Opsys and Opsys shall deliver to CDT duly executed stock transfer forms relating to the Opsys UK Option Shares in the name of CDT (or as it may direct) together with Opsys UK share certificates relating to such shares. Opsys acknowledges that from the Option Exercise Date until such time as the Opsys UK Option Shares have been registered in the register of members of Opsys UK in the name of CDT (or as it may direct), Opsys will hold such shares registered in its name as nominee for CDT and its nominees and shall exercise all voting rights available in respect of such shares in accordance with the directions of CDT or its nominees. If Opsys is in breach of the undertakings contained in this sub-clause, it irrevocably authorizes CDT to appoint a representative of CDT to execute all documents which CDT or its nominees may reasonably require and which may be necessary to enable CDT to attend and vote at general meetings of Opsys UK and to do anything necessary to give effect to the rights contained in this sub-clause.

3.8   CDT shall not be obliged to complete the purchase of any of the Opsys UK Option Shares pursuant to an Opsys UK Option unless Opsys completes the sale of all of such shares simultaneously, but completion of the purchase of some such shares shall not effect the rights of CDT with respect to its rights to the other shares.

3.9   If the Opsys UK Option is exercised within twelve months of the Completion Date, (i) CDT will make the payment of the Option Exercise Price less such number of CDT Shares at a deemed value of $16.15 per share as most nearly equals but does not exceed the amount by which the maximum liability cap of $5 million exceeds the aggregate amount of any claims made by CDT or CDT UK hereunder which have resulted in a reduction in the Option Exercise Price in accordance with this agreement (the "**Retained Shares**") and (ii) upon the first anniversary of the Completion Date CDT shall issue such number of Retained Shares to Opsys less that number of CDT Shares at a deemed value of $16.15 per share as most nearly equals but does not exceed the amount of any outstanding claim by CDT or CDT UK hereunder pending the resolution of such claim and shall deliver to Opsys certificates representing the number of Retained Shares so issued and registered in the name of Opsys. To the extent that any such claim is not eventually substantiated in favor of CDT, CDT will issue CDT Shares at the value of $16.15 as most equals but does not exceed the unsubstantiated amount of such claim and shall deliver to Opsys certificates representing the number of Retained Shares so issued and registered in the name of Opsys. At any time, Opsys may at its discretion replace the Retained Shares with cash at a replacement value of $16.15 per CDT Share.

3.10   If the Opsys UK Option is exercised then subject to sub-clauses 3.6 and 3.9 CDT shall initially issue to Opsys such number of CDT Shares referred to in sub-clause 3.6 as adjusted therein, and until such time as (A)(i) the Inland Revenue have accepted the joint election submitted in accordance with sub-

15

Transaction Agreement, dated October 23, 2002

clause 3.4; and (ii) the 179 Charge has been discharged in full by Opsys, or (B) (i) the Inland Revenue have accepted the joint election submitted in accordance with sub-clause 3.4; and (ii) the 179 Charge has not been discharged in full by the due date, CDT shall withhold the balance of the Option Exercise Price otherwise payable under sub-clause 3.5 ("**Withheld Shares**"). In the case of (A) above, on the date on which the Inland Revenue confirms that: (i) it has accepted the joint election; and (ii) the 179 Charge has been discharged in full by Opsys, the Withheld Shares shall be issued to Opsys and CDT shall deliver to Opsys certificates representing such Withheld Shares, registered in the name of Opsys. In the case of (B) above, CDT shall use its reasonable efforts to sell on behalf of Opsys such number of the Withheld Shares (at a price per share to be agreed with Opsys in its sole discretion) for an aggregate cash consideration as is most nearly equal to but is not less than the amount of 179 Charge and on receipt of such sale consideration (after tax) to discharge the 179 Charge on behalf of Opsys and issue the balance of such Withheld Shares to Opsys at such time together with corresponding certificates representing such Shares registered in the name of Opsys. If the Inland Revenue does not accept the election or the election is otherwise invalid or ineffective or the 179 Charge is not discharged in full by Opsys or by CDT on behalf of Opsys pursuant to this sub-clause 3.10, the Withheld Shares shall not be issued to Opsys and the Option Exercise Price shall be as set out in sub-clause 3.6. At any time, Opsys may at its discretion replace the Withheld Shares with cash at a replacement value of $16.15 per CDT Share.

3.11    Once given, the notice of exercise of the Opsys UK Option is irrevocable provided that the Opsys UK Option shall automatically lapse and have no further force or effect in the circumstances of CDT suffering an Insolvency Event.

3.12    On completion of a sale of Opsys UK Option Shares pursuant to this Opsys UK Option, the option in clause 9 (Opsys Limited Option) shall lapse and have no further force and effect.

3.13    Subject to sub-clause 3.14, if a receiver (including an administrative receiver), liquidator, trustee, administrator, custodian or similar official is appointed in any jurisdiction in respect of the whole or any material part of the business or assets of Opsys UK, CDT shall pay the Option Exercise Price to Opsys (and shall indemnify Opsys in respect of any tax payable by Opsys thereon) provided that such payment shall not be subject to sub-clauses 3.6 and 3.10 nor shall there be any indemnity from the Opsys Shareholders or the Warrantors in respect of the 179 Charge.

3.14    CDT shall not be obliged to perform its obligations under sub-clause 3.13 if the appointment of such receiver, liquidator, trustee, administrator, custodian or similar official was caused by circumstances constituting a breach by the Warrantors or Opsys of any Warranty or agreement referred to herein.

16

Transaction Agreement, dated October 23, 2002

3.15    Any Retained Shares which relate to a claim of CDT which has been withdrawn or represent an excess of the amount of a settlement of any claim by CDT shall be issued to Opsys and CDT shall deliver to Opsys certificates representing the number of such Retained Shares so issued and registered in the name of Opsys.

3.16    If Opsys receives any payments in the form of return on capital or otherwise from any such insolvency practitioner or official referred to in clause 3.13, such payment shall be paid by the Opsys Shareholders to CDT.

4.    **Conditions to Subscription**

4.1    The subscription obligations of CDT hereunder are in all respects conditional upon those matters (the "**Conditions**") listed in Schedule 1 (Conditions to Completion).

4.2    Opsys will use reasonable endeavours to fulfill or procure the fulfillment of the Conditions and acting through Michael Holmes and Alexis Zervoglos shall keep CDT advised of progress towards satisfaction of such conditions and will notify CDT as soon as practicable and in any event within two days of the satisfaction of such Conditions.

4.3    CDT may waive in whole or in part all or any of the Conditions or extend the period in which the Conditions are to be satisfied.

4.4    Opsys shall disclose to CDT, in writing, any matter of which they are aware which will or is likely to prevent any of the Conditions from being satisfied on the date initially set for Completion within two Business Days of it coming to its notice.

4.5    [Intentionally Left Blank]

4.6    If:

(a)    any fact which would prevent any of the Conditions from being satisfied on the Completion Date (whether it does so because of any disclosure made under sub-clause 4.4 or not) comes to the knowledge of CDT where such fact is not reasonably capable of remedy prior to the Completion Date to the effect that such conditions would then be satisfied before Completion; or

(b)    any of the conditions is not fulfilled (notwithstanding the required reasonable endeavours in sub-clause 4.2) or waived by CDT by the Long Stop Date,

the Opsys UK Option and the Opsys Option shall lapse and CDT may terminate this agreement by notice in writing to Opsys.

17

Transaction Agreement, dated October 23, 2002

4.7    If the agreement is terminated in accordance with sub-clause 4.6, all obligations of the parties under this agreement shall end except those expressly stated to continue without limit in time but (for the avoidance of doubt) all rights and liabilities of the parties which have accrued before termination shall continue to exist provided always that all put and call option rights and obligations under clauses 3 and 9 and all rights and obligations under clause 7 shall end and have no further force or effect.

## 5.    Consideration

5.1    In consideration of the mutual agreements and undertakings contained in this agreement the parties hereto have granted the rights and accepted the obligations appearing herein. In addition:

(i)    the consideration for the issue of the Opsys UK Subscription Shares shall be the subscription price referred to in sub-clause 2.1 (Subscription in Opsys UK);

(ii)   the consideration for the grant by Opsys of the Opsys UK Call Option shall be the option grant price referred to in sub-clause 3.1 (Opsys UK Option);

(iii)  the consideration for the grant of the Opsys CDT Licence shall be $2,000,000 (exclusive of VAT).

## 6.    Completion

6.1    Completion shall take place on the Completion Date at the offices of CDT's Solicitors in London.

6.2    At Completion the parties shall do those things listed in Schedule 2 (Completion Arrangements).

6.3    Neither Opsys nor CDT shall be obliged to complete this agreement unless the other complies fully with the requirements of sub-clause 6.2 and Schedule 2 (Completion Arrangements).

6.4    If the obligations of CDT or Opsys under sub-clause 6.2 and Schedule 2 (Completion Arrangements) are not complied with on the Completion Date the party not in default may:

(a)    by means of notice in writing to the other parties hereto, defer Completion to a date no later than December 1, 2002 (so that the provisions of this clause 6 shall apply to Completion as so deferred); or

(b)    proceed to Completion as far as practicable (without limiting its rights under this agreement); or

18

Transaction Agreement, dated October 23, 2002

(c)     terminate this agreement by notice in writing to the party in default.

6.5     If the agreement is terminated in accordance with sub-clause 6.4 subject to sub-clause 17.6 (CDT's remedies and Opsys and CDT's limitations on liability), all obligations of the parties under this agreement shall end except for those expressly stated to continue without limit in time but (for the avoidance of doubt) all rights and liabilities of parties which have accrued before termination shall continue to exist provided always that all put and call option rights and obligations under clauses 3 and 9 and all rights and obligations under clause 7 shall end.

6.6     Opsys undertakes to indemnify CDT and CDT undertakes to indemnify Opsys against any loss, expense or damage which it may suffer as a result of any document delivered to it pursuant to this clause being unauthorised or invalid.

7.     **Management of Opsys UK**

7.1     Effective from the date of this agreement CDT UK shall on an exclusive and irrevocable basis manage the assets and business of Opsys UK generally and in particular:

A.     direct its research programmes;

B.     licence all intellectual property of Opsys UK from time to time (including for the avoidance of doubt to CDT or any member of CDT's Group) under such terms in the sole discretion of CDT UK;

C.     enter into joint development agreements;

D.     procure the hire and dismissal of staff by Opsys UK;

E.     acquire and dispose of fixed assets;

F.     oversee and supervise the performance of all administrative accounting and operational matters; and

G.     provide such other services as may be reasonably required in connection with the above duties.

7.2     In connection with the management of the operations of Opsys UK and the provision of the services by CDT UK hereunder, Opsys UK and Opsys hereby irrevocably authorize CDT UK to take and perform or cause to be taken and performed, such actions in the name and on behalf of Opsys UK, as may be necessary or desirable, in the judgment and discretion of CDT UK, for the management and operation of Opsys UK. At all times CDT UK shall have complete and unrestricted rights of access to the systems, facilities and Books and Records relating exclusively to the Opsys UK Business from time to time.

19

22

Transaction Agreement, dated October 23, 2002

7.3    CDT UK shall finance all expenses, costs (including capital costs) and charges relating to the operations and management of Opsys UK after the Hive Down Date. Effective on the Completion Date CDT UK shall enter into the Opsys UK Loan Agreement under which it shall provide some or all of such finance.

7.4    CDT UK shall be entitled to an annual management fee for the management services provided to Opsys UK hereunder in an amount equal to 98% of all pre-tax profits (before taking into account any carryforward tax losses) earned by Opsys UK calculated before determining this management fee and shall be paid thirty days after completion of Opsys UK's audited accounts, annually in arrears. In addition to such fee and subject to the terms of the joint development agreement between Toppan and Opsys entered into on or around July 4, 2002, the CDT-USCO IP Licence, and the CDT-NewCo IP Licence under the Opsys CDT Licence, CDT UK shall be entitled to any new Intellectual Property created after the Hive Down Date by Opsys UK and CDT UK shall be entitled to file such intellectual property in its own name free from any claim from Opsys, Opsys UK, the Opsys Shareholders at the date hereof and from time to time or from any third parties with whom Opsys, USCO or Opsys Shareholders have a relationship. In the event that the management fee is not paid, it shall accrue and be paid in subsequent years to the extent of available cash flow in that subsequent year.

7.5    CDT and CDT UK shall be responsible for all liabilities arising from its management of Opsys UK and shall indemnify Opsys and the directors of both Opsys UK and Opsys against all claims arising from such liabilities. CDT UK shall procure that Opsys UK shall maintain adequate insurance relating to the Opsys UK Business.

7.6    CDT UK and its employees shall serve as independent contractors in rendering the services under this agreement and are not and shall not be employees or servants of Opsys UK. Opsys UK hereby designates CDT UK as the sole and exclusive agent and attorney to perform the services under this agreement on behalf of and act as Opsys UK, such that the agency and power of attorney shall be a power coupled with an interest of Opsys UK in making purchases of equipment, supplies and materials necessary for the operation and management of Opsys UK.

7.7    Opsys shall, upon CDT UK's reasonable request, promptly provide to any third party, any necessary evidence of CDT UK's authority to act pursuant to this agreement.

7.8    Immediately after the Completion, CDT UK shall procure that Opsys UK repays the amount of $2,500,000 outstanding on the inter-company loan account between Opsys and Opsys UK in full and final discharge of all loans due from Opsys UK to Opsys on Completion.

20

Transaction Agreement, dated October 23, 2002

7.9     The rights and obligations of the parties under this clause 7 shall terminate with immediate effect if CDT suffers an Insolvency Event or on completion of the Opsys UK Option.

7.10    If CDT UK suffers an Insolvency Event, CDT shall procure that another member of the CDT Group shall manage Opsys UK in accordance with this clause 7. If a subsequent managing company of the CDT Group appointed pursuant to this sub-clause 7.10 suffers an Insolvency Event, CDT shall procure that another member of the CDT Group shall act as manager of Opsys UK under the same terms as set forth in this clause 7.

8.      **Opsys UK Shareholders Arrangements**

8.1     Notwithstanding the provisions of the Opsys UK Articles, from the Completion Date Opsys shall be entitled to nominate one director and CDT shall be entitled to nominate two directors to the board of Opsys UK. With effect from the Completion Date, Opsys shall procure that Opsys UK appoints two directors nominated by CDT to the board of Opsys UK and the one director nominated by Opsys and thereafter shall vote its shares from time to time to replace such directors or reappoint them or appoint such number of new directors nominated by CDT as CDT in its sole discretion shall direct from time to time.

8.2     Opsys shall not create or allow to come into being any security interest upon any part of the property or assets or uncalled capital of Opsys UK.

8.3     Each of Opsys and CDT shall exercise their powers in relation to Opsys UK to procure in so far as by the exercise of such powers it can procure and Opsys UK undertakes (if and to the extent permitted by law, for which purpose each paragraph below shall be a separate and severable undertaking by each company) to CDT that Opsys UK shall not (in relation to (a) – (g) below) without the prior written approval of CDT and, in relation to (b) - (c) below without the prior written approval also of Opsys:-

        (a)     other than as directed by CDT and other than the directors appointed pursuant to the articles of association of Opsys UK appoint any person as director or pay any fees or other remuneration to any director or to any person who provides to Opsys UK any such director;

        (b)     make any alteration to the memorandum and articles of association of Opsys UK (other than in respect of a change of name) or pass any resolution for winding-up;

        (c)     allot, issue, redeem or purchase any shares or securities or grant to any person any option or right to call for the issue of any shares or securities in Opsys UK or increase or reduce the authorized share capital or reorganize the share capital of Opsys UK in any way;

21

Transaction Agreement, dated October 23, 2002

(d)     make or declare any dividend or other distribution in respect of the issued share capital of Opsys UK;

(e)     create or acquire any unincorporated business or enter into partnership or joint venture with any other person;

(f)     subscribe for or otherwise acquire any interest (whether on its own behalf or as nominee) in the share capital or instruments convertible into the share capital of any other company or other body corporate or entity or make any other investment in the same; or

(g)     create or allow to come into being any security interest upon any part of its property or assets or uncalled capital or create or issue any credit or issue any debenture or debenture stock or obtain any advance or credit in any form other than normal trade credit.

8.4     Opsys shall not transfer, sell, assign, renounce or otherwise create or dispose of any interest (including a security interest) in or over any of its shares in Opsys UK except in accordance with the provisions of this agreement.

8.5     Each of CDT and Opsys shall exercise its powers in relation to Opsys UK to procure so far as by the exercise of such power they can so procure and Opsys UK undertakes to each of CDT and Opsys that (subject to any requirement of law) unless CDT and Opsys otherwise agree in writing insofar as Opsys UK has profits available for distribution, all dividends in respect of the issued share capital of Opsys UK shall be paid strictly in accordance with the articles of association of Opsys UK and this agreement.

8.6     The rights and obligations of the parties under this clause 8 shall terminate with immediate effect on completion of the Opsys UK Option.

8.7     Each of CDT and Opsys shall exercise its powers in relation to Opsys UK to procure so far as by the exercise of such power they can procure that on request by CDT they shall vote their shares in Opsys UK to change the name of Opsys UK to such name as CDT requests (subject to any requirement of law).

**9.      Opsys Limited Option.**

9.1     CDT hereby grants a put option (the "**Opsys Option**") to the Opsys Shareholders on the exercise of which CDT undertakes to Opsys (for the benefit of the Opsys Shareholders) to purchase the whole of the Opsys Shares.

9.2     The Opsys Option shall be exercised by Opsys (on behalf of the Opsys Shareholders), by giving notice (the "**Notice Date**") in writing to CDT at any time following the Completion Date. Once exercised by Opsys, the Opsys Option shall be irrevocable by Opsys or the Opsys Shareholders provided that the Opsys Option shall automatically lapse and have no further force or effect in the event that CDT suffers an Insolvency Event.

22

Transaction Agreement, dated October 23, 2002

9.3     The exercise of the Opsys Option shall be conditional on Completion.

9.4     CDT's obligation to purchase the Opsys Shares pursuant to sub-clause 9.1 shall be conditional on the matters listed in sub-clauses 9.15 and 9.17 and further conditional on either CDT (acting reasonably) being satisfied that; or the Expert Report (as defined below in sub-clause 9.7(C)) or Expert's Second Report (as defined below in sub-clause 9.11(B)) concluding that:

    A.     the issued share capital of Opsys UK comprises the only material asset of Opsys; and

    B.     no criminal liability has been identified which arises from the past actions or omissions of the directors or employees of Opsys and which results or may result in future directors or employees of Opsys incurring criminal liability; and

    C.     the aggregate liabilities (including the maximum contingent liability under any contingent liabilities and including for the avoidance of doubt the maximum contingent liability for past breaches of pensions law and regulations but excluding liabilities to CDT, CDT UK or Opsys UK arising under this agreement) of the Opsys Group (other than Opsys UK and its subsidiaries from time to time) do not exceed $1.25 million and such liabilities can be adequately covered by the Opsys Shareholders on the Opsys Share Completion Date by means of offering CDT compensation or warranty or indemnity cover to be satisfied at the discretion of the Opsys Shareholders in cash or by means of a reduction to the Option Exercise Price at a deemed value of $16.15 per CDT Share to the satisfaction of CDT acting reasonably.

9.5     If CDT (acting reasonably) is not satisfied that all of the conditions in sub-clause 9.4 have been met, CDT shall so notify Opsys in writing within twenty Business Days of the Notice Date.

9.6     On receipt of such notice Opsys shall have ten Business Days in which to give written notice to CDT that an independent review of the liabilities and assets of Opsys should be undertaken pursuant to and in accordance with sub-clauses 9.7 to 9.10. Failure to make such a request within this period shall cause the Opsys Option to lapse and have no further force or effect.

9.7     If Opsys requests such an independent review under sub-clause 9.6, as soon as reasonably practicable thereafter, Opsys and CDT undertake to jointly appoint the law firm Clifford Chance or another mutually acceptable independent international law firm (the "Expert") reasonably agreed between CDT and Opsys to:

    A.     review the Opsys Disclosure Letter and the documents referred to therein together with the Warranties in part 2 of Schedule 3 which are relevant to the disclosures;

23

Transaction Agreement, dated October 23, 2002

B.      make further enquiries of the Warrantors and any continuing directors of Opsys at that time concerning (i) the circumstances identified in the Opsys Disclosure Letter; (ii) any changes in such circumstances or any changes to Opsys or the business and affairs of Opsys since the Hive Down Date; (iii) the liabilities (including contingent liabilities) in the Opsys Group (other than in Opsys UK and its subsidiaries from time to time) since the Hive Down Date; and (iv) the assets in Opsys; and review the documentation referred to in responses to such enquiries; and

C.      produce a written report (the "**Expert Report**") identifying in reasonable detail the investigation it has carried out; the documents it has reviewed and the enquiries it made in the review. The Expert Report shall list the assets and liabilities identified as a result of the review and shall contain an assessment of the nature of each liability and the maximum financial costs related to each. The Expert Report shall also either confirm that the conditions in sub-clause 9.4 have been fulfilled or it shall identify the circumstances accounting for non fulfillment of such conditions. Except as set out in sub-clause 9.11 B., the Expert Report shall be final and binding on CDT, Opsys and the Opsys Shareholders (in the absence of manifest error). Any challenge to the Expert Report on the basis of manifest error shall be made within 20 Business Days of the date of publication of the Expert Report.

9.8     The Expert shall address and deliver the Expert Report to and allow it to be relied on by both CDT and Opsys (on behalf of the Opsys Shareholders).

9.9     The Expert shall have the right to request the assistance of an independent accounting firm reasonably acceptable to both CDT and Opsys in order to assist it in classifying and quantifying existing liabilities (current and contingent).

9.10    Both CDT and Opsys shall have the right to make at least one oral and written submission to the Expert.

9.11    If:

A.      (i) the Expert confirms that; or (ii) CDT confirms in writing that the conditions in sub-clause 9.4 are satisfied then CDT shall proceed with the acquisition of the Opsys Shares in accordance with this clause 9 provided that CDT shall reduce from the Option Exercise Price: such number of CDT Shares at a value of $16.15 per share as most nearly

24

nsaction Agreement, dated October 23, 2002

equals but does not exceed the value of the aggregate current liabilities (which for the avoidance of doubt shall not include contingent liabilities) so agreed by CDT and Opsys or identified by the Expert in the Expert Report, and shall withhold CDT Shares from the Option Exercise Price in accordance with sub-clause 9.12.

B.    the Expert Report states that the conditions referred to in sub-clause 9.4 have not been fulfilled or otherwise identifies circumstances accounting for the non fulfillment of such conditions Opsys may attempt to satisfy the conditions and demonstrate to CDT that they have been satisfied. Thereafter, if CDT (acting reasonably) is not satisfied that the conditions have been satisfied, CDT shall promptly provide Opsys with reasonable details of why it believes that the conditions in sub-clause 9.4 remain to be satisfied. Opsys shall have the right prior to the expiry of a period of six calendar months from the date of the Experts Report to request a second independent review, after which a second written report (the "**Expert's Second Report**") will be produced, in accordance with sub-clauses 9.6 to 9.13 inclusive (mutatis mutandis) provided that this sub-clause 9.11 B shall not apply to any such second review.

9.12    CDT shall withhold from the Option Exercise Price, until the earlier of the date on which any contingent liability shall crystalise or the expiry of the applicable statute of limitations, such number of CDT Shares as most nearly equals but does not exceed the amount of all contingent liabilities so identified by the Expert or agreed by Opsys and CDT at a value of $16.15 per CDT Share. If the contingent liability ceases to exist or fails to crystalize before the expiry of the relevant statute of limitations CDT shall stop withholding such CDT Shares from the Opsys Shareholders and shall issue them in accordance with sub-clause 9.15 mutatis mutandis. If the contingent liability crystalizes before the expiry of the relevant statute of limitations, CDT shall reduce the number of withheld shares payable on expiry of the statute of limitations by such number of CDT Shares at a value of $16.15 per share as most nearly equals but does not exceed the amount of such contingent liability. At any time, Opsys may at its discretion replace such withheld shares with cash at a replacement value of $16.15 per CDT Share. If CDT shall have withheld CDT Shares under this sub-clause 9.12 for a period of two years, CDT and the Warrantors shall meet and discuss a possible reasonable earlier release date for such CDT Shares. If the parties fail to reach a reasonable agreement on the appropriate release date they agree to seek mediation of such dispute.

9.13    Opsys agrees to pay the full costs of the Expert's reviews referred to in sub-clauses 9.7 and 9.11 (B), unless the Expert confirms in the relevant Expert report that the conditions in sub-clause 9.4 are satisfied in which case CDT will pay the costs of such review on which the relevant Expert report was based.

25

Transaction Agreement, dated October 23, 2002

9.14    Subject to sub-clauses 9.11, 9.12 and 9.16, the exercise price payable to the Opsys Shareholders on exercise of the Opsys Option shall be the price referred to in sub-clause 3.5 (Opsys UK Options) as adjusted therein provided that in this circumstance the payment of such price shall not be subject to sub-clause 3.6 (Opsys UK Options) nor shall Opsys be required to file an election as required in sub-clause 3.4.

9.15    Subject to sub-clause 9.16 and conditional on the matters listed in A and B below:

A.    Opsys shall deliver to CDT (i) stock transfer forms duly executed by the Opsys Shareholders relating to the whole of the Opsys Shares in the name of CDT (or as it may direct); (ii) the Opsys Share certificates relating to such shares; (iii) the Joinder Agreement and the Investor Rights Agreement in each case duly executed by the Opsys Shareholders; (iv) a duly executed power of attorney and acknowledgement that from the date of completion of the sale of the Opsys Shares to CDT pursuant to the Opsys Option (the "**Opsys Share Completion Date** ") until such time as the Opsys Shares have been registered in the register of members of Opsys in the name of CDT, the Opsys Shareholders will hold such shares registered in their names on trust for and as nominees for CDT and its nominees and shall exercise all voting rights available in respect of such shares in accordance with the directions of CDT or its nominees;

B.    Subject to sub-clause 17.9 if the Warrantors warrant, and in respect of (w) and (x) only, Opsys Shareholders also warrant in each case, on the Opsys Share Completion Date (w) that they have the full capacity and authority to sell the whole of the Opsys Shares and that all such shares are sold with full title guarantee, (x) in the terms of the side letter required for US security law purposes and containing the warranties set out in Schedule 11 (Opsys Shareholder warranties) in agreed form, (y) Opsys has fewer than fifty shareholders in total who together hold the whole of Opsys Shares, and (z) that the Expert Report (and the Expert's Second Report, as the case may be) materially is accurate and there are no other facts which having been omitted, make any statement or conclusion in the Expert Report (and the Expert's Second Report, as the case may be) misleading;

then subject to the terms of this clause 9, CDT shall deliver to Opsys, certificates representing the Option Exercise Price registered in the names of the Opsys Shareholders and procure that the parties other than the Opsys Shareholders enter into the Joinder Agreement and the Investor Rights Agreement..

9.16    If the Opsys Option is exercised and CDT acquires the Opsys Shares within twelve months of the Completion Date, CDT shall make the payment of the

26

Transaction Agreement, dated October 23, 2002

Option Exercise Price referred to in sub-clause 9.14 less such number of CDT Shares at a deemed value of $16.15 per share as most nearly equals but does not exceed the amount by which $5 million exceeds the amount of any warranty claims made by CDT hereunder which have resulted in a reduction in the Option Exercise Price in accordance with this agreement ("**Retained Shares**"). At the expiry of the twelve month period referred to above, CDT shall issue such number of Retained Shares to the Opsys Shareholders less that number of CDT Shares at a deemed value of $16.15 per share as most nearly equals but does not exceed the amount of any outstanding claim by CDT hereunder pending resolution of such claim, together with certificates representing such CDT Shares issued and registered in the names of the Opsys Shareholders. To the extent that such claim is not eventually substantiated in favor of CDT, CDT will issue CDT Shares at the value of $16.15 as most equals but does not exceed the unsubstantiated amount of such claim. At any time, Opsys may at its discretion replace the Retained Shares with cash at a replacement value of $16.15 per CDT Share.

9.17    CDT shall not be obliged to complete the purchase of the Opsys Shares unless the Opsys Shareholders complete the sale of all the Opsys Shares simultaneously. If CDT elects to purchase some of Opsys Shares, CDT shall purchase the remaining Opsys Shares, within two Business Days of such shares becoming available, provided the:

A.    Opsys Shareholders who have not sold their Opsys Shares to CDT make their shares available for sale within six months of CDT's initial purchase; and

B.    conditions set out in sub-clauses 9.2, 9.3, 9.4, 9.15 and 9.17 are satisfied.

9.18    If any of Opsys Shareholders are in breach of the undertakings contained in sub-clause 9.15 A(v), it irrevocably authorizes CDT to appoint a representative of CDT to execute all documents which CDT or its nominees may reasonably require and which may be necessary to enable CDT to attend and vote at general meetings of Opsys and to take any measures necessary to give effect to the rights contained in sub-clause 9.16.

9.19    For the avoidance of doubt, on the completion of a sale of Opsys Shares pursuant to this clause 9, the options in clause 3 (Opsys UK Options) shall lapse and have no further force and effect.

9.20    If the Expert's Second Report is unable to make the confirmation that the conditions in sub-clause 9.4 are satisfied, CDT shall not be required to purchase the Opsys Shares hereunder and the Opsys Option shall lapse and have no further force and effect.

9.21    For the avoidance of doubt, the Opsys Option shall be exercised only once.

27

Transaction Agreement, dated October 23, 2002

10.  **Dilution and Reorganisation**

10.1  At any time during the period commencing on the date of this agreement and terminating on the Business Day next following the date on which CDT has issued equity or recorded revenues from sale of licences, intellectual property rights bringing in new funds aggregating \$25 million since the Completion Date (excluding the \$5 million investment by Toppan referred to in paragraph 3 of Schedule 1 (Conditions to Completion)), if CDT issues new CDT Shares at a price lower than \$16.15, then:

    (a)  the number of CDT Shares comprising the Option Exercise Price in sub-clauses 3.5 and 3.6 (Opsys UK Options);

    (b)  the number of CDT Shares held in sub-clause 3.10 (Opsys UK Options); and

    (c)  the number of CDT Shares held in sub-clause 9.16 (Opsys Options)

shall be multiplied by a ratio equal to \$16.15 divided by the new share price.

10.2  The number of CDT Shares issued in satisfaction of the exercise price referred to in sub-clauses 3.5 and 3.6 (Opsys UK Options) and the deemed value of CDT Shares hereunder shall be adjusted by the parties hereto as appropriate and necessary to reflect any bonus issue, share split share combination or recapitalization, merger, consolidation exchange of shares, dissolution or liquidation of CDT which takes place after the Completion Date to the extent that such adjustment would have been reflected in this agreement in the event that such capital adjustment had taken place prior to the date hereof.

10.3  Any dispute or difference among the parties hereto as to the effect of any capital adjustment on this agreement including the number of CDT Shares to be paid on satisfaction of the exercise price, which is not settled within ten Business Days of notice from one party to the other, shall be referred for final settlement to an independent firm of accountants reasonably acceptable to the parties or if the parties fail to agree on an accountant, then to a firm of accountants chosen by the President from time to time of the Institute of Chartered Accountants (the "**Accountant**"). The Accountant shall be entitled to call for and inspect such documents as they may consider necessary. In making their determination, the Accountant shall act as experts and not arbitrators. Their determination (in the absence of manifest error appearing within 14 days of such determination being served on the parties) shall be final and binding on the parties and their fees shall be borne equally by the parties.

28

Transaction Agreement, dated October 23, 2002

---

11.    **Hive Down**

11.1    On the first Business Day immediately following the date of this agreement Opsys and Opsys UK will execute the Hive Down Documentation and complete the Hive Down Reorganisation.

12.    **NewCo and NewCo IP Licence**

12.1    Within six months of Completion, Opsys or such Opsys Shareholders or vehicle controlled by such Opsys Shareholders as nominated by Opsys ("**Opsys Vehicle**") shall incorporate a new limited liability company registered in England and Wales ("**NewCo**"), which shall have the NewCo Articles as its articles of association.

12.2    As soon as reasonably practicable after the incorporation of NewCo, CDT and Opsys or the Opsys Vehicle shall execute the NewCo Shareholders' Agreement in the agreed form such that CDT shall hold 40% of the issued share capital and Opsys or Opsys Vehicle shall hold 60% of the issued share capital of NewCo, and CDT shall procure that Opsys UK grant the NewCo IP Licence to NewCo.

13.    **Opsys IP Licence**

13.1    As soon as practicable after Completion, Opsys UK will grant the Opsys IP Licence to USCO 1 Corporation.

14.    **CDT UK IP Licences and Licence Agreements**

14.1    As soon as practicable after Completion CDT UK and USCO 1 Corporation shall enter into the CDT-USCO IP Licence Agreement and CDT UK and Opsys shall enter into the CDT-NewCo IP Licence Agreement.

14.2    On the date hereof Opsys shall grant to CDT UK the Opsys CDT Licence.

15.    **Board Observer**

15.1    Commencing on the date of this agreement, the board of directors of Opsys have the right to nominate an observer to attend all board meetings of CDT provided that such observer is approved as suitable by CDT, such approval not to be unreasonably withheld or delayed. After the exercise of the Opsys UK Option such right shall continue until Opsys ceases to hold an aggregate Shareholding in CDT of at least 4% of the whole of the issued share capital of CDT. CDT shall provide the observer with reasonable prior written notice of all meetings (both formal and informal) of the board of directors of CDT and such observer shall be entitled to all information, papers and accounts presented to such directors in their capacity as directors. The expenses incurred by the observer in attending the meetings shall be for the account of Opsys until the date on which the Opsys UK Option or the Opsys Option is exercised and completed after which time such expenses are payable by and for the account of CDT.

29

Transaction Agreement, dated October 23, 2002

15.2    If the Opsys Option is exercised, the shareholders of Opsys on the date of such exercise shall have the right to appoint an observer subject to the terms referred to in <u>sub-clause 15.1</u> above where such right shall continue for such time as such shareholders hold an aggregate shareholding in CDT of at least 4% of the whole of the issued share capital of CDT.

15.3    Where the Chairman of CDT, acting reasonably, considers that the observer has a direct commercial conflict relating to any matter to be discussed at meetings of the board of directors of CDT, or the information to which he is entitled under sub-clause 15.1, then on request by CDT (to be made one week in advance of such meeting or the date on which the observer would otherwise have been entitled to such information), the observer (at its discretion) shall either (a) absent itself from such meetings and part of such meetings and or forgo his entitlement to information as the case may be, or (b) appoint an alternative observer to the meeting, or to receive such information as the case may be, such observer to be approved as suitable by CDT, such approval not to be unreasonably withheld or delayed.

16.    **Warranties and Covenants**

16.1    The Warrantors severally warrant to CDT in the terms of the Warranties in <u>Part 1</u> of <u>Schedule 3</u> (Warranties) on the date hereof and on Completion, in terms of the Warranties in <u>Part 2</u> of <u>Schedule 3</u> on the date hereof only and in terms of the Warranties in <u>Part 3</u> of <u>Schedule 3</u>, on the Hive Down Date.

16.2    Opsys and Opsys UK shall procure or ensure (as the case may be) that other than in the ordinary and usual course of their businesses, no act shall be performed or omission allowed in such interval which would result in any of the Warranties being breached or misleading at any time up to and including the time of Completion other than as contemplated by this agreement.

16.3    The Warrantors accept that CDT is entering into this agreement in reliance upon each of the Warranties.

16.4    The Warrantors undertake to disclose in writing to CDT anything which is or is likely to constitute a breach of any of the Warranties within two Business Days of it coming to the notice of any of them both before, at the time of or after Completion.

16.5    Save in the event of fraud including fraudulent concealment, the Warrantors and Opsys undertake (if any claim is made against any of them in connection with the sale of either the Opsys UK Option Shares or the Opsys Shares as applicable to CDT) not to make any claim against Opsys UK or its subsidiaries from time to time or any director, employee or adviser of Opsys

30

Transaction Agreement, dated October 23, 2002

UK from time to time on whom any of them may have relied before agreeing to any terms of this agreement or authorising any statement in the Disclosure Letter.

16.6    Each of the Warranties shall be construed as a separate and independent warranty and (except where expressly provided to the contrary) shall not be limited or restricted by reference to or inference from the terms of any other Warranty or any other term of this agreement.

16.7    In the event that any of the Warranties is breached and such breach is incapable of remedy or, if capable of remedy, is not remedied by Opsys by the Completion Date or is untrue or misleading, Opsys and CDT agree that the sole remedy of CDT in such circumstances will be a reduction in the Option Exercise Price in an amount agreed between the Warrantors and CDT, or in default of such agreement, as determined by order of a court of competent jurisdiction which is equal to the amount by which the value of the Opsys UK Business is or becomes less than its value would have been if the Warranties had not been breached or would not have been untrue or misleading, subject always to the proviso that the maximum amount by which the Option Exercise Price will be reduced is $5,000,000.

16.8    The Option Exercise Price shall be increased by such number of CDT Shares at a value of $16.15 per share as most nearly equals but does not exceed an amount equal to the lesser of:

(A)    $1,000,000; and

(B)    the aggregate sum of any monies paid by Dupont to CDT or any member of the CDT Group pursuant to any agreement relating to the licensing of Opsys IP and entered into within twelve months of the date of this agreement.

16.9    Opsys undertakes to indemnify CDT against all costs (including legal costs on an indemnity basis as defined in rule 44.4(3) of the Civil Procedure Rules), expenses or other liabilities which CDT may reasonably incur in connection with the enforcement of any settlement of any claim that any of the Warranties have been breached or the enforcement of any judgment in favour of CDT in respect of such claim under this agreement.

16.10    Each of Opsys and CDT agrees to treat any payments in respect of indemnification hereunder or a successful claim for breach of Warranties as an adjustment to the Option Exercise Price for all purposes (including all Tax purposes).

16.11    The only Warranties given by the Warrantors in respect of or relating to Intellectual Property are contained in paragraph 25 of Parts 2 and 3 Schedule 3 (Warranties) and the only Warranties in respect of or relating to

31

Transaction Agreement, dated October 23, 2002

Environmental Matters are contained in paragraph 32 of Part 2 of Schedule 3 (Warranties) and no claim or proceedings which could be brought within such paragraphs shall be brought and no liability which arises under such paragraphs shall also arise under any other Warranty.

16.12   CDT warrants to Opsys in the terms of CDT's Warranties and CDT's Warranties shall be deemed to have been repeated immediately before Completion by reference to the facts and circumstances subsisting at that date on the basis that any reference in such Warranties, whether express or implied, to the date of this agreement is substituted by a reference to the Completion Date.

16.13   Subject always to sub-clause 16.16, any liability or obligation of any of Opsys or the Warrantors to make a payment to CDT under the terms of this agreement shall first be determined in the relevant currency and then be translated into U.S. dollars using the prevailing spot rate of exchange as stated in the Financial Times newspaper on the date of such payment.

16.14   Where a Warranty given by the Warrantors is qualified by the knowledge of the Warrantors, then each Warrantor undertakes in such circumstances that it has made such enquiry into the subject of the Warranty as is reasonable in the context of a sale of the Company and assets to which it relates including reasonable enquiry of Damoder Reddy and it shall not be a defence that the Warrantors did not appreciate the relevance of any particular matter.

16.15   Other than in respect of claims by CDT for breach of warranties given in sub-clause 9.15B (limitation of which shall be governed by sub-clause 17.9), CDT's sole remedy in respect to indemnity claims or claims for damages for breach of contract hereunder shall be a corresponding reduction in the Option Exercise Price by such number of CDT Shares as most nearly equals but does not exceed the value of such claim at a deemed value of $16.15 per share. For the avoidance of doubt CDT shall not be prohibited from seeking the remedy of specific performance for any breach of contract.

16.16   The Option Exercise Price shall be reduced by such number of CDT Shares at a value of $16.15 per share as most nearly equals but does not exceed an amount equal to three times the sum of: (i) the amount of money payable to the Universities of Oxford and St Andrews with respect to the provision of research services; (ii) the amount payable to the University of Oxford with respect to leases in Begbroke Business and Science Park premises (together (i) and (ii) comprise the "University Payables"); (iii) the net current liabilities of Opsys UK at the Hive Down Date.

16.17   No warranty is given in respect of the recitals and such recitals shall not constitute a representation, warranty or guarantee to the accuracy thereof.

32

Transaction Agreement, dated October 23, 2002

16.18   The Warrantors shall not be personally liable (in cash or otherwise) under this agreement or otherwise to CDT, Opsys or Opsys UK for breach of Warranties.

**17.   CDT's remedies and Opsys' and CDT's limitations on liability**

17.1    Subject to sub-clauses 17.2 and 17.4(a) and to the limitations set out in Schedule 4 (Limitations on liability), CDT shall be entitled to claim after Completion that any of the Warranties has been breached. In accordance with clause 25 (Effect of Completion), Completion shall not in any way constitute a waiver of any of CDT's rights.

17.2    CDT shall not be entitled to claim that any fact causes any of the Warranties to be breached if it has been fairly disclosed to CDT in the Disclosure Letter in the absence of any fraud or fraudulent concealment on the part of any of the Warrantors.

17.3    CDT shall not be entitled to bring a claim under this agreement nor shall the Option Exercise Price be reduced, if and to the extent that the limitations set out in Schedule 4 (Limitations on liability) apply, in the absence of any fraud or fraudulent concealment on the part of any of the Warrantors.

17.4    (a)    If, between the date of this agreement and Completion, CDT becomes aware (whether it does so by reason of any disclosure made under sub-clause 16.4 (Warranties and covenants) or otherwise) that there has been any material breach of the Warranties set out in paragraphs 1, 2 and 4 of Part 1 of Schedule 3, and paragraphs 9, 19, 20 and 26 of Part 3 of Schedule 3 (Warranties) except as fairly disclosed in the Disclosure Letter, CDT may terminate this agreement by notice in writing to Opsys.

        (b)    If this agreement is terminated in accordance with sub-clause 17.4(a) subject to sub-clause 17.6, all obligations of the parties under this agreement shall end except for those expressly stated to continue without limit in time but (for the avoidance of doubt) all rights and liabilities of the parties which have accrued before termination shall continue to exist.

17.5    If, following Completion, CDT becomes aware (whether it does so by reason of any disclosure made pursuant to sub-clause 16.4 (Warranties and covenants) or otherwise) that there has been any breach of the Warranties or any other term of this agreement CDT shall not be entitled to terminate this agreement but shall be entitled to a reduction in Option Exercise Price in accordance with sub-clause 16.16 (Warranties and covenants).

17.6    CDT and Opsys acknowledge that the restrictions contained in clause 31 (Announcements) and clause 32 (Confidentiality) shall continue to apply after the termination of this agreement without limit in time.

33

Transaction Agreement, dated October 23, 2002

17.7  CDT is entitled to terminate this agreement in the circumstances referred to in clause 4 (Conditions).

17.8  CDT and Opsys are entitled to terminate this agreement in the circumstances referred to in sub-clause 6.4 (Completion).

17.9  Save in the event of fraud or fraudulent concealment, all claims by CDT for breach of warranty given in sub-clause 9.15B shall be limited to an aggregate cap of the lesser of such number of CDT Shares at a deemed value of $16.15 per share as most nearly equals but does not exceed $5,000,000 or the number of the CDT Shares held by the Warrantors on the date of notification of claim and such claim shall be wholly barred and unenforceable unless written notice of such claim shall have been served by no later than 5.00 pm on the first anniversary of the Opsys Share Completion Date and any such claim shall be deemed to have been withdrawn (if it has not been previously satisfied, settled or withdrawn) on the expiry of a period of 18 months from the date of the Opsys Share Completion Date, unless proceedings in respect of it have commenced by being issued and served on the Warrantors.

17.10 Save in the event of fraud or fraudulent concealment by CDT, CDT shall be under no liability under CDT's Warranties or any indemnities given by CDT in this agreement and any of such claims shall be wholly barred and unenforceable unless and to the extent that written notice of such claims (specifying in reasonable detail the circumstances which give rise to the claim, the breach that results and the amount claimed) has been given to CDT before the expiration of a period ending three months after the issuance of the audited accounts of CDT for the current accounting period of CDT ending after Completion. CDT at its sole discretion shall have the right to satisfy any claims under this agreement, including but not limited to indemnification, loss, breach, costs, expenses payable by it to Opsys by cash payment or by increasing the Option Exercise Price by such whole number of shares in CDT as most nearly equal but do not exceed the value of such claims and for such purposes the CDT Shares shall be deemed to have a value of $16.15 (or such other value as is appropriate after operation of clause 10 (Dilution and Reorganisation). Save in the event of fraud or fraudulent concealment the aggregate liability of CDT and CDT UK under the CDT warranties and the indemnities and agreements herein shall be limited to and shall not exceed the amount of $5,000,000.

17.11 Opsys shall not be entitled to claim that any fact causes the CDT Warranties to be breached if it has been fairly disclosed to Opsys in the CDT Disclosure Letter.

34

Transaction Agreement, dated October 23, 2002

17.12 Save in the event of fraud or fraudulent concealment CDT shall be under no liability in respect of any claim under the CDT Warranties:

    (a)    where the liability of CDT in respect of that claim would (but for this paragraph) have been less than £5,000; or

    (b)    unless and until the liability in respect of that claim when aggregated with the liability of CDT in respect of all the claims shall exceed £200,000 in which case CDT shall be liable for the full amount of such claims and not merely the excess.

## 18.   Conduct of business before Completion

Except as part of the Hive Down Reorganisation referred to in sub-clause 11 (Hive Down) or as otherwise expressly provided in this agreement, Opsys will procure that, between the date of this agreement and Completion, Opsys will carry on business in the ordinary and usual course and not do anything which is not of a routine nature and shall not take any action (including but not limited to, any action related to personnel, capital expenditure and material contracts) that could reasonably be expected to be material to the business of Opsys UK after Completion without having in each case the consent in writing of CDT, such consent not to be unreasonably withheld. In particular, the matters listed in Schedule 5 (Conduct of business before Completion) shall require CDT consent.

## 19.   Covenants and Undertakings

19.1 Opsys shall use its reasonable endeavours to procure that all options or rights of the Acquired Employees over or to the issue or allotment of Opsys Shares, under share option arrangements unexercised as of the date of this agreement (the **"Relinquished Share Options"**) shall be surrendered or exercised by them in every case as soon as reasonably practicable following the Completion Date.

19.2 After Completion, CDT shall replace the Relinquished Share Options with option equivalents in relation to CDT Shares to the same value as their existing employee options in Opsys.

19.3 Opsys UK or CDT UK will indemnify Opsys against all losses, costs, damages, expenses (including legal expenses reasonably incurred), compensation and other liabilities (including redundancy payments, unfair dismissal or any claim within the jurisdiction of an employment tribunal, wrongful dismissal, breach of contract and any other claim arising at common law, sex, race or disability discrimination, equal pay and any claim in tort or otherwise, whether arising under UK or European law) suffered or incurred by Opsys relating to an Acquired Employee and arising from:

    (a)    any act, omission or failure by CDT to comply with its obligations under sub-clause 19.2; and

35

Transaction Agreement, dated October 23, 2002

---

    (b)    any variation to the terms and conditions of employment of the Acquired Employees (save in respect of any incremental pay increases and pay awards or as a result of any change in the law) including any failure to receive new share options on equivalent terms to those enjoyed by the Acquired Employees as at the date of this agreement.

19.4    Opsys undertakes to CDT that on the Completion Date it shall pay the sum of $2,500,000 (the **"Account Balance"**) to the client account of the Opsys Solicitors in the name of Opsys (the "**Opsys Account**") pending satisfaction of the following conditions, after which the balance of such sum remaining in credit in the Opsys Account may be dealt with by Opsys at Opsys' sole discretion:

    (i)    the use of the Account Balance to repay to Dupont the sum of $1.5 million in respect of the cancellation of the Dupont Agreement;

    (ii)    the use of the Account Balance to pay Ulvac Technologies Inc., $1,000,000 in relation to the novation of the purchase order number US10002, dated 27 March 2001.

19.5    Opsys covenants with CDT that Opsys will indemnify CDT (for itself and as Trustee for Opsys UK) in an amount equal to the value of any and all claims which may be made against Opsys UK by or in respect of any of the Excluded Individuals because of their resignation from office or of their employment being terminated or otherwise and an amount equal to all costs, charges and expenses incurred by Opsys UK which are incidental to any such claim. For the avoidance of doubt, any liabilities arising because of the resignation from office of any other employee of Opsys UK after Completion shall be for the account of CDT.

19.6    On the Completion Date, Opsys undertakes to deliver to CDT's Solicitors undated stock transfer forms relating to the Opsys UK Option Shares in the name of CDT duly executed as deeds by Opsys and delivered in escrow pending satisfaction of the escrow condition or termination of the escrow referred to in sub-clause 19.7.

19.7    The escrow condition referred to in sub-clause 19.6 shall be deemed satisfied immediately prior to an Insolvency Event in respect of Opsys, or on completion of the sale and purchase of the Opsys UK Shares pursuant to the Opsys UK Option whereupon the stock transfer forms shall be released from escrow to CDT, the Option Exercise Price inserted as the consideration therein and the form dated. The escrow shall terminate and CDT shall or shall instruct its Solicitors to return the stock transfer forms to Opsys on completion of the sale and purchase of the Opsys Shares pursuant to the Opsys Option or in the case of an Insolvency Event of CDT or if a receiver (including an administrative receiver), liquidator, trustee, administrator, custodian or similar official is appointed in any jurisdiction in respect of the whole or any material part of the business or assets of Opsys UK.

36

39

Transaction Agreement, dated October 23, 2002

19.8   If, after the date of this Agreement, Opsys is required to pay redundancy payments in accordance with the terms of their respective contracts of employment or otherwise in accordance with the Employment Rights Act 1996 to any of the Redundant Individuals, Opsys UK will promptly reimburse Opsys within 7 days of demand by Opsys UK for 50 per cent. of the said redundancy payments and in the event that Opsys UK is required to pay such redundancy payments, Opsys will promptly reimburse Opsys UK within 7 days of demand by Opsys UK for 50 per cent of the said redundancy payments.

20.   **Employment indemnities**

20.1   If the contract of employment of any Excluded Individual is found by a court or employment tribunal or alleged by such Excluded Individual to have effect after the Hive Down Date as if originally made with Opsys UK, Opsys agrees that:

(a)   in consultation with CDT it will within 14 days of being informed of such finding or allegation make an offer or procure that an offer is made by USCO, or any person controlled by Opsys Shareholders at the date hereof, to that Excluded Individual to employ him under a new contract of employment to take effect on the termination referred to below; and

(b)   any such offer of employment made will be on terms and conditions which do not differ in any material way from the terms and conditions of employment of that Excluded Individual immediately before the Hive Down Date.

20.2   Upon that offer being made (or at any time after the offer should have been made if no offer is made) CDT shall procure that Opsys UK will terminate the employment of the relevant Excluded Individual concerned and Opsys will indemnify CDT (for itself and as trustee for Opsys UK) against all liabilities, obligations, costs, claims and demands arising directly or indirectly out of the employment of such Excluded Individual from the Hive Down Date until the termination of such employment.

20.3   Opsys will indemnify CDT (for itself and as trustee for Opsys UK) against any cost, loss, damage, expense, order or award suffered or incurred by reason of any proceeding, claim or demand by any Excluded Individual (or where applicable the individual representative of any Excluded Individual):

(a)   in relation to the employment or termination of employment of any Excluded Individual arising from any act or omission of Opsys, USCO or the Opsys Shareholders at the date hereof; and

37

Transaction Agreement, dated October 23, 2002

(b) to the extent that it arises from any failure by Opsys to comply with its obligations under Regulation 10 of the Transfer of Undertakings (Protection of Employment) Regulations 1981 in respect of any Excluded Individual.

20.4 In the event that any of the Redundant Individuals are made redundant (as defined in section 139 of the Employment Rights Act 1996) or otherwise dismissed by Opsys (or any Associated Company) directly or indirectly as a result of the Hive Down Reorganisation or for an economic, technical or organizational reason, CDT and Opsys UK will jointly and severally indemnify Opsys for any loss, cost, damage or expenses suffered or incurred by Opsys (or any Associated Company) in terminating their employment, including for the avoidance of doubt, compensation for unfair dismissal paid to such Redundant Individuals (save only in respect of the redundancy costs borne by Opsys pursuant to sub-clause 19.8 of this Agreement).

20.5 Opsys UK shall offer consultancy agreements to each of the Acquired Consultants on financial terms which do not differ in any material way from the terms and conditions of consultancy of each such Acquired Consultant immediately before the Hive down Date. Opsys will indemnify CDT (for itself and as trustee for Opsys UK) for any pensions contributions payable by Opsys UK under such terms and conditions in excess of 5% of such consultants consultancy fee. In addition, Opsys will indemnify CDT (for itself and as trustee for Opsys UK) against any cost, loss, damage, expense, order or award suffered or incurred by reason of any proceeding claim or demand by any Acquired Consultant (or where applicable the individual representative of any Acquired Consultant):

(a) in relation to the failure by Opsys to comply with its obligations under Regulation 10 of the Transfer of Undertakings (Protection of Employment) Regulations 1981 in respect of any Acquired Consultant;

(b) under the Employment Rights Act 1996 or other applicable employee protection legislation payable on the termination of such Acquired Consultant's consultancy agreements.

20.6 Opsys will indemnify CDT (for itself and as trustee for Opsys UK) against any cost, loss, damage, expense, order or award suffered or incurred by Opsys UK by reason of any proceeding claim or demand by or in relation to Mr. Ben Brosh arising out of payments made to Mr. Brosh during his current sickness absence and ending one month after the Hive Down Date and resulting from the management by Opsys of such sickness absence and any breach of law or regulation arising therefrom.

38

41

Transaction Agreement, dated October 23, 2002

20.7    Opsys will indemnify CDT (for itself and as trustee for Opsys UK) against any cost, loss, damage, expense, order or award suffered or incurred by Opsys UK by reason of any proceeding claim or demand by or in relation to or arising out of, the failure of Zugang Liu and Hua Hong Shi to have approved and valid permits to work for Opsys UK in the United Kingdom.

20.8    CDT or Opsys UK shall indemnify Opsys in respect of 50% of all costs, losses, damages, expenses, orders and awards by reason of any proceedings, claims or demands related to the termination of the consultancy agreement with Mr Oleg Salata on or after December 31, 2002.

20.9    Opsys shall indemnify and keep CDT (for itself and as trustee for Opsys UK) indemnified against all costs, claims, losses, liabilities and expenses which Opsys UK may incur in relation to any Acquired Employee employed in the Opsys UK Business prior to the Hive Down Date:

    (a)    arising out of or in connection with any claim made by or on behalf of any Acquired Employee which relates to his employment by Opsys prior to the Hive Down Date;

    (b)    arising out of or in connection with a dismissal by Opsys of any Acquired Employee and which Opsys UK may incur pursuant to the TUPE Regulations;

    (c)    incurred by Opsys UK in connection with any Excluded Individual whose employment transfers to Opsys UK as a consequence of the TUPE Regulations including, for the avoidance of doubt, any liability incurred by Opsys UK in dismissing any Excluded Individual; and

    (d)    arising out of Opsys's failure to discharge its duty to consult with its Employees in accordance with Regulation 10 of the TUPE Regulations (save insofar as such failure arises from Opsys UK's failure to comply with Regulation 10(3) of the TUPE Regulations).

20.10   If the contract of employment of any Acquired Employee is found by a court or employment tribunal or alleged by such Acquired Employee to have effect after the Hive Down Date as if originally made with Opsys or any member of Opsys's Group, Opsys UK agrees that:

    (a)    in consultation with Opsys it will within 14 days of being informed of such finding or allegation ensure that an offer is made by Opsys UK to that Acquired Employee to employ him under a new contract of employment to take effect on the termination referred to below; and

    (b)    any such offer of employment made will be on terms and conditions which do not differ in any material way from the terms and conditions of employment of that Acquired Employee immediately before the Hive Down Date.

39

Transaction Agreement, dated October 23, 2002

20.11  Upon that offer being made (or at any time after the offer should have been made if no offer is made) Opsys shall terminate the employment of the relevant Acquired Employee concerned and Opsys UK will indemnify Opsys against all liabilities, obligations, costs, claims and demands arising directly or indirectly out of the employment of such Acquired Employee from the Hive Down Date until the termination of such employment.

20.12  Opsys UK shall indemnify Opsys against each and every cost claim liability expense or demand arising from:

    (a)    any claim or allegation by an Acquired Employee that in consequence of the sale of the Opsys UK Business to Opsys UK there has been or will be a substantial change in such Acquired Employee's working conditions to his detriment;

    (b)    any act or omission of Opsys UK in relation to an Acquired Employee occurring after the Hive Down Date and against any claim for redundancy payments or protective awards and any liability for wrongful dismissal or unfair dismissal or otherwise in connection with the transfer of the employment of the Acquired Employees to Opsys UK; and

    (c)    any failure by Opsys UK to provide retirement or death in service benefits for or in respect of any Acquired Employees of the same or equivalent level as such persons would have been entitled to under Opsys's scheme (if any) immediately before the Hive Down Date.

    (d)    Any act or failure of Opsys UK or any of its associated companies to comply with its obligations under Regulation 10 of the TUPE Regulations 1981 in respect of any Acquired Employee.

21.  **Restrictions on business activities**

21.1  Opsys undertakes to and for the benefit of Opsys UK and CDT only that it will not, either alone or in conjunction with or on behalf of any other person, do any of the following things:

    (a)    neither pending nor within two years after the Completion Date, be engaged or directly or indirectly interested in carrying on a business within the United Kingdom, North America, Europe, Asia, Australia and South East Asia which competes materially and directly with the business of Opsys UK as it is carried on at the date of Completion (but

40

Transaction Agreement, dated October 23, 2002

for the avoidance of doubt CDT acknowledges that carrying on the business of USCO in accordance with the US Business Plan will not breach this clause 21);

(b)    disclose to any other person or (in any way which may be detrimental to the business of Opsys UK as carried on at the Completion Date) use any information which is Confidential Business Information for so long as that information remains Confidential Business Information;

(c)    from expiry of a period of 12 months commencing on the Completion Date or if earlier on the date of any change of control of USCO as a result of which any person other than Opsys or the Opsys Shareholders or a company owned by the Opsys Shareholders or an existing Shareholder of Opsys would obtain control of USCO without limitation to the provisions of this clause, use or permit the use of the name Opsys or use any trade or business name or distinctive mark, style or logo used by or in the business of Opsys at any time before Completion or anything intended or likely to be confused with it except as permitted in the Opsys IP Licence;

(d)    neither pending nor within two years after Completion, solicit the custom or business, in relation to goods or services sold to any person by Opsys in the course of its business during the two years before the Completion Date, of that person in respect of similar goods or services;

(e)    neither pending nor within two years after Completion employ any Acquired Employee (other than employees who fulfil purely administrative functions or whose employment has been terminated by Opsys UK); nor

(f)    assist any other person to do any of the foregoing things.

21.2    USCO undertakes to and for the benefit of Opsys UK and CDT only that it will not, either alone or in conjunction with or on behalf of any other person, do any of the following things:

(a)    from the expiry of a period of 6 months commencing on the Completion Date USCO and any other operational entity which is a member of the same corporate group of USCO will not use the name Opsys or use any trade or business name or distinctive mark, style or logo used by or in the business of Opsys at any time before Completion or anything intended or likely to be confused with it;

(b)    neither pending nor within two years after Completion employ any Acquired Employee (other than employees who fulfil purely administrative functions or whose employment has been terminated by Opsys UK); nor

41

Transaction Agreement, dated October 23, 2002

      (c)      enter into partnership with, employ or attempt to employ or negotiate or arrange the employment or engagement by any other person, of any person who held a senior management, technical or sales position with Opsys during the period of 12 months prior to the Completion Date (a person is deemed to be "**senior**" for this purpose if his or her total remuneration equals or exceeds £30,000 per annum) other than with Excluded Individuals or the Redundant Individuals.

21.3    Each undertaking contained in this clause 21 shall be construed as a separate undertaking and to the extent that one or more of the undertakings is held to be against the public interest or unlawful or in any way an unreasonable restraint of trade or otherwise enforceable, the remaining undertakings shall continue to bind Opsys and USCO as applicable.

21.4    In consideration of CDT agreeing to enter into this agreement with Opsys, Michael Holmes and Alexis Zervoglos severally undertake to CDT that until the expiry of three years from the Completion Date none of them shall and in the case of sub-clause 21.4(c) only USCO shall not:

      (a)      carry on any business other than USCO that competes materially and directly with any business being carried on by Opsys UK on the date of Completion;

      (b)      interfere with, solicit or attempt to entice away from Opsys UK the business of any person with which Opsys was in substantive discussions or negotiations in the last twelve months prior to Completion; or

      (c)      enter into partnership with, employ or attempt to employ or negotiate or arrange the employment or engagement by any other person, of any person who held a senior management, technical or sales position with Opsys during the period of 12 months prior to the Completion Date (a person is deemed to be "**senior**" for this purpose if his or her total remuneration equals or exceeds £30,000 per annum) other than with Excluded Individuals or the Redundant Individuals.

21.5    The restrictions imposed on Michael Holmes and Alexis Zervoglos by sub-clause 21.4 extend to any actions on his own account and on behalf of any firm, company or other person and shall apply whether he acts directly or indirectly.

21.6    For the avoidance of doubt, the restrictions in sub-clauses 21.1(a) and 21.4(a) shall not prohibit the relevant person from holding shares in a listed company which confer not more than 5% of the votes which could normally be cast at a general meeting of that company.

42

Transaction Agreement, dated October 23, 2002

22. **Intellectual Property and Business Information**

Without prejudice to paragraph 26 (Intellectual Property) of Schedule 3 (Warranties), if CDT discovers after Completion that any of those persons which are Opsys Shareholders or if Opsys or USCO owns any Intellectual Property or Business Information which has prior to Completion been used exclusively by the Opsys UK Business, Opsys agree subject to the terms of the Opsys IP Licence to procure in relation to Opsys and otherwise to use all reasonable endeavours to procure at its own cost that such Intellectual Property and/or Business Information is transferred to CDT or a company nominated by CDT for nominal consideration. For the avoidance of doubt, Intellectual Property owned by Oxford or St Andrews will only be licensed to Opsys UK under the terms of the Framework Agreement or the Umbrella Licence.

23. **Transitional Services**

CDT, Opsys and USCO shall co-operate in good faith to provide arrangements for transitional services for a period of 6 months after Completion required for the operation of each party's business, such services to be provided at no charge other than reimbursement of out of pocket expenses.

24. **Access, Books and Records**

24.1    As from the date of this agreement until Completion, CDT and any persons authorised by it will be given reasonable access on reasonable written notice to the premises and the Books and Records relating exclusively to the Opsys UK Business and the directors and employees of Opsys and Opsys will be instructed to give within two Business Days all information and explanations to CDT or any such persons as they may reasonably request.

24.2    Opsys and USCO as applicable shall at Completion deliver to CDT originals of all the Books and Records relating exclusively to the Opsys UK Business.

24.3    For a period of six years after Completion Opsys or USCO as applicable shall maintain and provide copies to CDT of any Books and Records relating exclusively to the Opsys UK Business as at Completion.

24.4    If Opsys exercises the Opsys Option, Opsys shall provide CDT on request with copies of the agreements and arrangements between Opsys and USCO and relating to the sale of USCO 1 Corporation and USCO 2 Corporation.

25. **Effect of Completion**

Any provision of this agreement and any other documents referred to in it which is capable of being performed after but which has not been performed at or before Completion and all Warranties and covenants and other undertakings contained in or entered into pursuant to this agreement shall remain in full force and effect notwithstanding Completion.

43

Transaction Agreement, dated October 23, 2002

.26.   **Remedies and waivers**

26.1   No delay or omission by CDT in exercising any right, power or remedy provided by law or under this agreement or any other documents referred to in it shall:

(a)    affect that right, power or remedy; or

(b)    operate as a waiver thereof.

26.2   The single or partial exercise of any right, power or remedy provided by law or under this agreement shall not preclude any other or further exercise of it or the exercise of any other right, power or remedy.

27.    **Assignment**

27.1   CDT may at any time assign all or any part of the benefit of (but not the burden), or its rights or benefits under, this agreement and any agreements referred to in clause 29 (Entire agreement) (including the Warranties and the covenants and indemnities in sub-clauses 16.7, 16.10, together with any causes of action arising in connection with any of them) to another member of CDT's Group provided that such assignment shall not be absolute but shall be expressed to have effect only for so long as the assignee remains a member of CDT's Group and that immediately before ceasing to be such a member the assignee shall assign the benefit to a member of CDT's Group provided that in the event of any such assignment the liability of Opsys under this agreement shall be no greater than if such assignment had not taken place.

27.2   Other than in accordance with sub-clause 27.1, no person may assign, novate or otherwise transfer rights or obligations hereunder.

28.    **Further assurance**

28.1   Each of Opsys and as applicable USCO shall so far as it is able from time to time at its own cost, on being required to do so by CDT, now or at any time in the future, do or procure the doing of all such acts and/or execute or procure the execution of all documents in a form reasonably satisfactory to CDT which CDT may reasonably consider necessary for the purpose of transferring to CDT the full legal and beneficial ownership of the shares in Opsys UK or Opsys and the Opsys IP as contemplated hereby.

28.2   CDT shall, so far as it is able from time to time at its own cost, on being required to do so by Opsys, now or at any time in the future, do or procure the doing of all such acts and/or execute or procure the execution of all documents in a form reasonably satisfactory to Opsys which Opsys may reasonably consider necessary for the purpose of issuing to Opsys the full legal and beneficial ownership of the CDT Shares as contemplated hereby.

44

Transaction Agreement, dated October 23, 2002

28.3    Each of the parties shall, at its own cost, execute such documents and take such steps as the other party may reasonably require to fulfil the provisions of and give to each party the full benefit of this Agreement.

29.    **Entire agreement**

29.1    With the exception of the heads of terms entered into between Opsys and CDT on September 14, 2002 which shall terminate and cease to have effect on the Completion Date. This agreement, the Disclosure Letter referred to in sub-clause 17.2 (CDT remedies and Opsys and CDT's limitations on liability) and any other documents referred to in this agreement (the "**Transaction Documents**"), but excluding the recitals to this agreement which are not legally binding, constitute the whole and only agreement between the parties relating to the sale and purchase of the shares in Opsys UK and Opsys, the subscription for shares in Opsys UK, the management of Opsys UK and shareholders arrangements for the holding of shares in Opsys UK.

29.2    Except in the case of fraud, no party shall have any right of action against any other party to this agreement arising out of or in connection with any draft, agreement, undertaking, representation, warranty, promise, assurance or arrangement of any nature whatsoever, whether or not in writing, relating to the subject matter of the Transaction Documents made or given by any person at any time prior to the date of this agreement except to the extent that it is repeated in the Transaction Documents.

29.3    This agreement may only be varied in writing signed by each of the parties.

30.    **Notices**

30.1    A notice under this agreement shall only be effective if it is in writing.

30.2    Notices under this agreement shall be sent to a party at its address or number and for the attention of the individual set out below:

| Party and title of individual | Address | Facsimile no. |
| --- | --- | --- |
| In the case of Opsys, or the Warrantors to each of:- | | |
| Michael Holmes | 3 Capel Close Oxford OX2 7LA England | |
| Alexis Zervoglos | 40 Sloane Court West London SW3 4TB | 020 7730 9654 |

45

48

Transaction Agreement, dated October 23, 2002

---

In the case of CDT to:

CDT Acquisition Corp.        its registered office from time to time

> provided that a party may change its notice details on giving notice to the other party of the change in accordance with this clause.

30.3    Any notice given under this agreement shall, in the absence of earlier receipt, be deemed to have been duly given as follows:

    (a)    if delivered personally, on delivery;

    (b)    if sent by first class post, two clear Business Days after the date of posting; and

    (c)    if sent by facsimile, when despatched.

30.4    Any notice given under this agreement outside Working Hours in the place to which it is addressed shall be deemed not to have been given until the start of the next period of Working Hours in such place.

31.    **Announcements**

31.1    Except for a press announcement in the agreed form, no announcement concerning the sale of the shares of Opsys or Opsys UK or any ancillary matter shall be made by Opsys, CDT or the Warrantors without the prior written approval of CDT, Opsys and the Warrantors. This sub-clause does not apply in the circumstances described in sub-clause 31.2.

31.2    Either party may, after consultation with the other party, make an announcement concerning the sale of the shares in Opsys or Opsys UK as contemplated by this agreement, or any ancillary matter, if required by:

    (a)    law; or

    (b)    any securities exchange or regulatory or governmental body to which that party is subject, wherever situated, whether or not the requirement has the force of law.

31.3    The restrictions contained in this clause shall apply without limit in time.

46

Transaction Agreement, dated October 23, 2002

---

32. **Confidentiality**

32.1  Each party shall treat as confidential all information obtained as a result of entering into or performing this agreement which relates to:

    (a)  the provisions of this agreement;

    (b)  the negotiations relating to this agreement; or

    (c)  the other parties.

32.2  Notwithstanding the other provisions of this clause, any party may disclose confidential information:

    (a)  if and to the extent required by law;

    (b)  if and to the extent required by any securities exchange or regulatory or governmental body to which that party is subject wherever situated, whether or not the requirement for information has the force of law;

    (c)  if and to the extent required to vest the full benefit of this agreement in that party;

    (d)  to its professional advisers, auditors and bankers;

    (e)  if and to the extent the information has come into the public domain through no fault of that party; or

    (f)  if and to the extent the other parties have given prior written consent to the disclosure.

Any information to be disclosed pursuant to sub-clauses (a), (b) or (c) shall be disclosed only after consultation with the other parties.

32.3  The restrictions contained in this clause shall apply without limit in time.

33. **Costs and expenses**

Except as otherwise stated in any other provision of this agreement, each party shall pay its own costs and expenses in relation to the arrangements contemplated herein. For the avoidance of doubt, all costs and expenses incurred by Opsys relating directly or indirectly to the arrangements contemplated by this agreement up to and including Completion shall be borne by Opsys.

47

Transaction Agreement, dated October 23, 2002

### 34.    Counterparts

34.1    This agreement may be executed in any number of counterparts, and by the parties on separate counterparts, but shall not be effective until each party has executed at least one counterpart.

34.2    Each counterpart shall constitute an original of this agreement, but all the counterparts shall together constitute but one and the same instrument.

### 35.    Contracts (Rights of Third Parties) Act 1999

35.1    Any person (other than the parties to this agreement) who is given rights or benefits under clause 9 (Opsys Limited Option) of this agreement and any Acquired Employee shall be entitled to enforce those rights or benefits against the parties in accordance with the Contracts (Rights of Third Parties) Act 1999. Save as provided in clause 9 (Opsys Limited Option) the parties to this agreement do not intend that any term of this agreement should be enforceable, by virtue of the Contracts (Rights of Third Parties) Act 1999, by any person who is not a party to this agreement.

35.2    The parties may amend, vary or terminate this agreement in such a way as may affect any rights or benefits of any third party which are directly enforceable against the parties under the Contracts (Rights of Third Parties) Act 1999 without the consent of such third party.

### 36.    Choice of governing law

This agreement is to be governed by and construed in accordance with English law.

### 37.    Jurisdiction

The courts of England are to have exclusive jurisdiction to settle any dispute arising out of or in connection with this agreement. Any Proceedings may therefore be brought in the English courts. This jurisdiction agreement is irrevocable.

48

Transaction Agreement, dated October 23, 2002

| | | |
|---|---|---|
| Executed as a deed by<br>**CDT ACQUISITION CORP.**<br>acting by | ) /s/ David Fyfe<br>)<br>)<br>) /s/ Eric Lucas | Authorised Signatory<br><br><br>Authorised Signatory |
| Executed as a deed by<br>**CAMBRIDGE DISPLAY<br>TECHNOLOGY LIMITED**<br>acting by | ) /s/ David Fyfe<br>)<br>)<br>) /s/ Eric Lucas | Director<br><br><br>Director/Secretary |
| Executed as a deed by<br>**OPSYS LIMITED**<br>acting by | ) /s/ Michael Holmes<br>)<br>)<br>) /s/ Alexis Zervoglos | Director<br><br><br>Director/Secretary |
| Executed as a deed by<br>**OPSYS UK LIMITED**<br>acting by | ) /s/ Michael Holmes<br>)<br>)<br>) /s/ Alexis Zervoglos | Director<br><br><br>Director/Secretary |
| Executed as a deed by<br>**ALEXIS ZERVOGLOS**<br>in the presence of | ) /s/ Alexis Zervoglos<br>)<br>) | |
| Witness's signature | /s/ Jeremy Osler | |
| Name (print) | /s/ Jeremy Osler | |
| Address | Ashursts<br>5 Appold Street | |
| Occupation | Solicitor | |

113

Transaction Agreement, dated October 23, 2002

| | | | |
|---|---|---|---|
| Executed as a deed by<br>**MICHAEL HOLMES**<br>in the presence of | ) ) ) | /s/ Michael Holmes | |
| Witness's signature | | /s/ Jeremy Osler | |
| Name (print) | | /s/ Jeremy Osler | |
| Address | | Ashursts<br>5 Appold Street | |
| Occupation | | Solicitor | |
| Executed as a deed in acceptance of<br>binding obligations under clauses<br>21, 23, 24 and 28 only by<br>**OPSYS US CORPORATION**<br>acting by | ) ) ) ) ) ) | /s/ Michael Holmes<br><br>/s/ Alexis Zervoglos | Authorised Signatory<br><br>Authorised Signatory |
| Executed as a deed in acceptance of<br>binding obligations under clauses<br>21, 23, 24 and 28 only by<br>**OPSYS 2 CORPORATION**<br>acting by | ) ) ) ) ) ) | /s/ Michael Holmes<br><br>/s/ Alexis Zervoglos | Authorised Signatory<br><br>Authorised Signatory |

114