# EXHIBIT E TO THE AFFIRMATION

Case 1:07-cv-08825-LLS     Document 1-10     Filed 10/12/2007     Page 1 of 19

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SUNNYSIDE DEVELOPMENT COMPANY, LLC,

    Plaintiff,

v.

OPSYS LIMITED,

    Defendants,

No. C 05 0553 MHP

**MEMORANDUM & ORDER**
Re: Plaintiff's Motion to Add
Cambridge Display Technology, Inc.
as a Party to Action and Judgment

Plaintiff Sunnyside Development Company, LLC ("plaintiff" or "Sunnyside") filed this breach of contract action against defendant Opsys Limited ("defendant" or "Opsys Ltd.") in the California Superior Court for the County of Alameda on December 14, 2004. Defendant removed the action to this court on February 7, 2005. The matter proceeded to jury trial on February 21, 2007. On March 9, 2007 the jury returned a verdict in favor of plaintiff. Plaintiff now moves pursuant to Federal Rules of Civil Procedure 25(c) and 69(a) to add Cambridge Display Technology, Inc. ("CDT, Inc.") as a party to the action and judgment. Having considered the parties' arguments and submissions, and for the reasons stated below, the court enters the following memorandum and order.

BACKGROUND

The factual background of this action is set forth in this court's order on defendant's motion for summary judgment. Sunnyside Dev. Co. v. Opsys Ltd., No. C 05 0553 MHP, 2007 WL 419865

(N.D. Cal. Feb. 6, 2007) (Patel, J.). The court addresses the relevant procural and factual background below.

I.   CDT, Inc.'s History in this Action[1]

Plaintiff filed this action on December 14, 2004, in Alameda Superior Court, naming as defendants Opsys Limited and CDT Limited, a subsidiary of CDT, Inc. Both defendants in that action jointly removed the suit to this court on February 5, 2007. The complaint alleged breach of contract and fraud in the inducement against both defendants. Defendants subsequently moved to dismiss the complaint. By order dated April 22, 2005, this court granted the motion in part and denied the motion in part, granting plaintiff "leave to and its complaint for the purpose of alleging facts sufficient to establish a fraud claim as to both defendants and establishing CDT's liability for breach of contract." Docket Entry 20. at 6.

Plaintiff filed its First Amended Complaint on May 11, 2005, again naming Opsys Limited and CDT Limited as defendants and asserting claims for fraud and breach of contract. Docket Entry 21. Defendants subsequently moved for partial dismissal. By order dated August 8, 2005 this court granted the motion, holding that plaintiff's claims for breach of contract against defendant CDT and its claims for fraud against both defendants were dismissed with prejudice. Docket Entry 39 at 10.

On November 2, 2005 plaintiff filed a Motion for Leave to File a Second Amended Complaint and/or to Join a Related Party as Successor-in-Interest. Docket Entry 48. The motion sought to add CDT, Inc. as a successor-in-interest to Opsys Limited pursuant to Federal Rule of Civil Procedure 25(c). Id. at 1. In ruling on plaintiff's motion the court declined to engage in the merits of plaintiff's Rule 25(c) motion on the grounds that joinder of CDT, Inc. at that time was premature. Docket Entry 57 at 7. Accordingly, the court denied plaintiff's motion for leave to add CDT, Inc. as party without prejudice, "subject to renewal if and when the primary liability of Opsys Limited is established." Id. The court granted plaintiff's motion for leave to file a second amended complaint. Id.

2

1    Plaintiff now renews its Rule 25(c) motion, and additionally seeks to add CDT, Inc. as a
2 party pursuant to Rule 69(a). Opsys Limited and CDT, Inc. have each filed separate oppositions to
3 plaintiff's motion.

5  II.   Factual Background[2]

6    Plaintiff asserts that CDT, Inc. has succeeded to the assets and business of defendant, and
7 that CDT, Inc. litigated this case on defendant's behalf. Plaintiff's contention is based on an
8 elaborate series of transactions in 2002 in 2004 involving CDT, Inc., Opsys Limited, and
9 subsidiaries of both companies. While the parties dispute the legal significance of these
10 transactions, the basic facts are largely undisputed.

11    Opsys Limited had two business lines in 2002: research into dendrimer materials, based in
12 the UK, and pilot manufacturing of displays based on small molecule emitters based in Fremont,
13 California. The lease and property at issue in this litigation involved Opsys Limited's pilot
14 manufacturing operations only. Opsys Limited was in serious financial trouble in 2002, having £17
15 million in liabilities. Bunzel Dec., Exh. M at 17–18. Opsys searched for financing and discovered
16 that potential investors were interested only in one business line or the other. No investor would
17 invest in both operations. Accordingly, Opsys Limited decided to split its operations and fund each
18 one separately. As part of the process of "spinning off" Opsys Limited's California operations,
19 defendant entered into the Assignment at issue in this case.

20    By late 2002, CDT, Inc. had been identified as a potential financing partner. According to
21 defendant and CDT, Inc., however, CDT, Inc. was not interested in Opsys Limited's California
22 operations, and would not engage in any transaction involving that business, its associated liabilities,
23 or its obligations under the lease. Fyfe Dec. ¶ 7. As a general matter, CDT, Inc. is a research and
24 design company and had no interest in manufacturing operations. Id. CDT, Inc. made it clear to
25 Opsys that it had no interest in the California assets and business, and that any deal would require a
26 clean separation of the US operations from the UK operations. Id. ¶ 8. Opsys agreed to this
27 arrangement.

3

1    On October 23, 2002 Opsys Limited struck a deal to sell interests in its intellectual property
2 related to dendrimer OLED technology and its UK operations to CDT, Inc., which at that time was
3 called CDT Acquisition Corp. Bunzel Dec., Exhs. A & B. As part of this transaction, Opsys
4 Limited transferred all of its UK assets and operations into a subsidiary known as Opsys UK.
5 Bunzel Dec., Exh. A at 5 of 116, clause (F). CDT, Inc. paid Opsys Limited $2.5 million in exchange
6 for 16% of the shares of Opsys UK. Ainslie Dec., Exh. B at 80 of 99. As part of this deal, CDT
7 Limited, a subsidiary of CDT, Inc., was granted management control of Opsys UK and 98% of
8 Opsys UK's profits, if any. Bunzel Dec. Exh. A at 22 of 116 clause 7. Opsys Limited received an
9 additional $2 million from CDT Limited for a license of its technology. Id. at 21 of 116 clause
10 5.1(iii) & 32 of 116 clause 14.2.

11   The 2002 transaction additionally included put and call options. Id. at 16–20 of 116 clause 3
12 & 25–30 of 116 clause 9. The transaction gave CDT, Inc. a call option to purchase the remaining
13 84% of shares in Opsys UK, which were at that time owned by Opsys Limited. The agreement also
14 contained two put option provisions which gave Opsys Limited's shareholders the right to require
15 CDT, Inc. to purchase all shares of Opsys Limited if certain conditions were met. Among the
16 conditions were that Opsys Limited's liabilities could not exceed $1.25 million, that Opsys
17 Limited's share ownership in Opsys UK was its only material asset, that the option exercise price
18 would be reduced by the value of the aggregate current liabilities, and that CDT, Inc. would
19 withhold from the exercise price the amount of all contingent liabilities until the liabilities
20 materialized or until the statute of limitations expired. Id. at 26 of 116 clause 9.4, 27 of 116 clause
21 9.11(a), 28 of 116 clause 9.12; Bunzel Dec., Exh. E at 81 of 99. Opsys Limited received an
22 additional $500,000 for the call option. Id. at 16 of 116 § 3.1. Opsys Limited therefore received a
23 total of $5 million in cash through the October 2002 transaction, and the value of the options
24 exceeded the vale of the assets transferred to Opsys UK as set forth in Opsys Limited's September
25 2002 Report and Financial Statements. Bunzel Dec., Exh. M.

26   Finally, the 2002 transactions involved a number of warranties by Opsys. Namely, that
27 Opsys was not a party to any contract that could not readily be performed by it on time; that it was
28

4

1  not a party to, nor did it have any liability under, any lease; that it was not a party to any contract
2  valued at more than £10,000 or of one year or greater duration; and that it was not under any
3  obligation in respect of unaccrued or undisclosed liabilities in connection with its US operations.
4  Bunzel Dec. ¶ 3, Exh. A at 59–60. A disclosure letter dated October 23, 2002 by Opsys Limited
5  explicitly states that the lease had been assigned to Opsys US. Black Dec., Exh. A. CDT, Inc.
6  asserts that this elaborate transaction structure was designed to minimize tax liability rather than
7  disadvantage plaintiff. Black Dec. ¶¶ 7–13.

8      The 2002 transaction did not involve any assets, including intellectual property, related to
9  Opsys Limited's US operations. Rather, Opsys Limited transferred all of its US assets to a separate
10 subsidiary, Opsys US, and sought financing for that company as well. Opsys Limited was
11 apparently unable to secure financing for Opsys US. As part of this transaction, Opsys Limited
12 attempted to assign the Lease at issue in this litigation to Opsys US, an assignment which the jury in
13 this action subsequently found to have been ineffective.

14     In late 2002, Opsys UK was renamed CDT Oxford Limited. Bunzel Dec., Exh. C at 68 of
15 149; Fyfe Dec. ¶ 9. CDT Oxford Limited remained in operation, being managed by CDT Limited,
16 until mid-2003. Beginning in July 2003, the CDT Oxford Limited facility in Oxford was gradually
17 shut down, and most of its employees were laid off. Id. ¶ 10. Via press release, CDT, Inc.
18 announced that it would close the CDT Oxford Limited facility and "move key scientists to
19 Cambridge as part of a new 'High Efficiency Materials' research group," consolidating the Oxford
20 and Cambridge resources "under one roof." Bunzel Dec., Exh. F. CDT, Inc. asserts that this new
21 materials research group was a fundamental transformation of the pre-existing operations. Fyfe Dec.
22 ¶¶ 9–10. Additionally, CDT, Inc. maintains that Opsys Limited and Opsys UK were separate legal
23 entities that at all times observed the proper corporate formalities. Black Dec. ¶¶ 14–18.

24     Subsequent to the October 2002 transaction, disputes arose between Opsys and CDT, Inc.
25 regarding the transaction and, at one point, Opsys Limited considered legal action against CDT, Inc..
26 Black Dec. ¶¶ 19–22. The companies resolved their dispute via a settlement agreement entered into
27
28

5

1  on August 3, 2004, which was amended via a second agreement dated December 14, 2004
2  (coincidentally, the date this action was filed in Alameda Superior Court).
3        In the meantime, CDT, Inc. filed a prospectus with the SEC to issue public shares. The
4  prospectus identified CDT, Inc.'s acquisition of the 16% interest in CDT Oxford Limited and the
5  right to control its operations as a key element of its research and development value, and stated that
6  up to $1.2 million of the IPO funds would be used to pay Opsys Limited's liabilities. Bunzel Dec.
7  Exh. C at 29 of 149, 40 of 149, 58 of 149, 68 of 149. As part of the settlement agreement between
8  CDT, Inc. and Opsys Limited, CDT, Inc. exercised its options and acquired 100% of the stock of
9  Opsys Limited in exchange for shares of newly public CDT, Inc. stock valued at $9.8 million.
10  Ainslie Dec., Exh. B at 82 of 99. CDT, Inc. valued the acquisition of CDT Oxford Limited at $26.9
11  million. Id. at 80 of 99; Black Dec. ¶ 25. Black Dec. ¶¶ 21–22, Bunzel Dec. ¶ 6; Exh. D at 4–5. As
12  part of this transaction, it was agreed that a portion of the CDT, Inc. stock offered in exchange for
13  the Opsys Limited stock would indemnify CDT, Inc. for undisclosed or contingent liabilities.
14  Bunzel Dec., Exh. D at 43 of 58 § 4(e). CDT, Inc. asserts that exercising this option was, again, a
15  matter of tax benefits. Black Dec. ¶ 25.
16        As part of the 2004 transaction, 133,938 shares of CDT, Inc. stock valued at a total of
17  $1,607,256 were held back to cover known and identified liabilities. Bunzel Dec., Exh. D at 6
18  (clause 1.1(g)); Black Dec. ¶ 27. The list of identified liabilities did not include the lease. Bunzel
19  Dec., Exh. D at 20–21. Additionally, 422,610 shares of CDT, Inc. stock, valued at $5,071,320 went
20  into escrow as security for contingent and unidentified liabilities. Black Dec. ¶ 28, Exh. D at 9–10
21  clause 1.1(h). The remaining CDT, Inc. shares constituting the payment for the put option were
22  distributed to Opsys management to be distributed between management and shareholders. Black
23  Dec. ¶ 29, Exh. B. CDT, Inc. claims that no shares have yet been distributed to shareholders, and
24  will not be until other creditors are paid off.
25        During the same month as CDT, Inc.'s IPO, plaintiff filed this action. Since that time, Opsys
26  Limited and CDT Oxford Limited have applied for, and obtained, substantial patents related to CDT,
27  Inc.'s research and development business. Bunzel Dec. ¶ 20; Exh. O. These patents are assigned to
28

CDT Oxford Limited or CDT Oxford Limited and CDT, Inc. Id. Plaintiff asserts that CDT, Inc. directed this litigation and advanced the funds to defend itself, and that its representatives "presided over the trial," citing evidence that attorneys and other representatives from CDT, Inc. were present at certain proceedings in the instant action. Bunzel Dec. ¶ 19, Exh. N, ¶¶ 12–13, Exhs. H & I.

In May 2005, while this action was pending, CDT, Inc. transferred its 16% interest in CDT Oxford Limited and its 100% interest in Opsys Limited to CDT Limited. Additionally, Opsys Limited transferred its 84% interest in CDT Oxford Limited to CDT Limited. Accordingly, CDT Oxford Limited and Opsys are now wholly owned subsidiaries of CDT Limited and indirect subsidiaries of CDT, Inc. Black Dec. ¶¶ 33–38. CDT, Inc. claims that these transfers were planned in late 2004, prior to the initiation of this lawsuit. Black Dec. ¶¶ 24–25. At the time of these transfers, CDT Limited, rather than CDT, Inc., was a defendant in this action.

Subsequent to the return of the jury verdict in this action in favor of plaintiff, CDT, Inc. issued a press release stating that Opsys Limited does "not have any assets, nor does it have any intellectual property rights which are relevant to CDT's business," and that CDT, Inc. did not intend to assist Opsys Limited in funding the litigation. Bunzel Dec., Exh. J. The present market capitalization value of CDT, Inc. is over $100 million.

LEGAL STANDARD

Federal Rule of Civil Procedure 25(c) provides, in relevant part: "In case of any transfer of interest, the action may be continued by or against the original party, unless the court upon motion directs the person to whom the interest is transferred to be substituted in the action or joined with the original party." Rule 25(c) is purely procedural and does not confer any substantive rights. Hilbrands v. Far East Trading Co., Inc., 509 F.2d 1321, 1323 (9th Cir. 1975). Accordingly, the issue of successor liability in the context of corporate mergers and acquisitions is a matter of state law. LiButti v. United States, 178 F.3d 114, 124 (2d Cir. 1999).

7

DISCUSSION

I.  Applicability of Rule 25(c)

As a preliminary matter, defendant asserts that Rule 25(c) does not apply at all in these circumstances, as cases have held that Rule 25(c) applies only after a transfer of interest with respect to the subject matter of the suit. Ignoring the rule that the substantive law of successor liability pursuant to Rule 25(c) is the law of the forum state, defendants cite a number of federal authorities from other circuits in support of this position. Oddly enough, the authorities cited by defendant generally stand for the proposition that successor liability is appropriate where the subject matter of the action has been transferred *or* the purported successor has acquired all of the defendant's assets and liabilities. Because plaintiff posits the latter theory, these authorities do not support a categorical bar on successor liability due to the fact that the lease interest was not specifically transferred from Opsys Limited to CDT, Inc.. As discussed below, California state law provides for several circumstances in which successor liability may attach following a general asset transfer.

Additionally, plaintiffs rely on an unpublished decision from this district in support of their claim that Rule 25(c) does not apply to stock transfers between shareholders and parent corporations. Equal Employment Opportunity Comm'n v. Pan Am. World Airways, Inc., No. C-81-3636 RFP, 1987 U.S. Dist. LEXIS 15182 (N.D. Cal. Dec. 1, 1987) (Peckham, C.J.). That case held only that successor liability was not available under those particular facts. Plaintiffs cite no further support for their proposed categorical bar on successor liability under Rule 25(c) for parent company acquisitions. As discussed below, however, acquisitions which involve only stock purchases rather than asset purchasers cannot give rise to successor liability, regardless of whether the purchaser is a parent of the seller.

II.  Successor Liability

Plaintiff cites Rule 25(c) and Rule 69(a) as bases for the imposition of successor liability. Because plaintiff appears to consolidate these two rules into a single inquiry, the court will do the same.[3]

8

The parties appear to be in agreement that California substantive law governs the issue of successor liability for the purposes of this motion.[4] California law generally provides that, with a few exceptions, successor liability does not attach in the context of an asset purchase:

> "As typically formulated the rule states that the purchaser [of corporate assets] does not assume the seller's liabilities unless (1) there is an express or implied agreement of assumption, (2) the transaction amounts to a consolidation or merger of the two corporations, (3) the purchasing corporation is a mere continuation of the seller, or (4) the transfer of assets to the purchaser is for the fraudulent purpose of escaping liability for the seller's debts."

Beatrice Co. v. State Bd. of Equalization, 6 Cal. 4th 767, 778 (1993) (quoting Ray v. Alad Corp., 19 Cal. 3d 22, 28 (1977)). "Eliminating the exceptions requires disproving at least one element of each exception or showing that at least one such element cannot be established." Fisher v. Allis-Chalmers Corp. Prod. Liab. Trust, 95 Cal. App. 4th 1182, 1188 (2002). This is obviously a highly factual inquiry that does not lend itself well to determination without a trial or, at the very least, an evidentiary hearing. Id. (stating that the successor liability exceptions are "extremely fact sensitive") (internal quotations omitted); Luxliner P.L. Exp., Co. v. RDI/Luxliner, Inc., 13 F.3d 69, 72–73 (3d Cir. 1993) (holding that where a Rule 25(c) decision "effectively imposes liability," the court should conduct an evidentiary hearing unless the standards for summary judgment have been met).

Before turning to the exceptions, however, it is worth noting that successor liability under California law requires the purchase of *assets*, not merely the purchase of stock. Potlatch Corp. v. Superior Court, 154 Cal. App. 3d 1144, 1150–51 (1984). In establishing this rule, the California Court of Appeal made it clear that this is not simply a matter of form over substance. As the court explained:

> [T]he fact that Potlatch did not acquire the physical assets of Speedspace and its Summer Bell division and continue the business of Summer Bell as a part of its own business but, instead, acquired the capital stock of Speedspace is no mere matter of form. It implicates fundamental concepts and principles of California and United States law: corporate identity and shareholder immunity.

9

1  Id. at 1150. The court further explained that when a corporation acquires only capital stock rather
2  than assets, it becomes a "sole shareholder" of the acquired company, and that "[i]t is fundamental
3  that a shareholder owns no part of the specific property of the corporation." Id.
4      Here, the record discloses a single relevant transfer of business assets: the transfer of Opsys
5  Limited's UK assets and operations to Opsys UK, which later became CDT Oxford Limited. CDT,
6  Inc. never acquired these assets, but rather purchased management rights, licenses, and an interest in
7  the profits. Even if this latter transaction may be considered an asset transfer, which is highly
8  dubious, the "assets" were transferred to CDT Limited, not CDT, Inc. Transfer to an "intervening
9  corporation" is not sufficient for successor liability to attach under California law. Katzir's Floor &
10 Home Design, Inc. v. M-MLS.com, 394 F.3d 1143, 1151 (9th Cir. 2004). Furthermore, "[t]he mere
11 fact of sole ownership and control does not eviscerate the separate corporate identity that is the
12 foundation of corporate law." Id. at 1149. Plaintiff makes no attempt to pierce the corporate veil
13 between CDT Limited and CDT, Inc. Accordingly, plaintiff's attempt to impose successor liability
14 upon CDT, Inc. fails.
15     Assuming, however, that the transactions may be characterized as an asset transfer from
16 Opsys Limited to CDT, Inc., the court will consider whether any or the above exceptions applies.
17
18     A.    <u>Express or Implied Assumption</u>
19     Plaintiff claims that, notwithstanding the express disclaimers of liability in the transactions
20 between Opsys and CDT, Inc., CDT, Inc. assumed the lease liabilities for a number of reasons.
21 CDT, Inc. understood that there was a risk of undisclosed contingent liabilities of Opsys Limited.
22 Because the lease was ultimately determined to be a liability of Opsys Limited (not having been
23 effectively assigned to Opsys US), plaintiff claims that the lease was a contingent liability assumed
24 by CDT, Inc..
25     In support of this claim, plaintiff asserts that CDT, Inc. has "invaded" the shares in escrow to
26 finance this litigation. Bunzel Dec. ¶ 11; Exh. G at 17–18 of 59. However, the passage of the SEC
27 filing that plaintiff cites in support of this position states only that the shares in escrow would be
28

10

1  forfeited to cover any loss or other costs that may incur to CDT, Inc. as a result of the claim. There
2  is nothing to suggest that CDT, Inc. "invaded" the escrow to "finance" this litigation. Rather, the
3  escrow shares were being used to cover a contingency as originally envisioned. The fact that CDT,
4  Inc. may have incurred some costs or losses as a result of a lawsuit involving one of its subsidiaries
5  does not amount to an assumption of the subsidiary's liability. In any case, the contingent liabilities
6  were ultimately the responsibility of Opsys Limited, not CDT, Inc., as indicated by the fact that
7  CDT, Inc. withheld consideration owed to Opsys Limited in order to satisfy the contingencies.
8  Plaintiffs have therefore failed to show that CDT, Inc. expressly or impliedly assumed the liabilities
9  associated with this litigation.

###    B.    Consolidation or Merger

Plaintiff contends that the transaction between Opsys Limited and CDT, Inc. was a de facto consolidation or merger. California courts consider the following five factors in determining whether a transaction styled as an asset purchase is a de facto merger:

> (1) was the consideration paid for the assets solely stock of the purchaser or its parent; (2) did the purchaser continue the same enterprise after the sale; (3) did the shareholders of the seller become shareholders of the purchaser; (4) did the seller liquidate; and (5) did the buyer assume the liabilities necessary to carry on the business of the seller?

Marks v. Minn. Mining & Mfg. Co., 187 Cal. App. 3d 1429, 1436 (1986). Plaintiff claims that all five factors favor a finding of de facto merger.

First, Cambridge acquired Opsys Limited by issuing 797,965 shares of stock and an additional 19,736 shares to two former Opsys Limited directors. Ainslie Dec., Exh. B. Plaintiff claims that the $5 million in cash paid in 2002 was for a controlling interest in an affiliate, as distinguished from the 100% stock deal in 2004. Second, plaintiff claims that CDT, Inc.'s acquisition of CDT Oxford Limited, along with full management control over CDT Oxford Limited beginning in October 2002, amounts to a continuation of Opsys Limited's enterprise. Third, plaintiff claims that the Settlement Agreement and Amended Agreement each establish that the

11

shares of CDT, Inc. will be distributed among Opsys Limited's shareholders, Bunzel Dec., Exh. D, and that the 2004 10-K describes the ultimate acquisition through a 100% stock deal. Ainslie Dec., Exh. B. Fourth, plaintiff asserts that Opsys Limited has no remaining assets and that the company has therefore liquidated. Ainslie Dec. ¶ 9, Exh. C; Bunzel Dec., Exhs. F & J. Finally, plaintiff argues that CDT, Inc. expressly assumed the operational liabilities of Opsys UK, which held the assets of Opsys Limited. Bunzel Dec., Exh. A at 23 of 116, § 7.5. Regarding this last point, defendant offers an overly ambitious reading of the documentary evidence. The clause in question states that CDT, Inc. would be responsible for liabilities arising from *its management* of Opsys UK, not any pre-existing liabilities.

Defendant, in response, focuses on the 2002 transaction, stating that Opsys Limited's assets in the UK were transferred to Opsys UK rather than CDT, Inc., and that Opsys Limited received cash consideration (the $5 million) rather than stock only. Defendant additionally argues that the 2004 transaction was not a de facto merger because it did not involve a sale or transfer of assets. Rather, CDT, Inc. acquired only capital stock of Opsys Limited, rendering Opsys Limited a wholly owned subsidiary of CDT, Inc.. The parent-subsidiary structure, according to defendant, insulates CDT, Inc. from Opsys Limited's liabilities.

CDT, Inc. further adds that the former Opsys shareholders have not yet received any CDT, Inc. stock, with the exception of the settlement of two personal claims. Black Dec. ¶ 29. CDT, Inc. additionally states that no shares will be distributed until certain superior creditors are paid. Id. This undercuts plaintiff's assertion that the operations of Opsys Limited merely switched hands, as in such circumstances courts expect the shares of the purchaser's stock to be "promptly distributed to the seller's shareholders in conjunction with the seller's liquidation." Marks, 187 Cal. App. 3d at 1435. Additionally, CDT, Inc. states that Opsys Limited has not liquidated, Black Dec. ¶ 35, and denies that CDT, Inc. assumed liabilities as discussed above.

Analyzing plaintiff's theory, it is clear that plaintiff is selectively characterizing the 2002 and 2004 transactions as a single transaction in certain respects and as separate transactions in other respects. For example, in an effort to escape the $5 million in cash consideration paid in 2002,

plaintiff characterizes those funds as going to a controlling interest in an affiliate. However, plaintiff conflates CDT, Inc.'s acquisition of Opsys Limited's UK subsidiary with the ultimate acquisition of Opsys Limited itself, notwithstanding the fact that Opsys Limited remained an independent company for two years after CDT, Inc. acquired Opsys UK. Because the Opsys UK deal involved cash consideration, that cash consideration must be considered in evaluating the acquisition of Opsys Limited. Additionally, CDT, Inc. has submitted evidence that it transformed Opsys UK's operations subsequent to the acquisition. Fyfe Dec. ¶¶ 9–11. This is therefore simply not a situation in which a pre-existing business continued following its acquisition by a separate entity.

Furthermore, a de facto merger requires a showing that the purchaser paid inadequate consideration for the seller's assets. Franklin v. USX Corp., 87 Cal. App. 4th 615, 625 (2001) ("The crucial factor in determining whether a corporate acquisition constitutes either a de facto merger or a mere continuation is the same: whether adequate cash consideration was paid for the predecessor corporation's assets."). California courts justify this rigid rule by citing the need for predictability in the field of corporate asset transfers. Id. As discussed more fully below, plaintiff has failed to make any showing that CDT, Inc. paid inadequate consideration for Opsys Limited's assets.

Accordingly, plaintiff has failed to establish that CDT, Inc.'s acquisition of Opsys Limited was a de facto merger for the purposes of successor liability.

C.  Continuation

Under California law, a corporation acquiring the assets of another corporation is the latter's mere continuation only upon a showing that "(1) no adequate consideration was given for the predecessor corporation's assets and made available for meeting the claims of its unsecured creditors," or "(2) one or more persons were officers, directors, or stockholders of both corporations." Ray, 19 Cal. 3d at 29. Plaintiff claims that the research and development business activities of Opsys Limited/Opsys UK continued under one roof after the Cambridge acquisition. Bunzel Dec., Exh. F. Additionally, plaintiff claims that the consideration was inadequate because Opsys Limited has been left with no assets and therefore unable to pay its debt to plaintiff. See

13

1  Katzir's Floor & Home Design, 394 F.3d at 1151. Regarding continuity of personnel, Opsys
2  Limited's financial controller became a director of the surviving subsidiary Opsys UK, which
3  became CDT Oxford Limited, and Opsys Limited CEO Michael Holmes became an observer on the
4  CDT, Inc. board. Bunzel Dec., Exh. P. Finally, plaintiff claims that Opsys Limited shareholders
5  became CDT, Inc. shareholders under the terms of the settlement agreement. Bunzel Dec., Exh. D.

6  Apart from the two specific requirements delineated in Ray, California courts generally hold
7  that successor liability based on continuation is not established "where the selling and purchasing
8  corporations were completely separate and distinct entities both before and after sale." Tidewater
9  Oil Co. v. Workers' Comp. Appeals Bd., 67 Cal. App. 3d 950, 955–56. Here, it is undisputed that
10 CDT, Inc. and Opsys Limited remain separate legal entities.

11 Turning to the "crucial factor" of adequate consideration, Franklin, 87 Cal. App. 4th at 625,
12 plaintiff must show more than Opsys Limited's current inability to pay its debts. Rather, "there must
13 be a causal relationship between a successor's acquisition of assets (i.e., inadequate consideration),
14 and the predecessor's creditors' inability to get paid." Katzir's Floor & Home Design, 394 F.3d at
15 1151 (citing Monarch Bay II v. Prof'l Serv. Indus., Inc., 75 Cal. App. 4th 1213 (1999)). Where it is
16 a "lack of sufficient assets that deprive[s] the predecessor's creditors of their remedy, not the
17 acquisition of the predecessor's assets by another entity," successor liability cannot attach based on a
18 theory of mere continuation. Id. See also Franklin, 87 Cal. App. 4th at 627 (holding that inadequate
19 consideration requires a showing that there were insufficient assets available at the time of the
20 acquisition). In other words, the inability to pay is not itself the basis for finding successor liability.
21 Over and above Opsys Limited's inability to pay, plaintiff must specifically point to inadequate
22 consideration at the time of the purported asset transfer. Although plaintiff asserts that the $5
23 million cash consideration was less than the value of Opsys Limited's *liabilities*, plaintiff makes no
24 argument that the payment in exchange for Opsys Limited's approximately £2 million worth of
25 *assets* was objectively inadequate. In addition to this cash consideration, CDT, Inc. paid over $11
26 million worth of stock when it finally acquired Opsys Limited as a result of the settlement
27 agreement. Plaintiff cites no authority for the proposition that in order for consideration to be
28

14

1  sufficient the purchaser must pay off the seller's debts, rather than simply compensate the seller for
2  its assets. Because CDT, Inc. paid consideration which was adequate in light of the assets it
3  received, plaintiff has failed to demonstrate inadequate consideration.
4        Failure to prove inadequate consideration is fatal to plaintiff's claim of mere continuation.
5  However, defendants further attack the sufficiency of plaintiff's evidence regarding the personnel
6  issue. Although the court in Ray required "one or more" persons switching from one company to
7  the other, subsequent decisions have required a more substantial continuity of personnel. In
8  Franklin, 87 Cal. App. 4th at 627, the court noted that some of the cases underlying the holding in
9  Ray "involved near complete identity of ownership, management or directorship after the transfer."
10 None of these cases involved a situation where "only a single person with minimal ownership
11 interest in either entity remained as an officer and director." Id.; see also Maloney v. American
12 Pharm. Co., 207 Cal. App. 3d 282, 288 (1988) ("a mere continuation typically involves continuity of
13 employees beyond [a] single officer"). Here, plaintiffs identify only two individuals allegedly
14 involved in both companies. One became a board member of CDT Oxford Limited, not CDT, Inc.
15 itself, while another became an observer on the CDT, Inc. board. This is hardly the level of
16 personnel continuity that courts look for when finding that an asset transfer amounts to a mere
17 continuation.
18       In sum, plaintiffs have not shown that the transfer of assets from Opsys Limited to CDT, Inc.
19 was a mere continuation of Opsys Limited's operations.
20
21       D.    Fraudulent Purpose
22       In support of its contention that the CDT transaction was entered into for the purpose of
23 avoiding Opsys Limited's debts, including its lease liabilities, plaintiff cites the following passage
24 from CDT, Inc.'s 2004 10-K:
25        The terms of the Transaction Agreement were entered into by the
          Company so that it could gain control of an economic interest in the
26        UK assets and operations of Opsys (which had been transferred to
          Opsys UK immediately prior to the transaction) in such a manner to
27        avoid acquiring any interest in any other assets or liabilities of Opsys.
28

15

Ainslie Dec. ¶ 8, Exh. B at 81 of 99. This statement is unremarkable. It is undisputed that CDT, Inc. at no time had any interest in Opsys Limited's US operations. Accordingly, the transaction was structured to avoid both the assets and liabilities of the Opsys Limited's US business—in other words, the entire operation. There is no indication that Opsys Limited's attempts to maintain its UK operations by seeking financing from CDT, Inc. was specifically designed to dodge the liabilities of the US operations. Rather, Opsys Limited unsuccessfully sought a financing partner for Opsys US at the same time it was working out its arrangement with CDT, Inc. regarding Opsys UK.

Furthermore, it is significant that this alleged fraudulent scheme involved two separate transactions separated by two years. The 2002 transaction, which ultimately resulted in CDT Limited acquiring control over Opsys UK, was supported by its own set of legitimate business reasons. Only two years later did CDT, Inc. acquire Opsys UK by purchasing Opsys Limited through a settlement agreement. Each transaction was supported by adequate consideration, and treating them as a consolidated fraudulent scheme is unwarranted.

Plaintiffs additionally point to the fact that defendants transferred CDT Oxford Limited from Opsys Limited to CDT Limited in 2005, while this action was pending, leaving Opsys Limited with no assets. Bunzel Dec. ¶ J. CDT, Inc. claims that these transfers were planned in late 2004, prior to the initiation of this lawsuit. Black Dec. ¶¶ 24–25. At the time of these transfers, CDT Limited, rather than CDT, Inc., was a defendant in this action. Id. An asset transfer between defendants is hardly an attempt to thwart a plaintiff's ability to collect. These facts do not support a finding of fraudulent transfer.

Finally, plaintiff argues that the consideration provided in 2002 was insufficient to pay off Opsys Limited's £17 million debts. As discussed above, however, it is undisputed that Opsys Limited received adequate consideration for the assets acquired, if any, by CDT, Inc. Accordingly, this outstanding debt is not a basis for fraudulent transfer.

The parties cite California's Uniform Fraudulent Transfer Act, California Civil Code sections 3439 et seq., as the controlling authority regarding whether successor liability applies based on the fraudulent transfer exception. A prerequisite for the various forms of fraudulent transfer is that the

16

acquiring party pays inadequate consideration. Because plaintiff has failed to demonstrate this with respect to any of the transactions at issue, the fraudulent transfer exception does not apply.

In sum, plaintiff has clearly not established that CDT, Inc. should be added as a defendant pursuant to Rule 25(c). At the very least, adding CDT, Inc. at this point would require discovery and additional evidentiary proceedings. In light of the weakness of plaintiff's arguments, however, and the undisputed facts in the record, the court holds as a matter of law that CDT, Inc. is not a proper defendant in this action.[5]

CONCLUSION

For the reasons stated above, the court DENIES plaintiff's motion to add Cambridge Display Technology, Inc. as a party.

IT IS SO ORDERED.

Dated: August 29, 2007

MARILYN HALL PATEL
United States District Court Judge
Northern District of California

17

# ENDNOTES

1. The background facts related to the Cambridge Display Technology companies are taken from this court's previous orders and other docket entries.

2. The background facts are taken from the parties' declarations and submissions. Because defendant has moved to strike plaintiff's declarations, every effort has been made to cite to documentary evidence rather than the declarations themselves. To the extent that citation to declarations is necessary to fully set forth the salient facts, the court will rule on defendant's objections as needed.

3. The specific basis for plaintiff's motion is somewhat unclear. In citing Rule 69(a), plaintiff seems to raise, but never fully develops, a separate theory of alter ego liability in addition to successor liability under Rule 25(c). In light of this court's previous orders dismissing plaintiff's alter ego theories with prejudice, the court is skeptical as to whether such an argument would be viable, if it were properly raised. Furthermore, plaintiff acknowledges the need to show that CDT, Inc. controlled the litigation in order to establish alter ego liability pursuant to Rule 69(a), and has not done so. At best, plaintiff has shown some degree of involvement and interest on the part of CDT, Inc., which is not surprising in light of the fact that its subsidiary was being sued. In any case, because plaintiff's successor liability theory appears to be a species of alter ego liability, the court will focus on the specifically developed successor liability arguments.

4. Remarkably, a footnote in defendant's opposition brief claims that plaintiff failed to address the choice of law issue regarding successor liability. Plaintiff's memorandum of points and authorities, in fact, devotes almost two pages to this very issue, raising substantial arguments in favor of California law. Defendant deigns to discuss the California law on which plaintiff relies but "does not concede that California law, rather than Delaware law, UK law, or some other law, should apply." In light of defendant's failure to address the choice of law arguments in plaintiff's brief, the court will consider any choice of law arguments to be waived by defendant, and will assume that California law controls the issue of successor liability. In its separate brief, CDT, Inc. also attempts to preserve its challenge to the application of California law but assumes *arguendo* that California law applies.

5. CDT, Inc. additionally argues that plaintiff's instant motion is barred by the doctrine of laches. Because plaintiff's delay in bringing this motion is due in part to this court's previous order deferring the issue until after trial, the court finds that the doctrine of laches is inapplicable.