# EXHIBIT F TO THE AFFIRMATION

1   JAMES E. BURNS, JR. (STATE BAR NO. 53250)
    jburns@orrick.com
2   JUSTIN M. LICHTERMAN (STATE BAR NO. 225734)
    jlichterman@orrick.com
3   M. TODD SCOTT (STATE BAR NO. 226885)
    tscott@orrick.com
4   MOJI SANIEFAR (STATE BAR NO. 233330)
    msaniefar@orrick.com
5   ORRICK, HERRINGTON & SUTCLIFFE LLP
6   The Orrick Building
    405 Howard Street
7   San Francisco, CA 94105-2669
8   Telephone:    415-773-5700
    Facsimile:    415-773-5759
9
    Attorneys for Defendant
10  OPSYS LIMITED, a United Kingdom Company

11

12              UNITED STATES DISTRICT COURT

13              NORTHERN DISTRICT OF CALIFORNIA

14                 SAN FRANCISCO DIVISION

15

| 16 | SUNNYSIDE DEVELOPMENT COMPANY, LLC, | Case No. C 05-00553 MHP |
|---|---|---|
| 17 | Plaintiff, | **DEFENDANT OPSYS LIMITED'S OPPOSITION TO PLAINTIFF'S** |
| 18 | | **MOTION TO ADD CAMBRIDGE** |
| 19 | v. | **DISPLAY TECHNOLOGY, INC. AS A PARTY AND JUDGMENT** |
| 20 | OPSYS LIMITED, a United Kingdom Company, | Date:        May 16, 2007 |
| 21 | Defendant. | Time:        1:00 p.m. |
| 22 | | Courtroom:   15, 18th Floor<br>Judge:       Hon. Marilyn Hall Patel |

23

24

25

26

27

28

1                                **TABLE OF CONTENTS**

2                                                                                                **Page**

3    I.    INTRODUCTION ................................................................................................... 1

4    II.   FACTUAL BACKGROUND ................................................................................. 3

5          A.    Opsys Limited Splits Its UK and US Businesses.................................... 3

           B.    The 2002 Transaction.............................................................................. 4

6          C.    The 2004 Transaction.............................................................................. 5

7          D.    Relevant Procedural History Of The Litigation ..................................... 5

8    III.  ANALYSIS ........................................................................................................... 7

9          A.    Rule 25(c) Does Not Apply Here............................................................ 7

           B.    Plaintiff's Arguments on Successor Liability, Alter Ego Liability, and
10               Fraudulent Transfer Fail on the Facts and on the Law............................ 9

11               1.    Plaintiff's Successor Liability Arguments Fail........................... 10

12                     a.    CDT Did Not Assume The Lease In Any Transaction ................. 11

13                     b.    There Is No De Facto Merger Between CDT and Opsys
                             Limited ........................................................................................ 13

14                     c.    CDT Is Not A "Mere Continuation" Of Opsys Limited .............. 14

15                     d.    Plaintiff Cannot Establish That Any Transaction Was For A
                             Fraudulent Purpose...................................................................... 16

16                     e.    Plaintiff's Attempt to Argue Successor Liability Fails On the
17                           Law and the Facts......................................................................... 18

18               2.    Plaintiff Cannot Prove Alter Ego Under State Law For Rule 69(a)
                       Purposes ...................................................................................... 18

19   IV.   CONCLUSION..................................................................................................... 22

20

21

22

23

24

25

26

27

28

1    I.    **INTRODUCTION**

2        Opsys Limited opposes Plaintiff Sunnyside Development Company LLC's ("Plaintiff")

3    motion to add Cambridge Display Technology, Inc. ("CDT") as a party to this action and

4    judgment.[1] Plaintiff's motion is nothing more than a hunt for a deep pocket which, if allowed,

5    would work a substantial injustice.

6        In 2002, CDT purchased a 16% interest in a UK subsidiary of Opsys Limited, which held

7    the assets of Opsys Limited's UK business. At the time, CDT was clear that it did not want any

8    part of Opsys Limited's US business, including the liabilities related to that business, such as the

9    Fremont lease, and the transaction was structured to ensure that it had no exposure to those

10   liabilities. Although Opsys Limited's consolidated business had assets of just two million British

11   pounds, Opsys Limited received $5 million from CDT in the deal plus an option on CDT stock.[2]

12       In December 2004, Opsys Limited became a wholly-owned subsidiary of CDT in a stock

13   purchase transaction. CDT expressly conditioned the 2004 transaction on Opsys Limited's

14   liabilities being below $1.25 million, which all parties believed to be the case. Had Plaintiff

15   attempted to enforce its lease at any time in the intervening two years after it decided the lease

16   Assignment was not effective, and *before* CDT acquired the stock of Opsys Limited in December

17   2004, CDT would not have consummated any transaction with Opsys Limited, and this motion

18   would not be before the Court. After years of silently sitting on its rights, Plaintiff cannot now

19   receive a windfall recovery from an entity that was never a party to the lease and who believed,

20   because of Plaintiff's inaction, that the Fremont lease had been effectively assigned to a separate

21   corporation not affiliated with Opsys Limited.

22       Moreover, as explained in Opsys Limited's Statement of Record re: CDT (Docket No.

23   175), this Court long ago dismissed *with prejudice* Plaintiff's two attempts to hold CDT liable for

24   Opsys Limited's lease.[3] Although Plaintiff tries to evade those rulings, it cannot avoid the

25   substance of its prior allegations and arguments by exalting form instead. Despite having failed

26   ───────────────
     [1] Opsys Limited files this opposition brief on its own behalf only. Opsys Limited is informed and believes that CDT
27   will file its own, separate opposition.
     [2] On October 23, 2002, two million British pounds equaled approximately $3.14 million.
28   [3] All emphasis herein is added, unless otherwise noted. Opsys Limited incorporates herein by reference its Statement
     of Record re: CDT, filed on March 20, 2007.

DEFENDANT OPSYS LIMITED'S OPPOSITION TO
MOTION TO ADD CAMBRIDGE DISPLAY
TECHNOLOGY, INC. AS A PARTY AND JUDGMENT
CASE NO. C05-00553 MHP

1   to plead a complaint against CDT, Plaintiff now offers flimsy arguments why this Court should

2   ignore long-standing principles of corporate law to pierce the corporate veil and inscribe CDT's

3   name on a judgment against Opsys Limited. Plaintiff proposes to initiate proceedings against

4   CDT simply by handing CDT a judgment. The Court should not indulge such extraordinary

5   relief.

6        Plaintiff's strategy on this motion is to offer the Court a buffet of choices in the hope of

7   enticing the Court to nibble at something. Plaintiff mixes and matches different transactions that

8   occurred over a three-year period between several parties, and argues that CDT is either a

9   successor in interest to Opsys Limited on one of four successor liability theories, or an alter ego

10   of Opsys Limited, or the recipient of a fraudulent transfer. No matter which theory it advances,

11   however, Plaintiff urges that it is entitled to an immediate judgment against CDT, either pursuant

12   to Federal Rule of Civil Procedure 25(c), or perhaps Rule 69(a). Plaintiff throws together a

13   hodge-podge of cases to support its stream of consciousness argument. But the law and facts,

14   when untangled and analyzed in a thoughtful manner, cannot justify the inequity of slapping a

15   judgment on non-party CDT nor support Plaintiff's overreaching characterizations.

16        The starting point, of course, is the fact that none of the successor liability, alter ego, or

17   fraudulent transfer issues raised by Plaintiff have ever been tried or adjudicated. CDT has never

18   had an opportunity to defend against the charges. Opsys Limited believes these issues were

19   dismissed on the pleadings after two rounds of dispositive motions. *See* Docket Nos. 20, 39 and

20   175. Plaintiff, however, contends that it should benefit from its own prior labeling error and get a

21   second bite at the apple. It should not be rewarded by its own mislabeling mistake, and the

22   Court's previous orders should dispose of this motion.[4] Nevertheless, the Court may also deny

23   Plaintiff's motion on the merits.

24        Opsys Limited has an important interest in the outcome of this motion because it and its

25   officers and directors made several representations and warranties that may be affected by the

26   outcome of this motion. Schedule 3, "Warranties," of the Transaction Agreement, includes

27   certain warranties and representation made by Opsys Limited as part of its transaction with CDT.

28

---

[4] Opsys Limited incorporates herein by reference its Statement of Record re: CDT, Docket No. 175.

1  In particular, in Section 24.4 of Schedule 3, the warrantors, (Mr. Michael Homes and Mr. Alexis

2  Zervoglos), warranted that Opsys had no "contingent, conditional or other liability as original

3  tenant, assignee, guarantor, surety or otherwise in respect of any real property or interest in real

4  property." *See* Declaration of Robert H. Bunzel Re Motion to Add Cambridge Display

5  Technology, Inc. as a Party to Action and Judgment, ("Bunzel Decl."), Exhibit ("Ex.") A, p. 64.

6  Accordingly, Opsys Limited submits this response to Plaintiff's motion to add CDT as a party to

7  this action and judgment because the legal rights of Opsys Limited and/or its warrantors under the

8  Transaction Agreement could be affected by the outcome of this matter.

9  ## II.    FACTUAL BACKGROUND

10

11  The core facts for this motion involve several corporate securities transactions between

12  CDT, Opsys Limited and various other entities based primarily in the UK.[5]

13  ### A.    Opsys Limited Splits Its UK and US Businesses

14  In the fall of 2002, Opsys Limited operated two business lines: (1) research into dendrimer

15  materials, based in the UK, and (2) pilot manufacturing of displays based on small molecule

16  emitters, a wholly different class of materials, based in Fremont, California. Opsys Limited

17  signed a lease with Plaintiff to house its US operations on premises in Fremont.

18  Owing to the financial climate at the time, Opsys Limited was in serious financial trouble.

19  According to its September 30, 2002, audited consolidated financial statements, Opsys Limited

20  had under two million British pounds in total assets, but more than £17 million in liabilities.

21  Opsys Limited therefore desperately needed some sort of financing transaction, but soon realized

22  that potential investors were interested in only one or the other business line. Opsys Limited

23  therefore decided to separate its businesses and seek funding for each line independently. Opsys

24  Limited hired investment bankers to help it spin off and find investors for its US business.

25  By late 2002, CDT had emerged as a potential deal partner. However, CDT was not

26  interested in Opsys Limited's US business and was unwilling to complete any transaction

27  involving that business or its associated liabilities, including the lease. As part of the spin out

28  ---

[5] Due to space limitations, only an abbreviated factual background is possible at this time.

OHS West:260219054.2                                          3

1    process, Opsys Limited and Plaintiff entered into an Assignment and Consent of Lessor on

2    October 18, 2002, which featured in the recent trial between the Plaintiff and Opsys Limited.

3         **B.    The 2002 Transaction**

4         On October 23, 2002, Opsys Limited entered into a Transaction Agreement with several

5    other parties, including CDT Acquisition Corp., which later changed its name to Cambridge

6    Display Technology, Inc., the entity that Plaintiff is chasing with this motion.

7         As part of the 2002 transaction, Opsys Limited transferred the assets used in its UK

8    business to a subsidiary called Opsys UK. Opsys Limited rec$2.5 million in cash in exchange for

9    16% *of the shares* of Opsys UK, which was later renamed CDT Oxford Limited. Under the

10   agreement, CDT Ltd. took over management responsibility for *the subsidiary*, CDT Oxford

11   Limited, in exchange for 98% of any profits. Opsys Limited received a further $2 million for a

12   license of its technology.

13        In addition, the Transaction Agreement gave CDT a call option to purchase the 84% of

14   shares in Opsys UK/CDT Oxford Limited that were owned by Opsys Limited, and contained two

15   put option provisions, one of which gave Opsys Limited's shareholders the right to sell to CDT

16   (or, put more accurately, require CDT to purchase) all of the remaining *shares* in Opsys Limited

17   if certain conditions were met. The put could not be exercised unless Opsys Limited's liabilities

18   did not exceed $1.25 million and its share ownership in Opsys UK was its only material asset.

19   *See* Exhibit Ex. E to the Declaration of Robert H. Bunzel re Motion to Add Cambridge Display

20   Technology, Inc., as a Party to Action and Judgment ("Bunzel Decl.") at 81 of 99. Opsys Limited

21   received another $500,000 for the call option.

22        The $5 million in cash that Opsys Limited received in the 2002 transaction and the value

23   of the options greatly exceeded the value of the assets transferred to Opsys UK. *See* Bunzel Decl.

24   at Ex. M.

25        In mid-2004, CDT announced its plan to go public and filed a Registration Statement with

26   the Securities & Exchange Commission.

27

28

OHS West:260219054.2                                    4

DEFENDANT OPSYS LIMITED'S OPPOSITION TO
MOTION TO ADD CAMBRIDGE DISPLAY
TECHNOLOGY, INC. AS A PARTY AND JUDGMENT
CASE NO. C05-00553 MHP

## C.    The 2004 Transaction

Subsequent to the parties' entry into the Transaction Agreement, certain disputes arose between Opsys and CDT about the transaction and, at one point, Opsys Limited contemplated taking legal action against CDT. Ultimately, the dispute was settled through a Settlement and Amended Agreement on August 3, 2004, which was amended in an Amended and Restated Settlement and Amendment Agreement, dated as of December 14, 2004.

As part of the settlement, CDT agreed to purchase 100% of the stock of Opsys Limited in exchange for 797,695 shares of stock of CDT. Under the original Transaction Agreement, CDT could not be obligated to acquire 100% of Opsys Limited unless Opsys Limited's liabilities were less than $1.25 million. In December 2004, Opsys Limited's liabilities were $1.6 million, excluding the Fremont lease, which both parties believed had been assigned more than two years earlier.

In the settlement, the parties recognized that, as with all acquisitions, Opsys Limited had potentially unknown liabilities. Because satisfaction of Opsys Limited's liabilities was a precondition to exercise of the put option, the Amendment Agreement included a provision whereby CDT would withhold in escrow 422,610 of the stock consideration otherwise payable to Opsys Limited shareholders. CDT set aside the portion of the consideration to ensure that (a) contingent liabilities would be satisfied *by Opsys* or its shareholders if the contingencies materialized, and (b) CDT did not assume Opsys Limited's liabilities.

On December 29, 2004, CDT went public.

## D.    Relevant Procedural History Of The Litigation

On December 14, 2004, Plaintiff, having learned that CDT was about to go public, filed a lawsuit against Opsys Limited and CDT (which it called "CDT Ltd.," although its factual allegations described the entity that acquired Opsys Limited). Plaintiff did not serve its lawsuit until January 2005, after CDT's initial public offering. The lawsuit alleged fraud and breach of contract against both Opsys Limited and CDT. The defendants removed the case to Federal court and moved to dismiss.

DEFENDANT OPSYS LIMITED'S OPPOSITION TO
MOTION TO ADD CAMBRIDGE DISPLAY
TECHNOLOGY, INC. AS A PARTY AND JUDGMENT
CASE NO. C05-00553 MHP

1    At oral argument on the defendants first motion to dismiss, the Court observed that CDT

2   was not a party to the lease, and therefore should not be liable for its alleged breach. In response,

3   Plaintiff argued that "CDT acquired Opsys, Limited, which was a party to the lease, *so basically*

4   *they are succeeding to it*." Docket Nos. 19, 37 at p. 2. On April 22, 2005, after the hearing, the

5   Court dismissed the breach of contract claim against CDT on the ground that it was not a party to

6   the lease, and dismissed the fraud claims against both defendants. Nevertheless, the Court gave

7   Plaintiff leave to amend its complaint.

8    On May 11, 2005, Plaintiff filed a First Amended Complaint asserting that CDT was

9   liable for breach of contract because it had assumed Opsys Limited's liabilities (Docket No. 21, at

10   ¶ 15) and was Opsys Limited's alter ego. On August 8, 2005, the Court dismissed CDT from the

11   case and all fraud claims *with prejudice*. Docket No. 39.

12    Plaintiff then hired new lawyers, who immediately tried to add CDT back into the case

13   with a motion under Federal Rule of Civil Procedure 25(c). At that time, Plaintiff stated that it

14   needed to file an amended complaint explaining the purported factual basis for a successor

15   liability claim against CDT. The Court denied the motion, declining to adjudicate either the Rule

16   25(c) or successor liability issues at that time, but permitted Plaintiff to file a Second Amended

17   Complaint ("SAC") in order to bring "welcome clarity" to the allegations.. Docket No. 57.

18    In its SAC, Plaintiff alleged that the CDT transaction somehow constituted a breach of the

19   implied covenant of good faith and fair dealing. Nevertheless, Plaintiff sought no discovery from

20   CDT (though it devoted extensive discovery to learning about CDT, including retaining an expert

21   to opine about the 2002 and 2004 transactions), and ultimately dropped all of its assertions

22   touching on CDT ahead of trial. Following its decision, Plaintiff argued successfully that the

23   Court should not permit any equitable defenses at trial, including *laches*, because the only claim

24   to be tried was a narrow, legal one for breach of contract.

25    Opsys Limited also filed a motion *in limine* ahead of trial to exclude evidence about the

26   corporate securities transactions between CDT and Opsys Limited. The Court substantially

27   granted the motion. Neither CDT not any of its directors, officers or employees were called at

28   trial; no CDT transaction documents were admitted into evidence; Plaintiff did not offer its expert

OHS West:260219054.2                          6

1    to opine about the CDT transaction.  No factual issues relating to the Transaction Agreement or

2    CDT were tried or adjudicated.

3         At the close of evidence, the Court granted Opsys Limited's oral Motion for Judgment as

4    a Matter of Law with respect to Plaintiff's supposed implied covenant of good faith claim.

5         In addition, the Court granted Plaintiff's Motion for Judgment as a Matter of Law

6    regarding Opsys Limited's equitable estoppel defense.  During argument, counsel for Plaintiff

7    expressly acknowledged that an equitable estoppel might eventually be available to CDT.  The

8    Court granted Plaintiff's motion.

9         The jury instructions and verdict form never mention CDT.  On March 9, 2007, the jury

10   reached a verdict that found that Opsys Limited breached the lease and owed $4.8m in damages.[6]

11        In a post-trial status conference statement, Plaintiff advised the Court that it intended to

12   try to hail CDT back into the case on a successor liability theory.  In that statement, Plaintiff

13   stated that it needed to conduct as much as six months more of discovery.  Docket No. 171 at p. 2.

14   Nevertheless, on April 2, 2007, Plaintiff filed a second Rule 25(c) motion, in which it reversed its

15   prior positions that a new complaint and discovery are appropriate, and that CDT may have

16   equitable defense, and instead urged that that CDT simply be tacked on to any judgment against

17   Opsys Limited immediately.

18   **III.    ANALYSIS**

19        Plaintiff relies chiefly on Federal Rules of Civil Procedure 25(c) and 69(a) as a basis to

20   use its successor liability and alter ego theories to bootstrap CDT into the case now.  Neither Rule

21   is helpful for a number of reasons, not the least of which is Plaintiff's inability to articulate facts

22   sufficient to prove its theories.

23   **A.    Rule 25(c) Does Not Apply Here**

24        In its opposition to Plaintiff's previous Rule 25(c) motion, Opsys Limited explained why,

25   under applicable legal authorities, that Rule does not apply in the circumstances present here.  *See*

26   Docket No. 52.

27

28   [6] Opsys Limited has pointed out elsewhere that the jury's verdict is irreconcilably inconsistent and must be vacated.
     Nothing herein should be construed to imply disagreement with or a waiver of that position.

DEFENDANT OPSYS LIMITED'S OPPOSITION TO
MOTION TO ADD CAMBRIDGE DISPLAY
TECHNOLOGY, INC. AS A PARTY AND JUDGMENT
CASE NO. C05-00553 MHP

1          The Ninth Circuit has held that Rule 25(c) is a purely procedural rule that does not

2    provide for survival of right of action (which depends on substantive law). *See Hilbrands v. Far*

3    *East Trading Co., Inc.*, 509 F.2d 1321, 1323 (9th Cir. 1975). As previously noted, Rule 25(c)

4    allows an action to be continued by or against the original party after a transfer of interest *with*

5    *respect to the subject matter of the suit. See* 6 James W.H. Moore, et al., Moore's Federal

6    Practice 25 at §25.30 (3d ed. 2005). Courts interpret Rule 25(c) to mean transfers of various

7    kinds of property interests that may be involved in a lawsuit, for example a transfer of property or

8    rights by assignment. *See Moore's* at §25.31; *In re Bernal*, 207 F.3d 595, 598 (9th Cir. 2000).

9    *See also Maysonet-Robles v. Cabrero*, 323 F.3d 43, 49 (1st Cir. 2003) (transferee brought into

10   court solely because it has come to own property in issue).

11         Many of the cases cited by Plaintiff affirm this point. In *Koehler v. Bank of Bermuda*

12   *Ltd.*, No. M18-302, 2002 WL 1766444 (S.D.N.Y. Jul. 31, 2002), the court expressly stated that a

13   successor in interest "may be a person or entity who acquires *the particular interest at stake in the*

14   *litigation*, such as a certain piece of property or a contractual right, or who acquires all the assets

15   and liabilities of a party to the litigation." *Id.* at \*3. The Court later reiterated that Rule 25(c)

16   generally requires a litigant to transfer "*its particular interest in the litigation* or [] all of its assets

17   and liabilities." *Id.* at \*4. Similarly, in *Luxliner P.L. Export, Co. v. RDI/Luxliner, Inc.*, 13 F.3d

18   69 (3d Cir. 1993), the Court reversed an order granting a Rule 25(c) motion, and noted that "[a]

19   'transfer of interest' in the corporate context occurs when one corporation becomes the successor

20   to another by merger *or other acquisition of the interest the original corporate party had in the*

21   *lawsuit.*" *Id.* at 71. Rule 25(c) "is designed to allow the action to continue unabated *when an*

22   *interest in the lawsuit* changes hands." *U.S.I. Prop. Corp. v. M.D. Const. Co., Inc.*, 186 F.R.D.

23   255 (D. P.R. 1999), *vacated on other grounds*, 230 F.3d 489 (1st P.R. 2000) (quoting a Fifth

24   Circuit case). CDT undeniably did not receive a transfer of the subject matter of this litigation,

25   namely, the lease. The rule does not apply here.

26         While cases acknowledge that an interest can be transferred individually (*e.g.*, by sale of

27   the particular item at issue in the lawsuit), or as part of a merger (which automatically transfers

28   the transferee's interests in the lawsuit), CDT did not merge with Opsys Limited; both companies

OHS West:260219054.2                                    8                    DEFENDANT OPSYS LIMITED'S OPPOSITION TO
                                                                             MOTION TO ADD CAMBRIDGE DISPLAY
                                                                             TECHNOLOGY, INC. AS A PARTY AND JUDGMENT
                                                                             CASE NO. C05-00553 MHP

1    exist as separate entities. CDT Inc. did not receive property from Opsys Limited in the 2002

2    transaction, and in 2004 it simply purchased stock from Opsys Limited, which it received pre-

3    litigation and which is not and never has been the subject matter of this lawsuit.

4            As before, Plaintiff steers clear of *Equal Employment Opportunity Comm'n v. Pan*

5    *American World Airways, Inc.*, No. C-81-3636 RFP, 1987 U.S. Dist. LEXIS 15182 (N.D. Cal.

6    Dec. 1, 1987). In *Pan American*, Chief Judge Peckham held that Rule 25(c), by its own terms,

7    does not apply to stock transfers between shareholders and parent corporations. The plaintiff in

8    *Pan American* sued Pan Am Airways. During the case, Pan Am reorganized to become a

9    subsidiary of a holding company (Holding), whose shares were exchanged with Pan Am

10    shareholders' shares. The plaintiff offered three arguments to join Holding under Rule 25(c): (1)

11    Holding had acknowledged its potential liability in a Shareholders Report, (2) Holding and Pan

12    Am had the same directors, and (3) Pan Am was thinly capitalized to help limit Holding's

13    liability. The Court rejected these arguments and denied the Rule 25(c) motion.

14            Unlike in *Pan American*, Opsys Limited and CDT do not have the same directors.

15    Moreover, as in *Pan American*, Opsys Limited reorganized to become a holding company of

16    Opsys UK, and then later became a subsidiary of CDT. Importantly, Opsys Limited did not

17    transfer any assets to CDT Inc. in 2002. Rather, Opsys UK, received some (but not all) of Opsys

18    Limited's assets, and in return Opsys Limited received $5 million in valuable consideration, not

19    to mention the stock option. Thus, the facts are even more compelling that Rule 25(c) does not

20    apply than those in *Pan American*.

21            **B.    Plaintiff's Arguments on Successor Liability, Alter Ego Liability, and**
        **Fraudulent Transfer Fail on the Facts and on the Law**

22

23            Faced with significant Rule 25 problems, Plaintiff tries to justify its effort to hold CDT

24    responsible without the bother of a complaint, discovery or trial by invoking three arguments

25    which it believes would, if proven, support liability against CDT. Distilling Plaintiff's brief, it is

26    apparent that Plaintiff relies heavily, and perhaps exclusively, on successor liability, alter ego

27    liability and fraudulent transfer. Taking on three such fact-intensive and circumstance-driven

28    theories in one post-trial motion is no easy task, and Plaintiff falls short on all three efforts.

OHS West:260219054.2                        9                DEFENDANT OPSYS LIMITED'S OPPOSITION TO
                                                             MOTION TO ADD CAMBRIDGE DISPLAY
                                                             TECHNOLOGY, INC. AS A PARTY AND JUDGMENT
                                                             CASE NO. C05-00553 MHP

1    First, each such theory is driven by facts that must be proved at trial and not by hyperbolic
2    assertions of counsel. Second, each theory plaintiff tries to invoke has requirements set out by
3    statute or case law that Plaintiff cannot come close to fulfilling. Third, the effort to justify a Rule
4    25 substitution by reason of these arguments further showcases the weaknesses of the basic
5    motion.

6              **1.    Plaintiff's Successor Liability Arguments Fail**

7    Plaintiff first attempts to justify the Rule 25 joinder by establishing successor liability
8    with neither a complaint nor a trial. The gist of the claim, though, is that since CDT bought all of
9    Opsys Limited's stock, it is a successor responsible for the liability on the lease. Because it
10    cannot be disputed that Opsys Limited did *not* transfer the least to CDT, Plaintiff argues that CDT
11    is responsible for Opsys Limited's lease liability on one of four successor liability theories. As a
12    footnote to this discussion, since Rule 25(c) is purely procedural, the failure of these successor
13    liability theories as a substantive matter dooms Plaintiff's attempt to add CDT under this rule.
14    *See Hilbrands*, 509 F.2d at 1323.

15    Case law recognizes four ways in which successor liability can be imposed against a party
16    other than the actual debtor. As typically formulated, the rule states that the purchaser does not
17    assume the seller's liabilities unless (1) there is an express or implied agreement of assumption,
18    (2) the transaction amounts to a consolidation or merger of the two corporations, (3) the
19    purchasing corporation is a mere continuation of the seller, or (4) the transfer of assets to the
20    purchaser is for the fraudulent purpose of escaping liability for the seller's debts. *Ray v. Alad*, 19
21    Cal. 3d 22, 28 (Cal. 1977).[7] Plaintiff fails under each element.

22    The law is well-settled ***against*** the imposition of successor liability. The general rule of
23    successor non-liability holds that where one company sells or transfers all of its ***assets*** to another,
24    the purchaser is not liable for the debts and liabilities of the seller. *See Marks v. Minnesota*
25    *Mining and Manufacturing Co.*, 187 Cal. App. 3d 1429, 1435 (1986). The rule promotes the
26    predictability vital to the corporate field, keeps transaction costs reasonable, and preserves the

---

[7] Plaintiff fails to address the choice of law issue regarding successor liability. In this brief we discuss the California
law on which Plaintiff relies. However, Opsys Ltd. Does not concede that California law, rather than Delaware law,
UK law, or some other law, should apply.

DEFENDANT OPSYS LIMITED'S OPPOSITION TO
MOTION TO ADD CAMBRIDGE DISPLAY
TECHNOLOGY, INC. AS A PARTY AND JUDGMENT
CASE NO. C05-00553 MHP

1   climate of relative certainty necessary to make major economic decisions. The imposition of

2   successor liability long after the transfer of assets defeats the legitimate expectations of the parties

3   held during negotiation and sale. *See Franklin v. USX Corp.*, 87 Cal. App. 4th 615, 625 (2001);

4   *Monarch Bay II v. Prof'l Serv. Indus., Inc.*, 75 Cal. App. 4th 1213, 1218 (1999).

5        The law recognizes the limited exceptions to the general rule discussed above and

6   embodied in the successor liability theories. Ordinarily, successor liability comes into play only

7   when a company *sells its assets* for *inadequate consideration* and then *liquidates*. *See Ray v.*

8   *Alad*, 19 Cal. 3d 22, 28 (1977). Under California law, "[e]liminating the exceptions requires

9   disproving *at least one element* of each exception or showing that *at least one such element*

10  *cannot be established.*" *Fisher v. Allis-Chalmers Corp.*, 95 Cal. App. 4th 1182, 1188 (2002)

11  (emphasis added). Here, over and above the due process problems with Plaintiff's proposed

12  cause of action, CDT can disprove at least one element of each exception.[8]

13              **a.    CDT Did Not Assume The Lease In Any Transaction**

14       Plaintiff argues that CDT somehow assumed the lease liability pursuant to the Transaction

15  Agreement. The argument relies chiefly on distortions of the terms of the relevant agreements

16  and does not withstand scrutiny.

17       In assessing an assumption successor liability claim, the Court looks to the Transaction

18  Agreement itself. *See Martin v. Watson/Hopper, Inc.*, No. F041808, 2004 WL 42596 (Cal. App.,

19  Jan. 8, 2004); *Zimmerman v. Accredited Home Lenders, Inc.*, No. 3158616, 2003 WL 21744323

20  (Cal. App., Jul. 29, 2003)(court looks at contract terms); *Fisher*, 95 Cal. App. 4th 1182 (same).

21

22  [8] As a preliminary matter, Plaintiff's is wrong that successor liability may be imposed on CDT without a trial. In
    *Luxliner, supra*, the Third Circuit reversed a Rule 25(c) order joining a putative successor to a judgment on *de facto*
23  merger and mere continuation successor liability theories. The Court held that due process concerns are particularly
    acute where a Rule 25(c) motion effectively seeks to impose liability, and they require at least an evidentiary hearing
24  after an adequate opportunity to be heard. Moreover, in *Panther Pumps & Equip Co., Inc. v. Hydrocraft Inc.*, 566
    F.2d 8, 24 (7th Cir. 1977), the Court found that successor liability could be imposed consistently with due process
25  only because the putative successor was afforded a two week evidentiary hearing to defend itself substantively
    against a successor liability charge, confront and cross-examine witnesses, and present evidence in its favor, etc. The
26  successor liability and other issues raised in Plaintiff's motion were not adjudicated at trial. Plaintiff insisted at trial
    that all equitable defenses be struck, and was largely successful in achieving that goal. But successor liability and
27  alter ego are equitable theories, and equitable defenses are available. Plaintiff moved successfully for Judgment as a
    Matter of Law on Opsys Limited's equitable estoppel defense, but acknowledged at that time that CDT might have
28  an equitable estoppel defense. Under the circumstances, CDT has not had its day in court and cannot be added to the
    judgment.

DEFENDANT OPSYS LIMITED'S OPPOSITION TO
MOTION TO ADD CAMBRIDGE DISPLAY
TECHNOLOGY, INC. AS A PARTY AND JUDGMENT
CASE No. C05-00553 MHP

1    Under California's statute of frauds, an agreement for real property lease for a period of more

2    than one year is invalid unless in writing and subscribed by the party to be charged, and an

3    interest in real estate cannot be transferred absent a writing. *See* Cal. Civ. Code §§ 1091,

4    1624(a)(3); Cal. Code Civ. P. § 1971. The Transaction Agreement contains no written provision

5    assuming the lease or liabilities. If anything, its terms show that CDT did not assume the lease,

6    including section 24.4, in which Opsys Limited expressly disavows any lease obligation. *See*

7    Bunzel Decl., Ex. A. That provision is inconsistent with an assumption of the lease liability.[9]

8        Plaintiff makes three arguments in support of assumption. First, it suggests that the

9    "WHEREAS" clause "(E)" in the Transaction Agreement somehow transfers Opsys Limited's

10   lease liability to CDT. It does not. That clause states that "*[i]t is the intention that*, after the date

11   of this agreement . . . all liabilities or obligations of any kind *relating to* such operations [of

12   Opsys's US subsidiaries] . . . are divested into a newly incorporated company." The evidence

13   adduced at trial was uncontroverted that the Fremont lease "related to" the operations of Opsys's

14   US subsidiary. Thus, far from assuming the lease liability, the Transaction Agreement expresses

15   an intent *not* to assume that liability. Mr. Zervoglos's undisputed trial testimony corroborates

16   that fact.

17       Plaintiff's suggestion that paragraph 7.5 of the Transaction Agreement somehow assumed

18   Opsys Limited's lease liability also is misleading. Paragraph 7.5 states that "CDT and CDT UK

19   shall be responsible for all liabilities arising from *its* management of *Opsys UK* . . . ." *See* Bunzel

20   Decl. at Ex. A. As Plaintiff knows, Opsys UK is a different entity from Opsys Limited, and never

21   was a party to the lease or this litigation. Plaintiff's deceptively loose language highlights why

22   any successor liability claim is best resolved in an orderly trial on the merits of properly pled

23   factual allegations, and not rushed through in some shotgun motion.

24       Finally, Plaintiff suggests that a routine escrow against unknown liabilities somehow is an

25   assumption of liabilities. Plaintiff's position is nonsensical. The purpose of the escrow plainly is

26

27   [9] Nor can Plaintiff show an implied assumption because that requires proof that the transferee voluntarily accepted all of the benefits of a contract before it is liable for the burdens of that contract. *See Zimmerman*, 2003 WL 21744323

28   (upholding defendant's demurrer because it had not accepted any of the benefits of the contract). at *5-6. CDT undeniably never accepted any benefit of the Fremont lease.

DEFENDANT OPSYS LIMITED'S OPPOSITION TO
MOTION TO ADD CAMBRIDGE DISPLAY
TECHNOLOGY, INC. AS A PARTY AND JUDGMENT
CASE NO. C05-00553 MHP

1  just the opposite: to assure that if any unknown liabilities did emerge, they would be satisfied by

2  Opsys Limited from the escrowed portion of the consideration, and not by CDT. The escrow

3  evidences an intent *not* to assume liabilities.

4          **b.    There Is No De Facto Merger Between CDT and Opsys Limited**

5          Generally, the elements required for a de facto merger successor liability theory are: (1)

6  whether the consideration paid *for the assets* was solely stock of the purchaser, (2) whether the

7  purchaser continued the same enterprise after the sale, (3) did the seller's shareholders become

8  shareholders of the purchaser, (4) did the seller liquidate, and (5) did the buyer assume the

9  liabilities necessary to carry on the seller's business. *Marks*, 187 Cal. App. 3d at 1436 (emphasis

10  added).

11          Here, despite Plaintiff's best efforts to conflate several transactions, Opsys Limited's UK

12  assets were transferred to Opsys UK -- not CDT -- in the 2002 transaction. Opsys Limited

13  received \$5 million in cash in that transaction. As a matter of law, that ends the analysis. In *Gee*

14  *v. Tenneco, Inc.*, 615 F.2d 857 (9th Cir. 1980), the Ninth Circuit, interpreting California law,

15  affirmed a finding no de facto merger because the exception requires that the "sole consideration"

16  in an asset sale must be stock before a transferee can be liable as a successor. In *Marks*, the

17  critical fact in finding a de facto merger was the intrinsic structure and nature of a sale of assets

18  for stock, which is akin to a merger and "*unlike a sale of assets for cash*." 187 Cal. App. 3d at

19  1438. California courts uniformly refuse to hold a purchaser of assets liable under a de facto

20  merger theory without a showing that the assets were purchased for stock. *See, e.g., Ray*, 19 Cal.

21  3d 22 (consideration for assets was solely cash and no stock, court found no de facto merger);

22  *Franklin*, 87 Cal. App. 4th 615 (same); *Ortiz v. South Bend Lathe*, 46 Cal. App. 3d 842 (1975)

23  (same).

24          Nor could the 2004 transactions be a de facto merger because Opsys Limited did not sell

25  or transfer any assets. Rather, CDT purchased capital stock of Opsys Limited from its

26  shareholders. Thus, CDT simply became the 100% shareholder of Opsys Limited, which became

27  a wholly, owned subsidiary, and remains insulated from liability under long-standing principles

28  of shareholder non-liability.

DEFENDANT OPSYS LIMITED'S OPPOSITION TO
MOTION TO ADD CAMBRIDGE DISPLAY
TECHNOLOGY, INC. AS A PARTY AND JUDGMENT
CASE NO. C05-00553 MHP

1    A comparison of the facts of this case with those in the seminal California de facto merger

2    case, *Marks v. Minnesota Mining and Manufacturing Co.*, starkly illustrates the type of showing

3    required for a finding of de facto merger and the inapplicability of the exception here. In *Marks*,

4    the purchaser (3M) bought *all* of the seller's (McGhan/Cal) assets and paid solely with 3M *stock.*

5    *All* McGhan/Cal shareholders became 3M shareholders by virtue of the transaction, and *all* five

6    McGhan/Cal founders continued to work for 3M in the same capacity after the reorganization, so

7    that the "operating board" remained the same. 3M assumed all of McGhan/Cal's normal

8    operating liabilities and manufactured and marketed the exact same product as McGhan/Cal,

9    without alteration. Further, *all* McGhan/Cal employees were asked to sign employment

10    agreements with 3M. None of these facts are present here; to the contrary, Opsys Limited

11    received cash in return for an interest in Opsys UK, and, as established at trial, none of Messrs.

12    Holmes, Zervoglos or Reddy (Opsys Limited's CEO, CFO and COO respectively) ever worked

13    for CDT. Finally, the fact that CDT and Opsys Limited both were in the display business *before*

14    the transactions does not establish successor liability. *See Luxliner*, 13 F.3d at 74 (merely

15    engaging in the same business not conclusive of successor liability).

16    **c.    CDT Is Not A "Mere Continuation" Of Opsys Limited**

17    The "mere continuation" successor liability exception envisions a reorganization

18    transforming a *single company* from one corporate entity to another, such that the new company

19    is merely a "reincarnation" of the transferor company. *See Maloney v. American Pharm. Co.*, 207

20    Cal. App. 3d 282, 287 (1988); *Koch v. Speedwell Motor Car Co.*, 24 Cal. App. 123 (1914).

21    California cases consistently hold that there is no continuation or reincarnation of the seller where

22    *two* corporate entities exist and operate by virtue of separate and distinct charters both *before* and

23    after the sale and the asset sale was negotiated at arm's-length. *See, e.g., id.; Tidewater Oil Co. v.

24    Workers' Comp. Appeals Bd.*, 67 Cal. App. 3d 950, 955-56 (1977); *Ortiz*, 46 Cal. App. 3d at 847.

25    *See also Kline v. Johns-Manville*, 745 F.2d 1217, 1219 (9th Cir. 1984) (Generally, California

26    does not impose successor liability on a corporation that purchases the assets of a selling

27    corporation in an arm's-length transaction). Here, it is undisputed that CDT and Opsys Limited

28

OHS West:260219054.2                                    14                    DEFENDANT OPSYS LIMITED'S OPPOSITION TO
                                                                             MOTION TO ADD CAMBRIDGE DISPLAY
                                                                             TECHNOLOGY, INC. AS A PARTY AND JUDGMENT
                                                                             CASE NO. C05-00553 MHP

1    have always been distinct corporate entities with separate corporate charters, and the transactions

2    at issue were the product of arm's-length negotiations.

3        An "essential ingredient" of "overriding significance" to the mere continuation exception

4    is that inadequate consideration is paid for the purchased assets; without a showing of inadequate

5    consideration, a mere continuation claim is fatally deficient. *Franklin*, 87 Cal. App. 4th 627;

6    *Maloney*, 207 Cal. App. 3d at 287 ("Before one corporation can be said to be a mere continuation

7    or reincarnation of another it is *required* that there be insufficient consideration running from the

8    new company to the old."); *Enos v. Picacho Gold Mining Co.*, 56 Cal. App. 2d 765, 778 (1943)

9    (lack of consideration is "essential element" of mere continuation).

10        The Ninth Circuit confirmed and emphasized this view as to successor liability generally

11   in *Katzir's Floor and Home Design, Inc. v. M-MLS.com*, 394 F.3d 1143 (9th Cir. 2004). The

12   Court held that the adequacy of consideration question involves a causation element. *See also*

13   *Monarch Bay II*, 75 Cal. App. 4th 1213 (indicating that there must be a causal relationship

14   between a successor's acquisition of assets (i.e., inadequate consideration), and the predecessor's

15   creditors' inability to get paid).

16        Although Plaintiff grudgingly acknowledges this element, it fails to analyze it correctly.

17   Causation is established by doing a direct comparison of the value of the individual assets

18   purchased (which would have otherwise been available to provide a remedy to the creditors)

19   versus the actual dollars paid for those assets. As Plaintiff's own exhibits show, Opsys Limited's

20   consolidated assets (i.e., of both its US and its UK businesses) were worth less than two million

21   British pounds; it received $5 million in the 2002 transaction. It is undisputed then, that CDT

22   paid more for Opsys Ltd assets than the value of those assets on the books of Opsys Limited.

23   Undeterred, Plaintiff suggests that the amount paid by CDT was less than the liabilities of Opsys

24   Limited. This is a false and illogical comparison unsupported by any law. The logical conclusion

25   of this argument is that a company with some assets but heavy liabilities could never sell its

26   assets at fair market value without running into a successor liability roadblock. Neither the law

27   nor reason supports such a radical result. Plaintiff's attempt to compare the $5 million paid for

28   Opsys Limited's assets against Opsys Limited's liabilities is contrary to law, erroneous and

OHS West:260219054.2                              15                    DEFENDANT OPSYS LIMITED'S OPPOSITION TO
                                                                         MOTION TO ADD CAMBRIDGE DISPLAY
                                                                   TECHNOLOGY, INC. AS A PARTY AND JUDGMENT
                                                                                    CASE NO. C05-00553 MHP

1  irrelevant, and simply reinforces the fact that Opsys Limited's assets were worth less than its

2  liabilities. That reality has nothing to do with successor liability.

3         Inadequate consideration is necessary, but not sufficient, to prove successor liability.

4  California law also requires more substantial continuity of management than the overlap of just

5  one individual. In *Franklin*, 87 Cal. App. 4th at 626-27, the court refused to find successor

6  liability, even though the same individual was the president and a board member of both the seller

7  and purchaser corporations. After reviewing all of the cases cited by the California Supreme

8  Court in *Ray*, 19 Cal. 3d at 29, the *Franklin* court noted that, with respect to common directors,

9  officers, or stockholders, the cases finding successor liability involved "near complete identity of

10  ownership, management or directorship after the transfer." *Id.* at 627. Furthermore, the court

11  noted that "[n]one of these cases involved a situation . . . where . . . only a single person with

12  minimal ownership interest in either entity remained as an officer and director." *Id.*

13        In *Maloney*, 207 Cal. App. 3d at 287, the Court was even more explicit, stating that mere

14  continuation involves continuity beyond the single officer that the two corporations shared there.

15  Even though one or more persons were officers, directors, or stockholders of both corporations

16  involved and the purchaser held itself out to the public as a continuation of the seller, the court

17  found no mere continuation. Plaintiff here offers no continuity of officers. It offers only that

18  Opsys Limited's former CEO was allowed to attend CDT board meetings as an observer (but was

19  never a board member himself) and that a former Opsys Limited officer became a board member

20  of Opsys UK (but not CDT). That does not suffice.

21                    **d.    Plaintiff Cannot Establish That Any Transaction Was For A
                              Fraudulent Purpose**

22

23        As Plaintiff appears to acknowledge, the fraudulent purpose exception to successor non-

24  liability is merely an application of the law of fraudulent transfer. Motion at 21-22 (citing the

25  California's Uniform Fraudulent Transfer Act ("UFTA") in support of its successor liability

26  argument). *See also* William B. Fletcher, Fletcher Cyclopedia of the Law of Private

27  Corporations § 7125 (updated Sept. 2004). Once again, however, Plaintiff's analysis is

28  irreparably flawed. The law of fraudulent transfer, which is wrapped into the successor liability

OHS West:260219054.2                              16          DEFENDANT OPSYS LIMITED'S OPPOSITION TO
                                                             MOTION TO ADD CAMBRIDGE DISPLAY
                                                             TECHNOLOGY, INC. AS A PARTY AND JUDGMENT
                                                             CASE NO. C05-00553 MHP

1    exception, has requirements established by statute. *See* California Civil Code sections 3439.01,

2    3439.03, 3439.04, 3439.05, and 3439.08. Central to any fraudulent conveyance claims is the

3    requirement that Plaintiffs prove that the seller transferred assets and received less that reasonably

4    equivalent value in exchange. Throughout this case, Plaintiff has argued that CDT bought Opsys

5    Limited's assets for some $26 million, making a claim of inadequate consideration somewhat

6    improbable.

7        Nevertheless, Plaintiff offers two arguments in support of its fraudulent transfer theory.

8    First, Plaintiff quotes a public statement by CDT that it wanted to "gain control of an economic

9    interest in the UK assets and operations of Opsys [Limited]" . . . in such a manner to avoid

10   acquiring any interest in any other assets or liabilities of Opsys [Limited]." Motion at 21. This,

11   according to Plaintiff, amounts to a fraud. Plaintiff is wrong. A transaction that allows a party to

12   acquire assets without accepting the seller's liabilities is lawful and does not give rise to successor

13   liability, provided the consideration for the assets received was adequate. *See Abbott v. Eviciti*

14   *Corp.*, No. IP 01-1802-C H/K, 2005 WL 1799438 at *4 (S.D Ind. Jun 29, 2005).

15       Second, Plaintiff argues that the cash "provided by [CDT] in 2002 was inadequate to pay

16   Opsys Limited's then-stated debts in excess of £17 million British pounds[.]" Motion at 21.

17   Plaintiff again has the law wrong. CDT had no obligation to provide consideration sufficient to

18   pay Opsys Limited's debts. Rather, the proper test for fraudulent transfer purposes is whether the

19   value received by Opsys Limited was reasonably equivalent to the value of the transferred assets.

20   *See* Cal. Civ. Code §§ 3439.05 (transfer not fraudulent if reasonably equivalent value received)

21   and 3439.08(a) ("a transfer is not voidable . . . against a person who took in good faith and for a

22   reasonably equivalent value . . . ."). *See also Annod Corp. v. Hamilton & Samuels*, 100 Cal. App.

23   4th 1286, 1294-95 (2002); *Atkinson v. Western Dev. Syndicate*, 170 Cal. 503, 509 (1915) (transfer

24   is not fraudulent if adequate consideration is paid for assets). As explained above, Opsys Limited

25   received $5 million in cash, while the value of its assets was just under £2 million. Thus, Opsys

26

27

28

DEFENDANT OPSYS LIMITED'S OPPOSITION TO
MOTION TO ADD CAMBRIDGE DISPLAY
TECHNOLOGY, INC. AS A PARTY AND JUDGMENT
CASE No. C05-00553 MHP

1    Limited received more than reasonably equivalent value for its assets, and there can be no

2    fraudulent transfer.[10]

3    Finally, any fraudulent transfer claim by Plaintiff against CDT would be barred by the

4    applicable statute of limitations. *See* Cal. Civ. Code 3439.09.

5    
6          **e.**    **Plaintiff's Attempt to Argue Successor Liability Fails On the Law and the Facts**

7    The elements of successor liability set out above are insurmountable obstacles to

8    Plaintiffs' current attempt to loop in CDT by motion. Perhaps more obvious from the discussion is

9    the fact-intensive nature of each exception and element in this area of law. Plaintiff's ineffective

10    attempt to prove the plethora of facts necessary by its submission of attorney and expert

11    declarations (that in large measure attempt to mischaracterize public filings) is a demonstration of

12    the futility and unfairness of the effort. Plaintiff's attempt to substitute declarations for a trial

13    against a non-party must fail.

14        **2.**    **Plaintiff Cannot Prove Alter Ego Under State Law For Rule 69(a) Purposes**

15    Plaintiff next attempt to justify its Rule 25(c) motion by suggesting (after its first attempt

16    to do so was dismissed with prejudice) that CDT is the alter ego of Opsys Limited. Plaintiff

17    argues that Rule 69(a) allows a judgment creditor to employ the practice and procedures of the

18    forum state in proceedings in aid of a judgment or execution of a judgment. Plaintiff therefore

19    relies on California Code of Civil Procedure § 187 (a catch-all jurisdictional section) to claim that

20    it can simply add CDT to the judgment.

21    The applicable California cases make clear that, in order to make this argument, Plaintiff

22    must prove that CDT both (1) is the alter ego of Opsys Limited, *and* (2) controlled the litigation.

23    *See Triplett v. Farmers Ins. Exchange*, 24 Cal. App. 4th 1415, 1421 (1994). But this Court

24    dismissed Plaintiff's attempts to plead alter ego *with prejudice* almost two years ago, in August

25    
26    
27    

---

28    [10] These facts dispose of Plaintiff's alternate theory that it may add CDT to any judgment pursuant to Federal Rule of Civil Procedure 18(b).

DEFENDANT OPSYS LIMITED'S OPPOSITION TO
MOTION TO ADD CAMBRIDGE DISPLAY
TECHNOLOGY, INC. AS A PARTY AND JUDGMENT
CASE NO. C05-00553 MHP

1  2005. Having tried and failed to make this claim at the outset of this action, Plaintiff cannot

2  revive it with backdoor maneuvers.[11]

3         Even if the Court indulged Plaintiff's alter ego allegation (and it should not), this motion

4  still must be denied. The law allows corporations to organize for the purpose of isolating liability

5  of related corporate entities, and only in unusual circumstances will the law permit a parent

6  corporation to be held either directly or indirectly liable for the acts of its subsidiary. *See Bowoto*

7  *v. Chevron Texaco Corp.*, 312 F. Supp. 2d 1229, (N.D. Cal. 2004). Thus, the law presumes that

8  Opsys Limited and CDT have separate corporate existence, and the burden of overcoming that

9  presumption rests upon Plaintiff. *See Mid-Century Ins. Co. v. Gardner*, 9 Cal. App. 4th 1205,

10  1213 (1992). Alter ego liability may be applied only in narrowly defined circumstances. *See*

11  *Mesler v. Bragg Mgmt. Co.*, 39 Cal. 3d 290, 300 (1985). To prevail on an alter ego claim,

12  Plaintiff must show (1) there is such a unity of interest that the separate personalities of the

13  corporations no longer exist, and (2) inequitable results will follow if the corporate separateness is

14  respected. *See Tomaselli v. Transamerica Ins. Co.*, 25 Cal. App. 4th 1269, 1285 (1994).

15         Plaintiff can establish nothing more than that Opsys Limited now is a wholly-owned

16  subsidiary of CDT (but was not in 2002). The United States Supreme Court has noted that "[i]t is

17  a general principle of corporate law deeply 'ingrained in our economic and legal systems' that a

18  parent corporation . . . is not liable for the acts of its subsidiaries." *United States v. Bestfoods*,

19  524 U.S. 51, 62, 68 (1998). Further, "it is hornbook law that the exercise of 'control' which stock

20  ownership gives to the stockholders . . . will not create liability beyond the assets of the

21  subsidiary." *Id.* A parent corporation is not liable on the contract of its subsidiary simply

22  because it is a wholly owned subsidiary. Some other basis must be established. *See Northern*

23  *Natural Gas Co. v. Superior Court*, 64 Cal. App. 3d 983 (1976).

24         Under California law, routine control of a subsidiary by a parent is insufficient to support

25  the contention that a subsidiary is a mere instrumentality for purposes of alter ego. *See Nordberg*

26  [11] Plaintiff also argues that section 187 applies to successor liability theories, citing *McClellan v. Northridge Park*

27  *Townhome Owners Ass'n, Inc.*, 89 Cal. App. 4th 746 (2001). In *McClellan*, however, the Court essentially found alter ego, resting its decision primarily on the fact that the old company never wound up, but simply reorganized and

28  changed its name. Regardless, since Plaintiff's successor liability claims fail as a substantive matter, Rule 69(a)'s procedural purpose is irrelevant.

DEFENDANT OPSYS LIMITED'S OPPOSITION TO
MOTION TO ADD CAMBRIDGE DISPLAY
TECHNOLOGY, INC. AS A PARTY AND JUDGMENT
CASE NO. C05-00553 MHP

1  *v. Trilegiant Corp.*, 445 F. Supp. 2d 1082 (N.D. Cal. 2006). Plaintiff does not even come close to

2  meeting these requirements, nor can it. In *Tomaselli*, *supra*, the court held that facts showing that

3  a parent company owns 100 percent of the subsidiary's stock, that the two companies shared

4  office space and policy manuals, have some common personnel and consolidated financial

5  statements fall "woefully short" of establishing alter ego. In *Bowoto*, *supra*, the Court relied on

6  several authorities to explain that:

7  Officers of a parent corporation may be involved in the supervision of a
   subsidiary corporation without incurring liability for the parent
8  corporation. Typical acts of parent corporation officers which are
   within the bounds of corporate formalities and do not warrant veil-
9  piercing include: supervising the acts of the subsidiaries; receiving
   regular reports from the subsidiaries; creating general policies and
10 procedures which the subsidiaries must follow; and overseeing the
   financial management of the subsidiaries. Appropriate parental
11 involvement includes: monitoring of the subsidiary's performance,
12 supervision of the subsidiary's finance and capital budget and
   articulation of general policies and procedures. Officers of a parent
13 may also simultaneously act as officers of the subsidiary without
   having their duties as parent corporation officers' presumed to be
14 effectuated also on behalf of the subsidiary corporation. Liability will
15 not be imposed on a parent merely because directors of the parent
   corporation also serve as directors of the subsidiary.
16

17 *Bowoto*, 312 F. Supp. 2d at 1235 (citations and quotations omitted). In light of the law, Plaintiff's

18 efforts too fall woefully short.

19  Nor can Plaintiff prove the second alter ego prong. Alter ego liability will be upheld only

20 when there is *clear* bad faith, fraud, flagrant abuses, and manifest injustice. *Sonora Diamond*

21 *Corp. v. Superior Court*, 83 Cal. App. 4th 523, 535 (2000). *See also Nordberg*, 445 F. Supp. 2d

22 1082 (for a court to pierce the corporate veil, it must determine that there is bad faith conduct by

23 the parent corporation that would otherwise remain without remedy). Notwithstanding Plaintiff's

24 conclusory accusations, there is no evidence of clear bad faith, fraud, flagrant abuses or manifest

25 prejudice.[12] The transactions at issue show nothing more than two corporations entering into a

26

27 [12] "The alter ego doctrine does not guard every unsatisfied creditor of a corporation but instead affords protection
   where some conduct amounting to bad faith makes it inequitable for the corporate owner to hide behind the corporate
   form." *Sonora*, 83 Cal. App. 4th at 539. The "injustice" or "inequity" on which an alter ego claim is based cannot
28 stem from the mere existence of limited liability, which is a legitimate characteristic of the corporate form. Rather,
   the injustice or inequity must be connected with the lack of separateness between the corporation and its controlling

1   lawfully permitted transaction, supported by reasonably equivalent value, after arm's-length
2   bargaining.

3          California courts have rejected the view that the potential difficulty a plaintiff faces
4   collecting a judgment is an inequitable result that warrants application of the alter ego doctrine.
5   *See Tamko Roofing Products, Inc. v. Smith Engineering Co.*, 450 F.3d 822, 828 (8th Cir. 2006),
6   citing *Neilson v. Union Bank of California, N.A.*, 290 F. Supp. 2d 1101, 1117 (C.D. Cal. 2003);
7   *Sonora*, 83 Cal. App. 4th at 539 ("Difficulty in enforcing a judgment or collecting a debt does not
8   satisfy this standard."). In sum, that is the gravamen of Plaintiff's argument -- that because it
9   likely cannot collect from Opsys Limited, it should be allowed to collect from CDT.

10         If anything, it would be inequitable to allow Plaintiff to collect rent owed on its lease from
11  CDT. First, as this Court has recognized, CDT was never a party to the lease, and was not in any
12  way connected to Opsys Limited when it entered into the lease, let alone its alter ego. Docket No.
13  39 at p. 2. Second, the evidence of record is undisputed that, had CDT known that about the lease
14  liability, it would not have done *any* transaction with Opsys Limited, either in 2002 or 2004.
15  Docket No. 74 at p. 2. Furthermore, CDT could not have been required to purchase the
16  outstanding stock of Opsys Limited in 2004 if Opsys Limited had liabilities in excess of $1.25
17  million. Plaintiff should not be rewarded for sitting on its hands for more than two years while
18  CDT went about its business, and CDT should not be prejudiced by Plaintiff's choice.

19         In addition, both Opsys Limited's September 30, 2002, financial statements and the
20  uncontradicted evidence adduced from every witness at trial established that Opsys Limited was
21  unable to pay its rent beyond October 2002 absent the CDT deal. That is precisely why Opsys
22  Limited separated its UK and US activities, entered into a deal with CDT, hired Kaufman
23  Brothers to assist with the spin off and $40 million private placement for Opsys US and, most
24  importantly, bargained for and entered into the Assignment with Plaintiff. There is nothing
25  inequitable in putting Plaintiff in exactly the position it would have been had there never been an

26

27

28  stockholder and the failure to observe corporate formalities. *See Cascade Energy and Metals Corp. v. Banks*, 896
    F.2d 1557, 1578 (10th Cir. 1990) (applying Utah law, which is the same as California law).

1 Assignment or CDT transaction. Plaintiff fails on both the facts and the law regarding alter ego.
2 This attempt to prevent giving CDT its day in court must also fail.

## IV.    CONCLUSION

4     Plaintiff's attempt to adjudicate liability without the bother of a complaint, discovery or
5 trial would be almost humorous were not the current motion actually before the Court for
6 determination. Opsys Limited has clear interests that need to be heard on this subject, as does
7 CDT. All of the arguments made, be they based on successor liability, fraudulent transfer or alter
8 ego, are intensely factual and the effort to have facts decided without a contested trial is, to say
9 the least, overreaching. Moreover, the current thrust by Plaintiff is contrary to the positions it has
10 taken throughout the case. Originally, Plaintiff named CDT as a defendant, recognizing that a
11 party to be charged had to be heard. Then, in the post-trial statement filed just a few weeks ago,
12 Plaintiff sought to file an amended complaint, obtain discovery and proceed to a second trial.
13 Now, Plaintiff seeks to eliminate all such steps. Both CDT and Opsys Limited should be advised
14 of the facts alleged against them, be able to test those allegations and to defend themselves at
15 trial.

16     Equally as important, the legal theories on which Plaintiff seeks to base the relief
17 requested contain elements Plaintiffs does not and cannot satisfy. Plaintiff's motion fails on the
18 facts, on the law and on the grounds of fairness. We have already proceeded to trial on the
19 current Complaint and it only makes sense for Plaintiff to set forth its current claims in a new
20 complaint and to proceed to trial on that complaint.

21     For the foregoing reasons, the Court should deny Plaintiff's motion to add CDT as a party
22 to this action and judgment.

1 | Respectfully submitted:

2 | Dated: April 23, 2007

JAMES E. BURNS, JR.
3 | JUSTIN M. LICHTERMAN
M. TODD SCOTT
4 | MOJI SANIEFAR
ORRICK, HERRINGTON & SUTCLIFFE LLP
5 |

6 |

*/s/ Justin Lichterman*
7 | _____
Justin Lichterman
8 | Attorneys for Defendant

9 |

10 |

11 |

12 |

13 |

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

DEFENDANT OPSYS LIMITED'S OPPOSITION TO
MOTION TO ADD CAMBRIDGE DISPLAY
TECHNOLOGY, INC AS A PARTY AND JUDGMENT
CASE NO. C05-00553 MHP