# EXHIBIT G TO THE AFFIRMATION

PILLSBURY WINTHROP SHAW PITTMAN LLP
BRUCE A. ERICSON #76342
SHARON L. O'GRADY #102356
ALICE KWONG MA HAYASHI #178522
50 Fremont Street
Post Office Box 7880
San Francisco, CA 94120-7880
Telephone: (415) 983-1000
Facsimile: (415) 983-1200
bruce.ericson@pillsburylaw.com
sharon.ogrady@pillsburylaw.com
alice.hayashi@pillsburylaw.com

Attorneys for Non-Party/Respondent
CAMBRIDGE DISPLAY TECHNOLOGY, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

SUNNYSIDE DEVELOPMENT COMPANY, LLC,

Plaintiff,

vs.

OPSYS LIMITED, a United Kingdom Company,

Defendant.

No. C 05-00553 MHP

**OPPOSITION OF CAMBRIDGE DISPLAY TECHNOLOGY, INC. TO PLAINTIFF'S MOTION TO ADD CAMBRIDGE DISPLAY TECHNOLOGY, INC. AS A PARTY TO ACTION AND JUDGMENT**

Date: May 16, 2007
Time: 1:00 p.m.
Courtroom: 15, 18th Floor
Judge: Hon. Marilyn Hall Patel

Declarations filed herewith:

1. Michael Black (Dkt. 204)
2. David Fyfe (Dkt. 205)
3. Alice K. M. Hayashi (Dkt. 206)

## TABLE OF CONTENTS

Page

I. INTRODUCTION. 1

II. STATEMENT OF FACTS. 2

- A. CDT Inc., its affiliates and their corporate structure. 2
- B. The transactions with Opsys in 2002. 3
- C. The changes in the business of Opsys UK/CDT Oxford after October 2002. 5
- D. The IPO and the exercise of the Opsys Limited Option in December 2004. 5
- E. The transfer of Opsys and CDT Oxford to CDT Ltd. in May 2005. 7

III. ARGUMENT. 7

- A. The Court should either deny Plaintiff's motion outright or order an evidentiary hearing. 8
- B. CDT Inc. is not liable as a successor. 10
  - 1. The successor liability doctrine has no application to stock purchases. 10
  - 2. Even if CDT Inc. had purchased Opsys' assets, the successor liability doctrine would not apply. 11
    - a. CDT Inc. did not agree to assume Opsys' liabilities. 12
    - b. CDT Inc.'s purchase of Opsys' stock did not amount to a de facto merger. 13
    - c. CDT Inc. is not a mere continuation of Opsys. 16
    - d. CDT Inc. has not fraudulently sought to escape liability for Opsys' debts. 18
- C. Plaintiff's motion under Rule 69(a) should be denied. 19
- D. Plaintiff's claim against CDT Inc. is barred by laches. 22
- E. Leave to add a fraudulent conveyance claim should be denied. 23

IV. CONCLUSION. 24

I. **INTRODUCTION.**

By this motion, Plaintiff seeks to join non-party **CAMBRIDGE DISPLAY TECHNOLOGY, INC.** ("CDT Inc.") to a judgment Plaintiff seeks to have entered on its jury verdict against defendant Opsys Limited ("Opsys"). Plaintiff seeks to do so summarily, by motion, without bothering to file a complaint against CDT Inc., or obtain its answer, or participate in discovery or proceed to evidentiary hearing or trial—in short without everything that goes by the name of "due process."

That won't wash. While parties may summarily be substituted where the facts are simple and uncontroverted—a party dies, one public officer succeeds another—where, as here, the facts are complex and disputed, due process and clear case law demand a fair opportunity to develop the case and an evidentiary hearing. What Plaintiff seeks cannot be done by motion.

There is, however, one thing that could be done summarily, and that is deny Plaintiff's motion. As a matter of law, the three theories advanced by Plaintiff will not work: That much can be determined without resolving disputed issues of fact.

*The successor liability doctrine:* Normally if one corporation buys assets from the other, the purchaser takes only the assets and not the liabilities. The successor liability doctrine creates four exceptions to this rule, but none fits here.

First and foremost, the doctrine does not apply because the transactions here were not asset sales, they were stock sales. The doctrine does not apply to stock sales. But even if we had asset sales here, none of the exceptions would apply. One exception applies when the buyer agrees to assume the seller's liabilities; there was no such agreement here. The second exception applies where the transaction is so close to a statutory merger that the law deems it a de facto merger; these transactions have none of the earmarks of a merger and none of the entities has disappeared. The third exception applies when the buyer pays inadequate consideration for the assets yet continues to operate exactly the same business as before; here, in contrast, CDT Inc. paid a price well in excess of the audited asset value of the company it bought and then dismantled most of that company. The fourth exception

applies to attempts to defraud creditors; here, in contrast, the proceeds of the transactions were held in escrow and trust for the benefit of creditors, known and unknown.

*The alter ego doctrine:* Alternatively, Plaintiff seeks to pierce the corporate veil—not once, not twice but three times, all the way from Opsys, a third-tier subsidiary, up to CDT Inc., its ultimate parent. Plaintiff does so despite making no showing whatsoever that any of the entities it must pierce to reach CDT Inc. are shells, or don't observe corporate formalities. And it does so despite the fact that it previously sued one of these entities—Cambridge Display Technology Limited ("CDT Ltd.")—in this action and suffered dismissal of those claims with prejudice. Dkt. 39.

*Fraudulent conveyance:* Finally, Plaintiff asserts that CDT Inc. committed fraud by transferring its stock in Opsys to CDT Ltd. in May 2005, while CDT Ltd. was a defendant in this action. A fraudulent conveyance normally involves the surreptitious transfer of assets from the defendant to a third party out of reach. Here, the third party (CDT Inc.) openly transferred its equity in Opsys to the then-defendant (CDT Ltd.). Some fraud.

*Laches:* For all these reasons, Plaintiff has no claim against CDT Inc., but there is another reason as well. For two years Plaintiff sat on its rights until CDT Inc. went public and bought stock in Opsys. Only then, after the public offering, and after a transaction that never would have happened had Plaintiff spoken up earlier, did Plaintiff attack CDT Inc.'s interest in Opsys. This is textbook laches: unreasonable delay coupled with prejudice.

## II. STATEMENT OF FACTS.

### A. CDT Inc., its affiliates and their corporate structure.

CDT Inc. is headquartered in Cambridge, England. A public company since December 2004, its stock is traded on the NASDAQ Global Exchange.

At all times relevant to this case, CDT Inc. has had a first-tier subsidiary called CDT Holdings Limited and a second-tier subsidiary, CDT Ltd., which, as noted above, once was a defendant herein but was dismissed with prejudice in August 2005. Dkt. 39.

Since May 2005, CDT Ltd. has had several subsidiaries (which therefore are third-tier subsidiaries of CDT Inc.). One is Opsys. Another is CDT Oxford Limited ("CDT

500132528v3 - 2 - CDT INC.'S OPPOSITION TO PL.'S MOTION TO ADD CDT INC. AS A PARTY TO ACTION & JUDGMENT Case No. C 05-00553 MHP

Oxford"), which until late 2002 was called Opsys UK Limited ("Opsys UK"). Before May 2004, the corporate structure was somewhat different, as shall be explained below.

**B. The transactions with Opsys in 2002.**

CDT Inc. is a leading developer of polymer organic light-emitting diode ("P-OLED") technology, which makes possible energy-efficient, ultra-thin, lightweight displays in a variety of electronic devices. Declaration of David Fyfe, Dkt. 205 ("Fyfe Decl."), ¶ 3. In 2002, CDT Inc. began negotiating to acquire control of certain UK-based assets of Opsys: some patents thought to be useful in developing the next generation of high efficiency P-OLED materials. *Id.* ¶ 4. Opsys had research facilities in the UK near Oxford, where it developed intellectual property based on these patents. *Id.* ¶ 5. Opsys also had US operations in Fremont for the pilot manufacturing of displays based on small molecule emitters. The US operations did not involve printable P-OLEDs, as the UK operations did. Instead, they employed a competing technology based on a license that Opsys had obtained from the Eastman Kodak Company ("Kodak"). *Id.* ¶ 6.

CDT Inc. wanted Opsys' UK assets but did not want Opsys' US assets for a number of business reasons. The Kodak process differed fundamentally from the CDT Inc. process; CDT Inc. had invested in its own facility and had no need of another such facility, particularly one using incompatible production equipment. *Id.* ¶ 7. Kodak competes with CDT Inc. in the licensing of OLED technology. Therefore, CDT Inc. did not wish to do anything that would endorse Kodak's technology. *Id.* CDT Inc. also wanted nothing to do with the manufacturing business that Opsys' US operations sought to enter—the highly competitive, low-profit, capital-intensive business of display manufacturing. It has never intended to be a volume manufacturer of displays; instead it seeks to license and transfer technology to the companies that do manufacture displays. *Id.*

CDT Inc. made it clear to Opsys that CDT Inc. had no interest in the US assets and business of Opsys, and that any deal would require a clean separation of the US operations from the UK operations. *Id.* ¶ 8. Opsys agreed, so the transaction proceeded on the basis of a clean separation: the UK assets were put into one subsidiary and the US assets into

another subsidiary. Opsys transferred its UK operations to Opsys UK. *Id.*; *see* Bunzel Decl. (Dkts. 182-85) ¶ 3, Ex. A at 5 (recital F) & 32 (clause 11.1). Opsys transferred its US operations to Opsys US Corporation ("Opsys US"). Fyfe Decl. ¶ 8. Despite Plaintiff's suggestion otherwise (Mot. 9:14-15), Opsys did not transfer any assets, including IP, of Opsys US to Opsys UK. Declaration of Michael Black, Dkt. 204 ("Black Decl."), ¶ 9.

On October 23, 2002, CDT Inc., Opsys and others entered into a Transaction Agreement (the "Transaction Agreement"). Bunzel Decl. ¶ 3. Ex. A. The terms are complex, but the essential points can be sketched briefly. CDT Inc. purchased a 16% interest in Opsys UK for $2.5 million in cash. *Id.* at 16 (clause 2.1). CDT **Ltd.**—*not* CDT **Inc.**—got management control of Opsys UK and 98% of Opsys UK's profits, if any. *Id.* at 22 (clause 7). CDT **Ltd.**—*not* CDT **Inc.**—paid Opsys $2 million in cash for a sublicense to Opsys' IP. *Id.* at 21, 32 (clauses 5.1(iii), 14.2). Plaintiff claims that CDT **Inc.** got control of Opsys UK (Mot. 9:16-19) but that is wrong: CDT **Ltd.** got control.

The Transaction Agreement created two "put" options and one "call" option. Bunzel Decl. ¶ 3, Ex. A, at 16-20 & 25-30 (clauses 3 & 9). Only one actually was exercised—one of the "put" options (the "Opsys Limited Option"). It gave Opsys' shareholders the right to force CDT Inc. to buy Opsys on these conditions (among others): Opsys' shareholders could exercise this option only if the aggregate liabilities, including contingent liabilities, of Opsys and its subsidiaries (excluding Opsys UK) were less than $1.25 million (*id.* at 26 (clause 9.4(C)); the option exercise price would be reduced by the value of the aggregate current liabilities; and CDT Inc. would withhold from the exercise price the amount of all contingent liabilities until the liabilities materialized or until the statute of limitations expired (*id.* at 27-28 (clauses 9.11(A) & 9.12)).

Opsys expressly warranted that it was not a party to any contract that could not readily be performed by it on time; that it was not a party to, nor did it have any liability under, any lease; that it was not a party to any contract "of a value of more than £10,000" or "of one year or greater duration"; and that it was not under any obligation in respect of unaccrued or undisclosed liabilities in connection with operations in the US. Bunzel Decl.

¶ 3, Ex. A, at 59-60 (sched. 3, part 2, clauses 9.1-9.2, 9.7(a)-(b), & 9.9). In its Disclosure Letter dated October 23, 2002, Opsys explicitly represents that the Fremont lease was assigned to Opsys US, and it attaches the Assignment of Lease and Consent of Lessor. Black Decl. ¶ 10, Ex. A (Disclosure Letter at 9).

The structure was complex but its purposes were simple and straightforward: CDT Inc. wanted Opsys' UK assets and not its US assets; and the parties wanted to avoid the punitive taxes that would be levied on a sale of assets. Paragraphs 7 through 13 of the Black Declaration explain the tax planning; we shall not burden the Court by repeating that explanation here. The salient point is that there were sound business and tax reasons for the structure, having nothing to do with disadvantaging Plaintiff or any other creditor. *Id.*

**C. The changes in the business of Opsys UK/CDT Oxford after October 2002.**

Late in 2002, Opsys UK was renamed CDT Oxford Limited. Fyfe Decl. ¶ 9. Beginning in July 2003, the CDT Oxford facility in Oxford was gradually shut down. Most of CDT Oxford's employees were laid off. *Id.* ¶ 10. Three employees eventually accepted offers to continue working for CDT Oxford in Cambridge, where they and certain CDT Ltd. employees, who were transferred to CDT Oxford, formed a new high efficiency materials research group located in Cambridge. *Id.*

Two points here are salient: First, CDT Inc. did not merely continue the business of Opsys UK but fundamentally transformed it. Fyfe Decl. ¶¶ 9-10. Second, Opsys and Opsys UK remained and remain separate legal entities that observe the proper corporate formalities and thus are entitled to have their separate existence recognized. Black Decl. ¶¶ 14-18. As shall be shown below, the first point undermines Plaintiff's "successor liability" argument, and the second point undermines Plaintiff's "alter ego" argument.

**D. The IPO and the exercise of the Opsys Limited Option in December 2004.**

Two things set the stage for the CDT/Opsys transaction of late 2004. The first was the IPO of CDT Inc. The second was a dispute between CDT Inc. and Opsys over whether an earlier round of private financing had triggered an anti-dilution provision in the Transaction Agreement; if it had, Opsys' shareholders stood to get more shares of CDT Inc.

stock if CDT Inc. went public than they would get otherwise. Black Decl. ¶¶ 19-22.

The dispute was settled and CDT Inc. went public on December 15, 2004. Plaintiff's manager, Frank Chiu, knew all about the public offering and had consulted an attorney about suing, but he breathed not a word of this to anyone at CDT Inc. until after the IPO had closed. *See* part III.D below.

After the IPO, Opsys' shareholders exercised the Opsys Limited Option, thus requiring CDT Inc. to acquire the equity of Opsys in exchange for 931,633 shares of CDT Inc.'s newly public common stock. Black Decl. ¶ 25. The number of shares of CDT Inc. stock to be paid was calculated pursuant to a formula agreed as part of the settlement of the anti-dilution dispute. Black Decl. ¶¶ 21-22; the Amended Settlement Agreement is Bunzel Decl. ¶ 6, Ex. D, at 4-5 (clause 1.1(c)).

By exercising the Opsys Limited Option rather than the other options, Opsys and its shareholders obtained significant tax benefits, which are detailed in Black Decl. ¶ 25. Once again, the salient point is that sound tax planning—and not creditor avoidance—accounts for the structure of the deal.

Far from harming creditors, the Transaction Agreement, as modified by the Amended Settlement Agreement, protected creditors in at least three ways:

First, 133,938 shares of CDT Inc. stock (at the IPO price of $12 a share, Black Decl. ¶ 23, this amounted to $1,607,256) were held back to cover known and identified liabilities, as set forth in Schedule A to the Amended Settlement Agreement. Bunzel Decl. ¶ 6, Ex. D, at 6 (clause 1.1(g)); Black Decl. ¶ 27. The list in Schedule A did not include the Fremont lease. Bunzel Decl. ¶ 6, Ex. D, at 20-21. Opsys Management (an entity created to hold the CDT Inc. shares) and the directors of Opsys (Michael Holmes and Alexis Zervoglos) warranted that there were no facts known to them, after reasonable inquiry, that would cause a reasonable person to conclude that "there are any liabilities of Opsys, whether absolute, accrued, contingent, or otherwise, other than those identified in Schedule A or Schedule B. . . ." *Id.* at 9 (clause 1.1(h)), 11 (clause 2.1). (Schedule B listed a claim by Damoder Reddy, who had served as COO either of Opsys or of Opsys US.)

Second, 422,610 shares of CDT Inc. stock (at $12 a share, $5,071,320) went into escrow as security for contingent and unidentified liabilities of Opsys (including the Reddy claim in Schedule B). *Id.* at 9-10 (clause 1.1(h)).

Third, the remaining CDT Inc. shares paid for Opsys were issued to Opsys Management (Bunzel Decl. ¶ 6, Ex. D, at 10 (clause 1.1(h)), to be distributed pursuant to a "Deferred Consideration Agreement" between Opsys Management and Opsys' shareholders. Black Decl. ¶ 29, Ex. B. None of the CDT Inc. shares held by Opsys Management has been paid out to the former shareholders. The shares are to be paid first to a former trade creditor of Opsys (Kodak), then to former debt holders that had provided venture capital to Opsys, and only then to the former shareholders. Black Decl. ¶ 29.

Opsys' shareholders could exercise the Opsys Limited Option only if Opsys' liabilities were below a specified level. CDT Inc. would not have allowed the exercise and CDT Inc. would not have purchased Opsys' stock if CDT Inc. had know that the Fremont lease assignment was ineffective or that Plaintiff was planning legal action against CDT Inc. or CDT Ltd. on the Fremont lease. Fyfe Decl. ¶ 14; Black Decl. ¶¶ 30-32.

E. **The transfer of Opsys and CDT Oxford to CDT Ltd. in May 2005.**

CDT Inc. held the stock of Opsys for only a short time. In May 2005, to simplify its corporate structure, CDT Inc. transferred both its 16% interest in CDT Oxford and its 100% interest in Opsys to CDT Ltd. In addition, Opsys transferred its 84% interest in CDT Oxford to CDT Ltd. As a result, both CDT Oxford and Opsys are now direct, wholly owned subsidiaries of CDT Ltd. and indirect third-tier subsidiaries of CDT Inc. Black Decl. ¶¶ 33-38. These transfers were planned in late 2004, before Plaintiff filed its claim. Black Decl. ¶¶ 24-25. These transfers occurred in May 2005, when CDT **Ltd.**, not CDT **Inc.**, was a defendant in this action. *Id.*

III. **ARGUMENT.**

Plaintiff moves under Rule 25(c) and Rule 69(a) (all references to "Rule" herein are to the Federal Rules of Civil Procedure) to add CDT Inc. to any judgment against Opsys. As discussed below, Rule 69(a) requires the same substantive showing of successor liability

500132528v3 - 7 - CDT INC.'S OPPOSITION TO PL.'S MOTION TO ADD CDT INC. AS A PARTY TO ACTION & JUDGMENT Case No. C 05-00553 MHP

as Rule 25(c), or a showing that CDT Inc. is Opsys' alter ego, *plus* a showing that CDT Inc. controlled Opsys' defense of Plaintiff's action. Plaintiff's motion should be denied under both Rule 25(c) and Rule 69(a).

**A. The Court should either deny Plaintiff's motion outright or order an evidentiary hearing.**

Rule 25(c) provides a procedure for substituting one party for another in cases of death, incompetency or transfer of interest or public office. Where the facts underlying the grounds for substitution are incontrovertible (e.g., death, appointment of a new Attorney General), the substitution can be made summarily, without an evidentiary hearing or trial. But where the facts are disputed, due process requires at least an evidentiary hearing (following appropriate discovery) and sometimes a trial before the decision whether to substitute one party for another can be made. *Luxliner P.L. Export Co. v. RDI/Luxliner, Inc.*, 13 F.3d 69 (3d Cir. 1993).

The plaintiffs in *Luxliner* moved under Rule 25(c), as Plaintiff does here, to join or substitute a corporation, Sturgis Lux-Liner Homologation, Inc. ("Sturgis"), on a judgment previously entered against another corporation, RDI/Luxliner, Inc. ("RDI"). Sturgis had purchased RDI's assets before entry of judgment against RDI, making RDI judgment-proof. *Id.* at 71. The district court granted the motion, finding that Sturgis' purchase of RDI's assets had resulted in a de facto merger and that Sturgis was a mere continuation of RDI. But the Third Circuit reversed, holding that because there were conflicting affidavits concerning whether Sturgis was RDI's successor in interest, the district court should have held an evidentiary hearing. *Id.* at 70.

*Luxliner* emphasized that "[b]efore a party may be deprived of a property interest, due process requires, at a minimum, notice and an opportunity to be heard." *Id.* at 72 (citations omitted). The court said that Sturgis' due process interest were "particularly compelling" because Sturgis was joined "not merely in ongoing litigation but on a judgment already entered against RDI." *Id.* In such a context, the court held, a district court must determine "whether the affidavits 'show that there is no genuine issue as to any

material fact and that the moving party is entitled to [joinder or substitution] as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(c)). If there are genuine issues of material fact, the court must conduct an evidentiary hearing. *Id.* at 72-73. *Accord, EEOC v. Pan American World Airways, Inc.*, No. C-81-3636 RFP, 1987 U.S. Dist. LEXIS 15182, at *8 (N.D. Cal. Dec. 1, 1987) (denying plaintiff's pre-trial Rule 25(c) motion to join a new defendant where the motion raised numerous factual disputes, and observing that "granting such a motion requires extensive factual development, and such development is sorely lacking here").

It is obvious, even from a cursory reading of the declarations submitted on this motion, that here the facts are hotly disputed on every level. Our witnesses will say that Plaintiff does not understand the corporate transactions it purports to describe and its attempts to ascribe nefarious motives to CDT Inc. are wholly without merit. Plaintiff has not adduced enough evidence even to create a genuine issue of material fact. Its motion should therefore be summarily denied. If the Court finds, however, that there might be genuine issues of material fact, then it must at least hold an evidentiary hearing before deciding whether to add CDT Inc. as a judgment debtor. *See Luxliner,* 13 F.3d at 72.

Plaintiff has acknowledged that an evidentiary hearing would be appropriate here. It originally sought to proceed against CDT Inc. via complaint. On November 28, 2005, when seeking leave to file a second amended complaint, it stated, "If [Rule 25(c)'s] application affects substantive due process, such as substituting a party *after* a judgment, then the Court should conduct an evidentiary hearing to decide whether the motion should be granted." Dkt. 55, at 6:17-19 (emphasis in original) (citing *Luxliner*, 13 F.3d at 72). More recently, in Plaintiff's Post-Trial Case Management Statement, it sought to renew its motion to add CDT Inc. as a defendant, stating that if the Court granted this motion, it would "file and serve a new pleading that adds Cambridge as an additional party to the existing Second Amended Complaint." Dkt. 171, at 1:20-25. Plaintiff also asked the Court to "set a schedule for adjudicating the successor liability of Cambridge," estimating that discovery would take 90 to 120 days. *Id.* at 1:25-28. Only when it filed its current motion (Dkt. 179) did Plaintiff switch ground and argue that successor liability can be determined

without pleadings, discovery and an evidentiary hearing. If the Court does not deny Plaintiff's motion out of hand, it should schedule an evidentiary hearing.

B. **CDT Inc. is not liable as a successor.**

Plaintiff argues this issue under California law. Mot. 14-15. But the Transaction Agreement provides that English law should apply. Bunzel Decl. ¶ 3, Ex. A at 51 (clause 36). As the 2002 transaction in particular involves the UK assets of several UK companies, it is not at all clear that California law should be applied. But until we can obtain expert advice on the UK law of successor liability (if any), we shall assume *arguendo* that California law applies without conceding the point.

1. **The successor liability doctrine has no application to stock purchases.**

Plaintiff's principal argument that that CDT Inc. is a successor to Opsys under the "successor liability" doctrine. That doctrine—a limited exception to the principle that a corporation can normally sell assets, even all its assets, without also transferring its liabilities to the vendee—applies only to asset purchases, not stock purchases. *Potlatch Corp. v. Superior Court,* 154 Cal. App. 3d 1144, 1150 (1984). The transactions here were fundamentally stock-for-stock deals. CDT Inc. did not buy assets; it and CDT Ltd. bought equity interests in Opsys and Opsys UK. Accordingly, the successor liability doctrine has no application here.

*Potlatch* held that a corporation (Potlatch) was not liable for damages caused by a defective product manufactured by another company before Potlatch purchased all the outstanding stock of that company. The court observed, "The difference between an acquisition of capital stock and an acquisition of physical assets is no mere matter of form." *Id.* at 1150. "It implicates fundamental concepts and principles of California and United States law: corporate identity and shareholder immunity." *Id.*; *see also Marks v. Minnesota Mining & Mfg. Co.,* 187 Cal. App. 3d 1429, 1436 (1986) (listing factors that indicate "whether a transaction cast in the form of *an asset sale* actually achieves the same practical result as a merger") (emphasis added); *Phillips v. Cooper Labs., Inc.,* 215 Cal. App. 3d 1648, 1660 (1989) (holding that *Marks* did not apply to stock sale).

500132528v3

- 10 -

CDT INC.'S OPPOSITION TO PL.'S MOTION TO ADD CDT INC. AS A PARTY TO ACTION & JUDGMENT
Case No. C 05-00553 MHP

Here, CDT Inc. purchased the stock of Opsys in 2004; it never purchased the assets of Opsys. Accordingly, the successor liability doctrine simply does not apply.

Plaintiff's characterization of the earlier 2002 transaction as an asset purchase also is wrong. In 2002, CDT **Ltd.** agreed to manage and fund the operations of Opsys UK. This was a management agreement, not an asset purchase. The parties were CDT **Ltd.** and Opsys UK (later renamed CDT Oxford)—not CDT **Inc.** and Opsys, the two companies now before the Court. Opsys UK is not the same as Opsys, and CDT Inc. is not the same as CDT Ltd. Plaintiff admits that CDT Inc. and CDT Ltd. are different companies. *E.g.*, Mot. 13 n.24. Plaintiff admits that the 2002 transaction involved Opsys UK, that it was not until 2004 that CDT Inc. acquired Opsys and that the 2004 transaction was "a 100% stock deal." Mot. 18 n.32. These admissions defeat Plaintiff's successor liability claim.

**2. Even if CDT Inc. had purchased Opsys' assets, the successor liability doctrine would not apply.**

A corporation that purchases the assets of another corporation ordinarily does not assume the debts of the selling corporation.[1] Only if one of four recognized exceptions applies is the vendee liable for the vendor's debts. As stated by the California Supreme Court in *Ray v. Alad Corp.*, 19 Cal. 3d 22 (1977), the four recognized exceptions are: "(1) there is an express or implied agreement of assumption, (2) the transaction amounts to a consolidation or merger of the two corporations, (3) the purchasing corporation is a mere continuation of the seller, or (4) the transfer of assets to the purchaser is for the fraudulent purpose of escaping liability for the seller's debts." *Id.* at 28.[2] Plaintiff previously argued that only *one* of these four exceptions applied—the de facto merger exception. Dkt. 48, at 12:8-13:28. Although it now seeks to invoke all four, its earlier decision not to claim the

---

1 In contrast, when there has been a statutory merger, the surviving corporation assumes the disappearing corporation's liabilities. Plaintiff concedes that there has been no statutory merger of CDT Inc. and Opsys. Mot. 12:15-17.

2 *Ray* created a fifth exception to the general rule of non-liability, but that fifth exception has since been limited to cases of strict tort liability for product defects. *See Franklin v. USX Corp.*, 87 Cal. App. 4th 615, 627-29 (2001); *see also* Mot. 17 n.30 (agreeing that this fifth exception does not apply here).

other three exceptions underscores the weakness of its position.

a. **CDT Inc. did not agree to assume Opsys' liabilities.**

CDT Inc. never agreed to assume Opsys' liabilities, whether expressly or by implication. Instead, before the exercise of the Opsys Limited Option and its purchase of Opsys' stock, CDT Inc. took steps to ensure that it would *not* assume Opsys' liabilities and that Opsys would pay those liabilities itself. The 2002 Transaction Agreement provided that the Opsys Limited Option could not be exercised unless Opsys' aggregate liabilities, including its contingent liabilities, were less than $1.25 million. The 2004 Amended Settlement Agreement provided that all of Opsys' identified liabilities would be satisfied out of the consideration payable for the Opsys shares. CDT Inc. also deposited part of this consideration into an escrow account as security for any unidentified liabilities of Opsys, including contingent liabilities.

Plaintiff argues that CDT Inc. understood there was a risk of undisclosed contingent liabilities and that plaintiffs might even assert claims for such liabilities against CDT Inc. Mot. 17:21-18:1. But that does not mean that CDT Inc. agreed to assume such liabilities. To the contrary, CDT Inc. insisted on an escrow and a trust and set-asides, as outlined in part II.D above, to ensure that the former Opsys shareholders would continue to bear responsibility for such claims. *See* Black Decl. ¶¶ 19-32. These provisions are compelling evidence that CDT Inc. did *not* agree to assume Opsys' unidentified contingent liabilities. *See Franklin,* 87 Cal. App. 4th at 621-22 (buyer held not liable as successor-in-interest where, among other factors, asset purchase agreement showed unambiguously that buyer did not assume seller's contingent tort liabilities); *Chaknova v. Wilbur-Ellis Co.*, 69 Cal. App. 4th 962, 967-69 (1999) (buyer held not liable as successor-in-interest in part because it had assumed only certain specific financial liabilities in asset purchase agreement, which did not include contingent tort liabilities), *abrogated on other grounds, Weber v. John Crane, Inc.,* 143 Cal. App. 4th 1433 (2006).

Plaintiff cites a provision in the Transaction Agreement stating that CDT Inc. and CDT Ltd. "shall be responsible for all liabilities arising from its management of Opsys

500132528v3 - 12 - CDT INC.'S OPPOSITION TO PL.'S MOTION TO ADD CDT INC. AS A PARTY TO ACTION & JUDGMENT
Case No. C 05-00553 MHP

UK." Mot. 18:1-2 (citing Bunzel Decl. ¶ 3, Ex. A at 23 (clause 7.5)). But this provision plainly does not state that CDT Inc. shall be responsible for all liabilities of **Opsys**. The "liabilities arising from [CDT Ltd.'s] management of Opsys UK" do not include liabilities of Opsys—a different corporation than Opsys UK—which are wholly unrelated to CDT Ltd.'s management of Opsys UK.

Plaintiff concedes that CDT Inc. intended not to assume any obligations arising from Opsys US operations (Mot. 17:18-19), but argues that the Fremont lease is different because it is an obligation of Opsys itself. This argument is irrelevant. The Transaction Agreement and Amended Settlement Agreement make clear that CDT Inc. did not assume any of Opsys' liabilities, including liability for the Fremont lease— whether or not it is characterized as a "US obligation."

b. **CDT Inc.'s purchase of Opsys' stock did not amount to a de facto merger.**

In evaluating claims of de facto merger, courts consider the following factors:

(1) Was the consideration paid for the assets solely stock of the buyer or its parents?

(2) Did the buyer continue the same enterprise after the sale?

(3) Did the shareholders of the seller become shareholders of the buyer?

(4) Did the seller liquidate?

(5) Did the buyer assume the liabilities necessary to carry on the business of the seller?

*Marks,* 187 Cal. App. 3d at 1436.[3] Here, four of the questions must be answered "no." Only one question—the first—even allows of any ambiguity.

(1) *Was the consideration paid for the assets solely stock of the buyer or its parents?* The consideration paid in 2004 by CDT Inc. for Opsys' stock was CDT Inc.

---

[3] Citing *Herrera v. Singh,* 118 F. Supp. 2d 1120 (E.D. Wash. 2000), Plaintiff offers what appears to be an alternative test for successor liability. Mot. 12:27-13:3 (arguing that a transferee may be liable for a judgment when it is a "bona fide successor," the transferee had notice of the potential liability, and the predecessor is unable to directly provide adequate relief). In fact, *Herrera* describes the "successorship doctrine" under federal common law. 118 F. Supp. 2d at 1123 (observing that this doctrine is frequently invoked in employment situations). *Herrera* is therefore irrelevant here.

stock. But Plaintiff urges the Court to look at the 2002 transaction as well. If one does so, one sees this: In 2002, CDT Inc. paid not stock but $2.5 million cash for stock not in Opsys but in Opsys UK.

(2) *Did the buyer continue the same enterprise after the sale?* No. Opsys had no operations of its own after the transfer of its UK operations to Opsys UK in 2002. Fyfe Decl. ¶ 11. Hence, Opsys had no operations either before or after its acquisition by CDT Inc. in 2004. CDT Inc. did not either continue or discontinue Opsys' business after the acquisition. Plaintiff argues, in effect, that CDT **Inc.** continued the same enterprise after its purchase of Opsys in 2004 because CDT **Ltd.** continued the business of Opsys UK after CDT **Ltd.** acquired control of Opsys UK in 2002. *See* Mot. 18:22-19:7. But CDT Inc. and CDT Ltd. are different companies, just as Opsys and Opsys UK are different companies. Moreover, CDT Ltd. did *not* continue the business of Opsys UK as before. The facts here are not even remotely like the facts in *Ray v. Alad*, where the successor continued the old business in every respect. 19 Cal. 3d at 26-28. Here, in contrast, virtually all the employees were let go, the Oxford facility was closed and the few employees left joined a new lab in Cambridge. Fyfe Decl. ¶¶ 9-11.[4] Such facts do not create successor liability. *See Orthotec, LLC, v. REO Spineline, LLC,* 438 F. Supp. 2d 1122, 1131 (C.D. Cal. 2006) (holding that an alleged successor did not continue the same enterprise where it hired some of predecessor's employees, developed relationships with some of predecessor's sales agents and operated out of the same office space, but marketed its own products and retained its own trade name).

(3) *Did the shareholders of the seller become shareholders of the buyer?* For the most part, no. Except in settlement of two personal claims, the former Opsys shareholders have not yet received any CDT Inc. stock, and none will be distributed to them unless Kodak and certain debt holders are paid. Black Decl. ¶ 29. The de facto merger

---

[4] Plaintiff says the operations of CDT Oxford were "fully 'consolidated' into Cambridge or Cambridge's other affiliates." Mot. 10:5-6 (citing Bunzel Decl. ¶ 8, Ex. F). But the press release Plaintiff cites describes only a "consolidation of resources."

exception applies "where the consideration consists wholly of shares of the purchaser's stock which are *promptly distributed* to the seller's shareholders in conjunction with the seller's liquidation." *Marks,* 187 Cal. App. 3d at 1435 (citations and internal quotations omitted) (emphasis added). Even if some former Opsys shareholders eventually receive some CDT Inc. stock, they will not have been paid "promptly."

(4) *Did the seller liquidate?* No. Opsys has not liquidated. Black Decl. ¶ 35; Fyfe Decl. ¶ 11. During the five months that CDT Inc. held Opsys' stock directly, CDT Inc. did not dispose of Opsys' only material asset, its 84% interest in CDT Oxford. Opsys did not transfer its interest in CDT Oxford to CDT Ltd. until after CDT Inc. transferred Opsys to CDT Ltd. As Plaintiff itself has repeatedly emphasized, it seeks to add CDT **Inc.** to a judgment here, not CDT **Ltd.** *See, e.g.*, Mot. 13 n.24.

(5) *Did the buyer assume the liabilities necessary to carry on the business of the seller?* No. CDT Inc. did not assume Opsys' liabilities. *See* part II.D above.

The differences between the facts here and those in *Marks* illustrate why a different result is required. In *Marks,* the court held that there had been a de facto merger where, among other factors, the predecessor corporation was required to change its name (so that the successor corporation could use it), distribute the successor's stock to its shareholders, and dissolve as soon as practicable; all of the predecessor's employees, including the seven shareholders, were asked to sign employment agreements with the successor; all five founders of the predecessor continued to work for the successor in substantially the same capacity; the successor assumed essentially all normal operating liabilities of the predecessor; and the successor manufactured and marketed the same products as the successor. 187 Cal. App. 3d at 1432, 1435-36. In contrast, Opsys did not change its name and has not dissolved. Opsys Management has not distributed the CDT Inc. stock to the former Opsys shareholders. Only a handful of Opsys UK employees became employees of CDT Ltd.; most were laid off within a matter of months. Opsys' CEO, CFO, and COO were never employees of CDT Inc. or CDT Ltd. None of them has ever been a member of CDT Inc.'s Board of Directors. Black Decl. ¶¶ 16-17.

c. **CDT Inc. is not a mere continuation of Opsys.**

"California decisions holding that a corporation acquiring the assets of another corporation is the latter's mere continuation and therefore liable for its debts have imposed such liability only upon a showing of one or both of the following factual elements: (1) no adequate consideration was given for the predecessor corporation's assets and made available for meeting the claims of its unsecured creditors; (2) one or more persons were officers, directors, or stockholders of both corporations." *Ray,* 19 Cal. 3d at 29. Subsequent decisions have clarified that the first of these elements is determinative. The "crucial factor" in determining whether a corporate acquisition constitutes a mere continuation is "whether adequate cash consideration was paid for the predecessor corporation's assets." *Franklin,* 87 Cal. App. 4th at 625. The *Franklin* court said that all the cases cited by *Ray* "involved the payment of inadequate cash consideration, and some also involved near complete identity of ownership, management or directorship after the transfer." *Id.* at 627. *Franklin* therefore held that a buyer was not a mere continuation of a seller even though the same individual was president and a board member of both corporations. *Id.* at 626-27. To the same effect are *Orthotec, LLC,* 438 F. Supp. 2d at 1128 n.6, 1133; and *Maloney v. American Pharm. Co.,* 207 Cal. App. 3d 282, 287 (1988) (refusing to find one corporation liable as a successor absent the "essential ingredient" of inadequate consideration, although the corporation held itself out as a continuation of the first corporation and the two corporations shared a common officer). *Mahoney* also hold that the party asserting successor liability bears the burden of proving inadequate consideration. *Maloney,* 207 Cal. App. 3d at 288 & n.3.

*Adequacy of consideration:* CDT Inc. paid 931,633 shares of its common stock for Opsys' stock in 2004. At the IPO price of $12 per share, this amounts to $11,179,596. Furthermore, Opsys had received $5 million in cash in 2002—CDT Inc. had paid $2.5 million for its 16% interest in Opsys UK; CDT Ltd. had paid $2 million for a patent license; and CDT Inc. had paid $500,000 for a call option to acquire 84% of Opsys UK (Bunzel Decl. ¶ 3, Ex. A, at 16 (clause 3.1)). Thus, the 2002 and 2004 transactions together resulted

in payments totaling $16,179,596. This far exceeds the book value of Opsys' assets, which was £1.8 million ($2.9 million) as of September 30, 2002, just before execution of the Transaction Agreement. Bunzel Decl. ¶ 18, Ex. M at OPS 07500. (Amounts in British pounds have been converted to US dollars at the September 30, 2002 rate of £1 to $1.56 (http://www.oanda.com/convert/fxhistory).)

The same balance sheet shows that Opsys' *liabilities* exceeded £17 million. *Id.* Plaintiff argues that adequacy of consideration should be measured against the seller's liabilities rather than the assets purchased—a novel position for which Plaintiff cites no authority. A rule requiring a purchaser of a corporation's assets to pay enough to settle all of the corporation's liabilities—regardless of the value of the assets themselves—would place such a corporation's creditors in a better position than if there had been no acquisition at all. *Cf. Katzir's Floor & Home Design, Inc., v. M-MLS.com,* 394 F.3d 1143, 1151 (9th Cir. 2004). It would mean that a corporation in distress could never liquidate its assets—truly a senseless result.

Plaintiff argues that CDT Inc. initially reported a $26.894 million purchase price for CDT Oxford, based on the cash and stock paid or to be paid to Opsys and its shareholders. Bunzel Decl. ¶ 7, Ex. E, at 80 (CDT Inc.'s Form 10-K). This figure was reduced in December 2004 to $19.679 million to reflect a decrease in the value of CDT Inc.'s common stock. *Id.* at 82. Plaintiff claims that these figures reflect how much CDT Oxford or Opsys was worth. Mot. 10:15-17. But as noted, Opsys' own audited financial statements dated September 30, 2002, just before to the execution of the Transaction Agreement, show assets of only £1.8 million ($2.9 million). Bunzel Decl. ¶ 18, Ex. M at OPS 07500. Opsys had a negative net worth of £15.5 million ($24.1 million). *Id.* It had lost £19.7 million ($30.8 million) for the year ending September 30, 2002. *Id.* at OPS 07499; *see also* Dkt. 200-1 ¶ 2, Ex. A at 4-6 (expert witness report).

The claim that Opsys' assets were worth $26.894 million or $19.679 million (*see* Mot. 10:15-17) depends on the declaration of Plaintiff's expert Paul Ainslie, who candidly admits that he has "not yet reviewed" contracts and records that he "would expect to

500132528v3 - 17 - CDT INC.'S OPPOSITION TO PL.'S MOTION TO ADD CDT INC. AS A PARTY TO ACTION & JUDGMENT Case No. C 05-00553 MHP

review…to complete an opinion" about whether Opsys received fair value for assets transferred to CDT Inc. Ainslie Decl. ¶ 11. Moreover, the $26.9 million and $19.7 million numbers represent the price paid by CDT Inc., *not* the value of Opsys' assets. Plaintiff would have the Court determine the adequacy of the consideration by reference to the amount of the consideration. This is circular: If the value of the assets is the same as the consideration paid, then the consideration paid is necessarily adequate. Black Decl. ¶ 11; *see also* Dkt. 200-1 ¶ 2, Ex. A at 4-6 (expert witness report re: valuation of Opsys' assets).

*Interlocking directors and officers:* Plaintiff asserts that Opsys' financial controller became a director of Opsys UK, that Michael Holmes became an observer on the CDT Inc. Board of Directors and that Opsys shareholders became CDT Inc. shareholders. Mot. 20:19-21:2. These assertions do not come close to making CDT Inc. the successor to Opsys. Whether or not Michael Holmes was an observer on the CDT Inc. board is irrelevant; he was not a director, and there is no such creature as an "observer director" (Bunzel Decl. ¶ 21). Although CDT Inc. or CDT Ltd. employees have served as directors of Opsys, no director of CDT Inc. has ever been a director of Opsys or Opsys UK and the principal shareholders and officers of Opsys have never worked for CDT Inc. or CDT Ltd. Black Decl. ¶¶ 16-17. Whether they ever even get much CDT Inc. stock remains to be seen. *Id.* ¶¶ 26-29.[5]

d. **CDT Inc. has not fraudulently sought to escape liability for Opsys' debts.**

CDT **Ltd.** acquired control of Opsys UK in 2002 to gain access to IP potentially useful to CDT Ltd.'s business. CDT **Inc.** purchased the stock of Opsys in 2004 to obtain Opsys' 84% interest in Opsys UK. There was nothing fraudulent about these transactions.

---

[5] CDT Inc. is not a mere continuation of Opsys for the additional reason that Opsys' assets were transferred to Opsys UK and then, arguably, to CDT **Ltd.**—not CDT **Inc.** *See Maloney,* 207 Cal. App. 3d 282, 288 (1988) ("a mere continuation contemplates a *direct* sale of assets from the predecessor corporation to the successor corporation") (emphasis added); *Katzir's,* 349 F.3d at 1151 (holding that corporation was not mere continuation of judgment debtor where it had obtained the assets of the judgment debtor from an intervening corporation, although this intervening corporation was wholly owned by the wife of the sole shareholder of both the alleged successor corporation and the judgment debtor).

Opsys received ample consideration for its UK assets.[6] Black Decl. ¶ 11.

The structure of these transactions reflected legitimate business reasons and sound tax planning, not a plan to defraud creditors. A simpler structure, such as an asset purchase, would have created tax liability that Opsys probably could not have paid—a significant barrier to completing the transaction. Black Decl. ¶ 8. Creating new unpaid tax obligations would have done nothing for Opsys' creditors.

The Transaction Agreement and Amended Settlement Agreement explicitly provided for the satisfaction of all of Opsys' identified liabilities, as well as providing for contingent liabilities and unidentified liabilities. *See* part II.D above; Black Decl. ¶¶ 26-29. CDT Inc. did not purchase Opsys' stock to escape liability for Plaintiff's claim because CDT Inc. did not even know about Plaintiff's claim. Plaintiff cites no authority for its argument that CDT Inc. should not have been permitted to acquire the UK assets of Opsys without assuming liability for Opsys' US operations. *See* Mot. 21:7-13. The rule is to the contrary. It is well settled that, absent one of the four exceptions enunciated in *Ray,* a corporation that purchases the assets of another corporation does *not* assume the selling corporation's liabilities. *Ray,* 19 Cal. 3d at 28. Here, none of the four exceptions applies.

C. **Plaintiff's motion under Rule 69(a) should be denied.**

Plaintiff argues that Rule 69(a) allows it to rely on California Code of Civil Procedure section 187, which courts have interpreted to permit the amendment of a judgment to add judgment debtors under certain circumstances. Doing this requires "(1) that the new party be the alter ego of the old party *and* (2) that the new party had controlled the litigation, thereby having had the opportunity to litigate, in order to satisfy due process concerns." *Katzir's,* 394 F.3d at 1148 (citations and internal quotations omitted); *McClellan v. Northridge Park Townhome Owners Ass'n, Inc.*, 89 Cal. App. 4th

---

[6] Plaintiff cites California's Uniform Fraudulent Transfer Act (Mot. 22:103), which explicitly considers whether a debtor received "reasonably equivalent value" for the asset transferred. *See* Cal. Civ. Code §§ 3439.04(a)(2) & (b)(8); *see also id.* § 3439.08 (a transfer is not voidable against a person who took in good faith and for a reasonably equivalent value or against any subsequent transferee).

746, 752 (2001). Section 187 has also been applied to permit the addition of successors in interest, as well as alter egos, to a judgment. *Id.* at 753-55.

Here, none of these requirements is satisfied. As shown above, CDT Inc. is not a successor in interest to Opsys. It also is not the alter ego of Opsys, its third-tier subsidiary. Plaintiff has not even begun to make the showing necessary to pierce the corporate veil between Opsys and Opsys UK, much less the one separating those two corporations from CDT Ltd., CDT Ltd. from CDT Holdings Limited, and CDT Holdings Limited from CDT Inc. Nor has there been any failure to observe corporate formalities. Opsys UK has employees, books of accounts and bank accounts separate from those of CDT Inc. and CDT Ltd. Black Decl. ¶ 15. Its employees use different laboratories than CDT Ltd.'s employees. Fyfe Decl. ¶ 10. CDT Ltd., Opsys and Opsys UK all have their own audited accounts. Each maintains its own share register. Each has its own General Ledger. Each has its own board of directors. No member of CDT Inc.'s board has ever sat on the boards of Opsys or Opsys UK, nor have the principals in Opsys sat on the boards of CDT Inc. Black Decl. ¶¶ 15-17. Plaintiff concededly is *not* alleging that CDT Inc. is an alter ego of Opsys with respect to breach of the Fremont lease. *See* Mot. 13 n.24 & 16 n.29. In no way has Plaintiff made an alter ego showing, much less one that would pierce through the three layers from a third-tier subsidiary to the ultimate parent.

Contrary to Plaintiff's bare assertion, no entity other than Opsys has directed Opsys' defense of this litigation. The suggestion that CDT Inc. has directed Opsys' defense is demonstrably wrong. Black Decl. ¶¶ 39-49. Plaintiff mentions Dr. Fyfe's attendance at a settlement conference but neglects to mention that Plaintiff asked that a representative of CDT Inc. attend the meeting. Fyfe Decl. ¶ 13. Dr. Fyfe and Mr. Chiu did not speak again following that meeting. *Id.*

CDT Inc. has taken an interest in the litigation not only because Opsys is a subsidiary of CDT Ltd. (and hence an indirect third-tier subsidiary of CDT Inc.) but also because Plaintiff named CDT Ltd. in its original complaint and in its first amended complaint, and because Plaintiff moved to add CDT Inc. as a party in November 2005.

CDT Inc. (and CDT Ltd.) did not direct the day-to-day defense of Plaintiff's claim. Fyfe Decl. ¶ 12; Black Decl. ¶ 32. Mr. Fields (an in-house lawyer for CDT Inc.) attended the trial because of Plaintiff's attempts to sue CDT Inc. and CDT Ltd. and because Opsys' representative Mr. Black was excluded from the first six days of trial as a potential witness. Black Decl. ¶¶ 46-49.

Plaintiff cites cases that supposedly impose liability on a corporation solely on the ground that it controlled the litigation for the defendant. *See* Mot. 12:17-25 & 13:3-5 & n.22. But none supports Plaintiff's position here. In *Koehler v. Bank of Bermuda Ltd.*, No. M18-302, 2002 WL 1766444 (S.D.N.Y. July 31, 2002), the court denied a Rule 25(c) motion to join or substitute as an additional judgment debtor a bank that had transferred some of the original judgment debtor's assets to its own account, allegedly in satisfaction of outstanding debts. There was no claim that the bank had controlled the litigation. *Koehler* mentions in passing that a corporation that acquires all of another corporation's assets without merging ordinarily is not liable for a judgment as a successor unless it controlled the litigation that resulted in the judgment. *Id.* at *3. This observation is dicta.

Both *Expert Electric, Inc., v. Levine,* 554 F.2d 1227 (2d Cir. 1977), and *TRW, Inc., v. Ellipse Corp.*, 495 F.2d 314 (7th Cir. 1974), applied res judicata to determine whether appellants were bound by the results in prior proceedings. They did not hold that a corporation could be added to the judgment in an action to which it was not a party.

In *Oyakawa v. Gillett,* 8 Cal. App. 4th 628 (1992), the court of appeal reversed an order granting a motion under section 187 to add a judgment debtor's wife as an additional judgment debtor, reasoning that the wife was not the husband's alter ego and had not controlled the litigation.[7]

In *Troy Co. v. Products Research Co.,* 339 F.2d 364 (9th Cir. 1964), the district court found that the defendant, Troy, was only a nominal defendant, and that another entity,

---

[7] Plaintiff's assertion that *Oyakawa* approved of the order amending the judgment and that the "new defendant [had been] represented by the original defendant's representation at trial" (Mot. 13 n.22) is wrong.

500132528v3 - 21 - CDT INC.'S OPPOSITION TO PL.'S MOTION TO ADD CDT INC. AS A PARTY TO ACTION & JUDGMENT Case No. C 05-00553 MHP

Danville, was principally responsible for the litigation. *Id.* at 366. Danville, however, was significantly more involved in the litigation than CDT Inc. here. *Troy* was a patent infringement suit; Danville manufactured the allegedly infringing device, prepared exhibits, designated all prior art references, indemnified Troy and conducted settlement negotiations without Troy's knowledge. *Id.* at 367. There was no issue of adding or substituting Danville as a judgment debtor. *Id.* at 368.

In sum, neither *Troy* nor any of the other cases cited by Plaintiff supports its argument that controlling the litigation of an action alone is sufficient to justify the imposition of liability in that litigation.

D. **Plaintiff's claim against CDT Inc. is barred by laches.**

Even if Plaintiff's claim against CDT Inc. had any merit—which, as demonstrated above, it does not—Plaintiff's motion should nevertheless be denied because its claim is barred by laches. Laches "addresses delay in the pursuit of a right when a party must assert that right in order to benefit from it." *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 820 (7th Cir. 1999). To demonstrate laches, a defendant must prove "unreasonable delay by the plaintiff and prejudice to itself." *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 951 (9th Cir. 2001) (citation omitted). Because laches is an equitable defense (*id.* at 950), it may properly be asserted against an equitable doctrine such as successor liability. *See Katzir's*, 394 F.3d at 1149 (holding that proceedings under Civ. Proc. Code § 187 are equitable). Both of the requirements for laches are satisfied here.

*Unreasonable delay:* Although Plaintiff received no rent payments after November 1, 2002 (Pl.'s 2d Am. Compl. ¶ 17, Dkt. 58), it waited two years until December 14, 2004 to file its complaint—the day before CDT Inc.'s IPO. CDT Inc. filed its registration statement on July 30, 2004. Plaintiff knew about the planned IPO by November 2004, when Damoder Reddy faxed him information about the IPO and suggested that he file suit. Mr. Chiu asked Mr. Reddy to refer him to an attorney; Mr. Reddy introduced Mr. Chiu to Stanley Hilton, Plaintiff's first counsel in this case. Hayashi Decl. ¶ 2, Ex. A (Chiu Dep. 293:24-295:5, Ex. 46) & ¶ 3, Ex. B (Reddy Dep. 19:9-20:17, 136:7-137:6). Plaintiff sat

silent while CDT Inc. priced its IPO and went to market. Black Decl. ¶ 23. Plaintiff sat silent while CDT Inc. acquired all of Opsys' stock, allowing Opsys to exercise the Opsys Limited Option. *Id.* ¶ 24. All this time, Plaintiff sat on its rights. It did not serve its complaint until January 10, 2005, well after the IPO and the completion of the 2004 transaction. *See* Notice of Removal, Ex. A (summons and complaint) (Dkt.1). If Plaintiff had promptly asserted its claim, then CDT Inc. would have known that Opsys' liabilities exceeded the $1.25 million cap set in the Transaction Agreement, CDT Inc. would not have purchased Opsys' stock and Plaintiff would not have had a theory for suing CDT Inc.— which is undoubtedly why Plaintiff did not act sooner.

Hence, the first requirement for laches—unreasonable delay—is satisfied. "In determining reasonableness, courts look to the cause of the delay." *Danjaq,* 263 F.3d at 954. Here, Plaintiff waited to act until it had what it hoped would be a deep pocket.

*Prejudice:* The second requirement for laches—prejudice—also is met. A defendant may demonstrate prejudice by showing that it "took actions or suffered consequences that it would not have, had the plaintiff brought suit promptly." *Id.* at 955. If Plaintiff had acted promptly here, CDT Inc. would not have bought Opsys' stock and would not now be facing a motion to add it to a $5 million judgment against Opsys. This is prejudice by any definition. Plaintiff's counsel himself commented in court that CDT Inc. might have an equitable defense based on Plaintiff's inaction. *See* Dkt. 198, at 7:6-8.

E. **Leave to add a fraudulent conveyance claim should be denied.**

Plaintiff notice of motion seeks leave to add a claim under Rule 18(b) for fraudulent conveyance of Opsys' assets to CDT Inc. and to CDT Oxford. Mot. 1:12-13. Elsewhere, however, Plaintiff seeks leave to file this claim only "if needed" (*id.* 2:13-14), stating that it "*may* also seek leave to file a supplemental claim for relief for fraudulent conveyance against Cambridge and CDT Oxford Limited" (*id.* 23:6-7) (emphasis added).

Plaintiff apparently claims that CDT **Inc.**'s transfer of Opsys' 84% interest in Opsys UK to CDT **Ltd.** in May 2005 was fraudulent. *In May 2005, however, CDT Ltd. was a defendant in this litigation.* The order dismissing CDT Ltd. with prejudice was not entered

until August 8, 2005. *See* Dkt. 39. One does not avoid liability by transferring assets from one party defendant (Opsys) to another (CDT Ltd.). There is no ground to assert that this transaction defrauded anybody, or was intended to do so. Black Decl. ¶¶ 33-38. The transfer of assets from Opsys to CDT Ltd. was planned well before the filing of Plaintiff's complaint—before CDT Inc. knew of Plaintiff's claim—to simplify CDT Inc.'s corporate structure. *Id.* Contrary to Plaintiff's claims (Mot. 21:13-16), the 84% interest in CDT Oxford that Opsys transferred to CDT Ltd. had little value because CDT Ltd. had been entitled to 98% of CDT Oxford's profits since 2002. Black Decl. ¶ 36.

Possibly Plaintiff will dispute that CDT **Ltd.** was the defendant named in its original complaint and its first amended complaint and claim it meant all along to sue CDT **Inc.** After all, Plaintiff described the CDT entity named in its original complaint as a British company that was the owner of Opsys. Dkt. 1, ¶ 2. On the date Plaintiff filed its complaint, CDT Inc. owned 16% of Opsys UK; CDT Ltd. did not own any stock in Opsys or Opsys UK. Thus, the only CDT entity that owned any part of Opsys was CDT Inc., not CDT Ltd.

If this is Plaintiff's theory, then its Rule 18 motion must be denied because that defendant—CDT Inc.—was dismissed with prejudice in August 2005. Dkt. 39.

Plaintiff's request to add a fraudulent conveyance claims also fails on procedural grounds. Rule 18(b) provides that "a plaintiff may state a claim for money and a claim to have set aside a conveyance fraudulent as to that plaintiff, without first having obtained a judgment establishing the claim for money." But Plaintiff has filed no claim for money against either CDT Inc. or Opsys UK. Plaintiff has cited no authority permitting it to piggyback a fraudulent conveyance claim on top of a successor liability claim under Rule 25(c) or Rule 69(a). Because Plaintiff has declined to file a complaint against CDT Inc., there is no pleading to which a fraudulent conveyance claim may be added, much less a pleading that would satisfy the heightened pleading standards of Rule 9(b). Having not even lodged a proposed complaint, Plaintiff has not begun to comply with these rules.

## IV. CONCLUSION.

The Court should deny outright Plaintiff's motion to add CDT Inc. as a party to this

action and to the judgment to be entered against Opsys. If, however, the Court believes that Plaintiff has alleged enough to go forward, the Court should hold an evidentiary hearing on the matter. If the Court grants Plaintiff's request for discovery on successor liability issues, CDT Inc. requests that the Court permit the parties to file motions for summary judgment on Plaintiff's successor liability claim following the close of discovery.

Dated: May 7, 2007.

PILLSBURY WINTHROP SHAW PITTMAN LLP
BRUCE A. ERICSON
SHARON L. O'GRADY
ALICE KWONG MA HAYASHI
50 Fremont Street
Post Office Box 7880
San Francisco, CA 94120-7880

By /s/ Bruce A. Ericson
Bruce A. Ericson
Attorneys for Non-Party/Respondent
CAMBRIDGE DISPLAY TECHNOLOGY, INC.