PILLSBURY WINTHROP SHAW PITTMAN LLP
Maria T. Galeno, Esq. (MG-6189)
John E. Davis, Esq. (JD-1445)
1540 Broadway
New York, New York 10036
Telephone: (212) 858-1000
Telefax: (212) 858-1500

*Attorneys for Respondent Cambridge Display Technology, Inc.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SUNNYSIDE DEVELOPMENT COMPANY, LLC,<br><br>Petitioner,<br><br>-against-<br><br>BANK OF NEW YORK (as escrow agent), CAMBRIDGE DISPLAY TECHNOLOGY, INC., and OPSYS MANAGEMENT LIMITED,<br><br>Respondents. | Case No. 07 CV 8825(LLS) |

**MEMORANDUM OF LAW OF**
**RESPONDENT CAMBRIDGE DISPLAY TECHNOLOGY, INC.**
**IN OPPOSITION TO TURNOVER PETITION**
**AND**
**IN SUPPORT OF MOTION TO DISMISS**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................................... 1

FACTS .......................................................................................................................... 3

    CDT Inc. and Its Affiliates............................................................................... 3

    The 2002 Transactions ..................................................................................... 4

    The 2004 Transactions ..................................................................................... 5

    The Escrow Agreement..................................................................................... 6

    The CDT Inc. Disbursement Notices ............................................................... 8

    OML's Disclaimer of the Escrow Assets......................................................... 9

    The California Proceedings............................................................................... 9

    The New York Proceedings – The Summons With Notice Proceeding ........... 11

    The New York Proceedings – The Turnover Proceeding ................................ 12

ARGUMENT ............................................................................................................... 12

I.     THE TURNOVER PETITION SHOULD BE DISMISSED BECAUSE CDT
       INC., AND NOT SUNNYSIDE, IS ENTITLED TO THE ESCROW ASSETS ............. 12

    A.    Because Opsys Has No Interest in the Escrow Assets,  Sunnyside Cannot
         Reach Them Through This Proceeding ............................................... 13

        1.    Opsys Is Neither a Party to, nor an Intended  Beneficiary of, the
             Escrow Agreement.................................................................... 13

        2.    Any Right of Opsys to Have its Creditors Paid From the Escrow
             Assets Is Outside of the Reach of CPLR 5225(b) and 5227 .................... 18

    B.    CDT Inc. Has the Superior Claim to the Escrow Assets ...................................... 19

II.    SUNNYSIDE IS COLLATERALLY ESTOPPED FROM RE-LITIGATING THE
      CALIFORNIA COURT'S RULING THAT THE PURPOSE OF THE ESCROW
      ACCOUNT IS TO INDEMNIFY CDT INC. ............................................................. 20

III.   CDT INC. IS NOT JUDICIALLY ESTOPPED FROM  ASSERTING ITS
      RIGHT TO THE ESCROW ASSETS ....................................................................... 22

CONCLUSION............................................................................................................ 25

# TABLE OF AUTHORITIES

## CASES

*AXA Marine & Aviation Insurance (UK) Ltd. v. Seajet Industrial Inc.*,
    84 F.3d 622 (2d Cir. 1996).................................................................................22

*Banco Espirito Santo de Investimento, S.A. v. Citibank, N.A.*,
    No. 03 Civ. 1537(MBM), 2003 WL. 23018888 (S.D.N.Y. Dec. 22, 2003),
    *aff'd*, 110 Fed. App'x 191 (2d Cir. 2004) .....................................................16

*Beauvais v. Allegiance Sec., Inc.*,
    942 F.2d 838 (2d Cir. 1991)........................................................................13, 19

*Bridgeway Corp. v. Citibank*,
    201 F.3d 134 (2d Cir. 2000)...........................................................................23

*Cargill, Inc. v. Sabine Trading & Shipping Co.*,
    756 F.2d 224 (2d Cir. 1985).............................................................................7

*Cortec Industries, Inc. v. Sum Holding L.P.*,
    949 F.2d 42 (2d Cir. 1991) .............................................................................13

*Fourth Ocean Putnam Corp. v. Interstate Wrecking Co.*,
    66 N.Y.2d 38, 485 N.E.2d 208, 495 N.Y.S.2d 1 (1985)..........................15, 17

*In re Gulf Oil/Cities Serv. Tender Offer Litigation*,
    725 F. Supp. 712 (S.D.N.Y. 1989) .................................................................15

*Hickerson v. City of New York*,
    146 F.3d 99 (2d Cir. 1998)..............................................................................22

*John Hancock Mutual Life Insurance Co. v. Carolina Power & Light Co.*,
    717 F.2d 664 (2d Cir. 1983)............................................................................17

*Kramer v. Time Warner, Inc.*,
    937 F.2d 767 (2d Cir. 1991)............................................................................13

*Piccoli A/S v. Calvin Klein Jeanswear Co.*,
    19 F. Supp. 2d 157 (S.D.N.Y. 1998)..............................................................16

*Rent Stabilization Association of City of New York v. Dinkins*,
    5 F.3d 591 (2d Cir. 1993)................................................................................13

*Sassower v. Abrams*,
    833 F. Supp. 253 (S.D.N.Y. 1993) .................................................................22

*Sochor v. IBM Corp.*,
    60 N.Y.2d 254, 457 N.E.2d 696, 469 N.Y.S.2d 591 (1983)..........................18

*Sunnyside Development Co., LLC v. Opsys Ltd.*,
    No. C-05-553-MHP, 2005 WL. 1876106 (N.D. Cal. Aug. 8, 2005) ...............4

*Sunnyside Development Co., LLC v. Opsys Ltd.*,
    No. C-05-553-MHP, 2007 WL. 2462142 (N.D. Cal. Aug. 29, 2007) ..............1

*U.S. Fidelity & Guaranty Co. v. Treadwell Corp.,*
    58 F. Supp. 2d 77 (S.D.N.Y. 1999) ........................................................................23

*United States v. American Vault Co.,*
    No. 77 CIV 260(CPS), 1980 WL. 1566 (E.D.N.Y. May 5, 1980)..............................14

*United International Holdings, Inc. v. The Wharf (Holdings) Ltd.,*
    988 F. Supp. 367 (S.D.N.Y. 1997) ........................................................13, 14, 15, 16, 17

*Van Emrik v. Chemung County Department of Social Services,*
    191 A.D.2d 143, 600 N.Y.S.2d 157 (1993) ..............................................................22

## STATUTES & RULES

Fed. R. Civ. P. 12(b)(1)....................................................................................................1, 13

Fed. R. Civ. P. 12(b)(6)....................................................................................................1, 13

Fed. R. Civ. P. 69(a) .............................................................................................................13

Fed. R. Evid. 201 ..................................................................................................................13

N.Y. C.P.L.R. 5202(b) (McKinney 2007) ............................................................................20

N.Y. C.P.L.R. 5225(b) (McKinney 2007) ............................................................................12

N.Y. C.P.L.R. 5227 (McKinney 2007) .................................................................................12

N.Y. C.P.L.R. 5234(c) (McKinney 2007)..............................................................................20

## MISCELLANEOUS

David D. Siegel, *Practice Commentaries to CPLR 5225*, C5225:1 at 261
    (McKinney 1995)............................................................................................................13

David D. Siegel, *New York Practice* § 508, at 862, § 510, at 869, § 518, at 879
    (4th ed. 2005)..........................................................................................................13, 20

Respondent Cambridge Display Technology, Inc. ("CDT Inc."), by its attorneys Pillsbury Winthrop Shaw Pittman LLP, respectfully submits this memorandum of law in opposition to the Turnover Petition of Petitioner Sunnyside Development Company, LLC ("Sunnyside") brought by way of an Order to Show Cause dated October 5, 2007 (the "Turnover Petition"), and in support of the motion of CDT Inc. for an order dismissing the Turnover Petition pursuant to Federal Rules of Civil Procedure ("Rule") 12(b)(1) for lack of standing and Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

## PRELIMINARY STATEMENT

By its Turnover Petition, Sunnyside seeks to enforce against CDT Inc. a judgment (the "Judgment") that Sunnyside obtained against Opsys Limited ("Opsys"), a third-tier subsidiary of CDT Inc. Sunnyside does so despite the fact that a federal court in California (the "California Court") ruled in August 2007 that Sunnyside cannot enforce the Judgment against CDT Inc.[1]

CDT Inc. acquired Opsys in a stock-for-stock transaction in December 2004. As part of that transaction, CDT Inc. placed some of the consideration for Opsys into an escrow (the "Escrow Assets"). As the California Court found, the escrow was *to protect CDT Inc.* against unknown or contingent liabilities of Opsys. The escrow was not designed to protect Opsys. The Escrow Assets do not belong to Opsys. Therefore, and for the reasons set forth below, the Turnover Petition must be denied.

*First*, a turnover petition under CPLR 5225(b) and 5227 can have merit only if the judgment debtor (here, Opsys) has a proprietary interest in the assets sought or a right to receive

---

[1] This dispute has an extended history in the California Court. This is not the first time that Sunnyside has attempted to make CDT Inc. responsible for Opsys' debts. *See Sunnyside Dev. Co., LLC v. Opsys Ltd.,* No. C-05-553-MHP, 2007 WL 2462142 (N.D. Cal. Aug. 29, 2007) (the "Cal. Mem. & Order"). The background of Opsys' litigation against Sunnyside and CDT Inc. and its affiliate is chronicled in the Cal Mem. & Order, which is attached (in Slip Op. form) as Exhibit E to the Affirmation of Christoph Heisenberg dated October 5, 2007 ("Heisenberg Aff.") submitted by Petitioner in support of its Turnover Petition.

500180820v1

them. But Opsys has *no* interest in the Escrow Assets, nor any claim on them. Therefore, Sunnyside cannot pursue the Escrow Assets under CPLR 5225(b) and 5227. The Escrow Assets are governed by an Escrow Agreement to which neither Opsys nor Sunnyside is a party.[2] The Escrow Agreement allows only two potential claimants to the Escrow Assets: CDT Inc. and OML. *See* Escrow Agreement §§ 4(e), 5. Neither Opsys nor Sunnyside is a potential claimant under the Escrow Agreement.

Nor is Opsys an intended beneficiary of the Escrow Agreement, which expressly provides that the escrow *"shall be held in trust and shall not be subject to lien or attachment of any creditor of any party hereto and shall be used solely for the purposes and subject to the conditions set forth herein"* (Escrow Agreement § 2).[3] The Escrow Agreement comprehensively describes who can assert claims against the Escrow Assets and receive distributions. *Id.* §§ 4, 5. It restricts any encumbrance or other disposition of the Escrow Assets until they are "actually paid over to and received by" CDT Inc. or OML. *Id.* § 11. It expressly identifies to whose benefit the agreement inures (*id.* § 13). Under New York law (which governs), such provisions preclude any finding that CDT Inc. or any other party to the Escrow Agreement intended to give rights to Opsys.

It is not good enough that CDT Inc. *could* in its discretion use the Escrow Assets to compromise claims against Opsys and thus could use Escrow Assets to settle with Sunnyside. There is no agreement of CDT Inc. to pay Opsys' unknown or contingent liabilities from the Escrow Assets, so any benefit to Opsys or Sunnyside from the escrow would only be an incidental by-product of the parties' intent to maintain shares in escrow for the protection of *CDT Inc.*

---

[2]   The Escrow Agreement, dated December 29, 2004, was entered into by the Bank of New York ("BNY"), as escrow agent, and by CDT Inc. and Opsys Management Limited ("OML"). *See* Heisenberg Aff. Ex. D. OML, which is not affiliated with CDT Inc., was created by the founders of Opsys to hold a portion of the consideration that CDT Inc. was paying for Opsys in trust *first,* for certain identified creditors and debt-holders of Opsys (not including Sunnyside) and, if the creditors and debt-holders were paid in full, *second,* for the shareholders of Opsys. *E.g., id.,* Ex. C at Recitals D-G.

[3]   All emphasis herein is supplied unless otherwise noted. Exhibits attached to the accompanying Declaration of John E. Davis, dated October 25, 2007 are referred to and cited herein as "Davis Decl. Ex. __."

2

Incidental beneficiaries have no contractual rights under New York law. Further, a judgment creditor cannot pursue under CPLR 5227(b) or 5227 speculative, inchoate or unvested contract rights, such as are claimed by Sunnyside.

*Second*, the California Court has already decided the very issues raised by the Turnover Petition by denying Sunnyside's motion to add CDT Inc. as a party to the Judgment. The California Court stated that (i) CDT Inc. was not the successor to Opsys and was not responsible for Opsys' debts, (ii) the escrow was intended to "***indemnify CDT, Inc. for undisclosed or contingent liabilities***" and (iii) CDT Inc. properly obtained reimbursement of its legal fees and expenses from the account instead of paying Sunnyside's claim. *See* Cal. Mem. & Order at 6 (construing Escrow Agreement § 4(e)). Sunnyside's attempt to relitigate these determinations through the Turnover Proceeding is barred by the doctrine of collateral estoppel.

*Third*, contrary to Sunnyside's assertions, CDT Inc. did not advise the California Court that Opsys or Sunnyside were entitled to the Escrow Assets, nor did the California Court so find. Sunnyside's judicial estoppel argument – based on a misleading collection of elipsized and out-of-context quotations – is refuted by the record. CDT Inc. did not mislead the California Court, and the California Court was not misled: it found against Sunnyside. This Court should do likewise.

## FACTS

### CDT Inc. and Its Affiliates

CDT Inc. is headquartered in Cambridge, England. A public company from December 2004 to September 2007, its stock was traded on the NASDAQ Global Exchange until its recent acquisition by Sumitomo Chemical Co., Ltd.

CDT Inc. has a first-tier subsidiary called CDT Holdings Limited and a second-tier subsidiary called CDT Ltd. CDT Ltd. once was a defendant in the California action but was

dismissed with prejudice in August 2005. *Sunnyside Dev. Co., LLC v. Opsys Ltd.,* No. C-05-553-MHP, 2005 WL 1876106 (N.D. Cal. Aug. 8, 2005).

Since May 2005, CDT Ltd. has had several subsidiaries (which therefore are third-tier subsidiaries of CDT Inc.). One is Opsys. Another is CDT Oxford Limited ("CDT Oxford"), which until late 2002 was called Opsys UK Limited ("Opsys UK"). Heisenberg Aff. Ex. G at 2-3.

<u>The 2002 Transactions</u>

CDT Inc. is a developer of polymer organic light-emitting diode ("P-OLED") technology, used in creating energy-efficient, ultra-thin, lightweight displays in a variety of electronic devices. In 2002, CDT Inc. began negotiating to acquire control of certain UK-based intellectual property of Opsys thought to be useful in developing the next generation of P-OLED materials. Opsys had research facilities in the UK near Oxford, where it developed this intellectual property. Opsys, through its subsidiary (Opsys US) also had US operations in Fremont, California for the pilot manufacturing of displays. The US operations did not involve printable P-OLEDs but instead involved different technology licensed from Eastman Kodak ("Kodak"). Davis Decl. Ex. 1, Fyfe Decl. ¶¶ 3-6; Cal. Mem. & Order at 3.

CDT Inc. wanted Opsys' UK assets but did not want Opsys' US assets. *Id.* at 3. CDT Inc. made it clear to Opsys that any deal would require a clean separation of the US operations from the UK operations. Opsys agreed, so the transaction proceeded on that basis: the UK assets were put into one subsidiary, Opsys UK, with the US assets having already been placed by Opsys in Opsys US. Fyfe Decl. ¶¶ 4-8.

On October 23, 2002, CDT Inc., Opsys and others entered into a Transaction Agreement (the "2002 Transaction Agreement," Heisenberg Aff. Ex. B). CDT Inc. purchased a 16% interest in Opsys UK for $2.5 million in cash. *Id.* at 16 (clause 2.1). CDT ***Ltd. – not*** CDT ***Inc.*** – paid

4

Opsys $2 million in cash for a sublicense to Opsys' IP. *Id.* at 21, 32 (clauses 5.1(iii), 14.2); Cal. Mem. & Order at 3-6.

The Transaction Agreement created two "put" options and one "call" option. Heisenberg Aff. Ex. B at 16-20 & 25-30 (clauses 3 & 9). Only one option – one of the "put" options (the "Opsys Option") – actually was exercised. It gave Opsys' shareholders the right to cause CDT Inc. to buy Opsys where, among other conditions, (i) the aggregate liabilities, including contingent liabilities, of Opsys and its subsidiaries (excluding Opsys UK), were less than $1.25 million (*id.* at 26 (clause 9.4(C)); (ii) the option exercise price would be reduced by the value of the aggregate current liabilities; and (iii) CDT Inc. would withhold from the exercise price the amount of all contingent liabilities until the liabilities materialized or until the statute of limitations expired (*id.* at 27-28 (clauses 9.11(A) & 9.12)).

Opsys expressly warranted that it was not a party to any contract that could not readily be performed by it on time; that it was not a party to, nor did it have any liability under, any lease; that it was not a party to any contract "of a value of more than £10,000" or "of one year or greater duration"; and that it had no unaccrued or undisclosed liabilities left over from operations in the US. *Id.* Ex. B, at 59-60 (sched. 3, part 2, clauses 9.1-9.2, 9.7(a)-(b), & 9.9).

The structure was complex but its purposes were simple and straightforward: CDT Inc. wanted Opsys' UK assets and not its US assets; and the parties wanted to avoid the punitive UK taxes that would be levied on a sale of assets. There were sound business and tax reasons for the structure, having nothing to do with disadvantaging Sunnyside or any other creditor. *See* Heisenberg Aff. Ex. H, Black Decl. ¶¶ 7-13.

<u>The 2004 Transactions</u>

Disputes soon arose between Opsys and CDT Inc. concerning the 2002 Transaction (specifically, whether CDT Inc.'s issuance of convertible preferred shares to third parties

5

implicated the anti-dilution provisions of the 2002 Transaction Agreement). In 2004, CDT Inc.,

Opsys and OML, among others, entered into a Settlement and Amendment Agreement dated

August 2, 2004 and then an Amended Settlement and Amendment Agreement dated December 14,

2004 (the "Amended Settlement Agreement," Heisenberg Aff. Ex. C). Cal. Mem. & Order at 5-6.

As part of the Amended Settlement Agreement, Opsys' shareholders exercised the Opsys Option,

thus requiring CDT Inc. to acquire the equity of Opsys in exchange for CDT Inc. stock.

Heisenberg Aff. Ex. H ¶¶ 21-22.[4] With limited exceptions, the stock did not go to Opsys'

shareholders, but instead was withheld to provide a means of dealing with (a) known and identified

liabilities – which "did not include the [Fremont L]ease]" (Cal. Mem. & Order at 6); and

(b) contingent and unidentified liabilities of Opsys. To that end, (i) 375,085 shares were issued to

OML in trust to be distributed pursuant to a Deferred Consideration Agreement between OML and

Opsys shareholders, which include former creditors such as Kodak; and (ii) 422,610 shares were

placed in escrow with BNY pursuant to the Escrow Agreement. *Id.* at 5-6.

    The Escrow Agreement

    The Escrow Agreement (Heisenberg Aff. Ex. D) was entered into pursuant to (and is an

exhibit to) the Amended Settlement Agreement (Heisenberg Aff. Ex. C). The Escrow Agreement

governs the holding and disbursement of the CDT Inc. shares transferred to BNY in escrow. *See*

Escrow Agreement at 1 and § 2 (the Escrow Assets are "to be held and disposed of as provided in

this Escrow Agreement."). The Escrow Assets currently are worth about $1.5 million.[5]

---

[4] The California Court incorrectly states that CDT Inc. exercised its option (Cal. Mem. & Order at 4), but then
corrects itself to note that "[t]he remaining CDT, Inc. shares constituting the payment for the put option were
distributed to Opsys management ...." (*id.* at 6). This was not a contested issue. Sunnyside does not dispute that
Opsys' shareholders exercised the Opsys Option, as reflected in the 2004 Transaction Agreement (Heisenberg Aff.
Ex. C § 9.15, at 6-7) and the Escrow Agreement (*id.* Ex. D at Recital B ("Opsys has exercised the Opsys Option")),
and that CDT Inc. did not exercise its "call" option.

[5] Prior disbursements were made to reimburse CDT Inc. for legal fees incurred in connection with Sunnyside's
claims and to pay the "Reddy claim," which was a claim against Opsys by a former officer of Opsys or its former
subsidiary. Heisenberg Aff. Ex. G, CDT Inc.'s Opp. to Mot. to Add CDT Inc., filed May 7, 2007 ("CDT Inc. Opp.

CDT Inc. insisted on the escrow mechanism as a protection for CDT Inc. *See* Heisenberg

Aff. Ex. H, Black Decl. ¶¶ 19-32. Its primary purpose was to compensate CDT Inc. if, after its

acquisition of Opsys, additional creditors or claims surfaced that caused the value of Opsys to be

less than what CDT Inc. believed it to be in December 2004. *See* Heisenberg Aff. Ex. J, 9/4/07

Black Letter at 2. Accordingly, Section 4(e) of the Escrow Agreement permits CDT Inc. to seek

payment from the escrow account to defend against or compromise claims against Opsys, and to

indemnify CDT Inc. for its related litigation costs and expenses. Section 4(e) provides:

> In the event Buyer [CDT Inc.] determines that any liability, contingent liability,
> claim, obligation or damage (collectively, "Claim") exists or has been asserted
> against Opsys…, Buyer shall have the right (but not the obligation) to deliver to the
> Escrow Agent, with a copy to NewCo [OML], a written notice (a "Disbursement
> Notice"). A Disbursement Notice shall set forth (i) the amount of such Claim or a
> good faith estimate of the amount thereof together with an estimate of any costs and
> expenses to be incurred in resolving such Claim (including, without limitation,
> reasonable attorneys' fees and expenses) (the "Claimed Amount"); (ii) a brief
> description of the facts giving rise to such Damages to the extent then known to the
> Buyer and (iii) payment instructions specifying the number of CDT Shares to be
> transferred to the Buyer in respect thereof, which shall be equal to that number of
> CDT Shares…that when multiplied by the IPO Price…shall most nearly equal the
> amount of the Claimed Amount….

Heisenberg Aff. Ex. D § 4(e).

Significantly, the Escrow Agreement makes no provision for disbursements to entities

other than CDT Inc. or OML, and provides no means for non-parties to request disbursements, and

imposes no requirement on CDT Inc. or OML to pay unidentified creditors from the Escrow

Assets. Instead, Section 2 provides that the escrow "***shall be held in trust and shall not be subject
to lien or attachment of any creditor*** of any party hereto and shall be used solely for the purposes

and subject to the conditions set forth herein." *Id.* § 2. Sections 4 and 5 describe the method and

manner of claims and disbursements from the Escrow Assets. *Id.* §§ 4, 5. Section 11 states,

---

Mem.") at 6; *id.* Ex. H ¶ 16. The Escrow Agreement expressly contemplates payment of the Reddy Claim (*id.* Ex.
D § 4(b)-(d)) and CDT Inc.'s fees and expenses (*id.* § 4(e)).

*"Neither [CDT Inc.] or [OML] shall* sell, assign, transfer, or encumber, or *in any* other *manner*

*anticipate or dispose of any portion of the Escrow Fund ... until the same shall be actually paid*

*over to and received by [CDT Inc.] or [OML]*, as the case may be, pursuant to the terms hereof."

*Id.* § 11.  Further, Section 13 states, "This Escrow Agreement shall be binding upon and *inure to*

*the benefit of* the respective successors, assigns and legal representatives of [CDT Inc.], [OML]

and [BNY]."  *Id.* § 13.

    The CDT Inc. Disbursement Notices

       Section 4(e) of the Escrow Agreement (quoted above) permits CDT Inc. to issue

"Disbursement Notices."  CDT Inc. issued its first Disbursement Notice on February 2, 2005,

notifying BNY that Sunnyside had asserted a claim against Opsys for an amount in excess of

$35,000,000, estimating attorney's fees and expenses in connection with that claim in excess of

$500,000, identifying a "Claimed Amount (as such term is defined in the Escrow Agreement)" of

$35,500,000 and requesting transfer of all Escrow Assets to CDT Inc.  Davis Decl. Ex. 2.

       On February 10, 2005, OML issued a "Contest Notice" objecting to the February 2, 2005

Disbursement Notice "until such time as the true cost of the claim can be established."  Davis

Decl. Ex. 3.  But OML later agreed that CDT Inc. would disburse amounts needed to cover defense

costs, and so CDT Inc. received disbursements from the escrow to cover defense costs and to fund

the Reddy settlement.  *See* Heisenberg Aff. Ex. J (9/25/07 letter from Michael Black to Richard

Eng at 2; 9/25/07 letter from Maria T. Galeno, Esq. to Christoph C. Heisenberg, Esq. at 2).

       Similarly, on September 19, 2007, CDT submitted two additional Disbursement Notices for

payment of its fees and expenses incurred since the 2005 notice (*see* Davis Decl. Ex. 4), and  OML

on September 20, 2007 filed a Contest Notice objecting to disbursement "pending clarification

from CDT as to the amounts claimed."  *Id.* Ex. 5.  On September 27, 2007, CDT Inc. submitted an

amended Disbursement Notice, amending the September 19 notices.  *Id.* Ex. 6.

8

OML's Disclaimer of the Escrow Assets

On October 12, 2007, following the filing of the Turnover Petition, OML faxed a letter to

New York Supreme Court Judge Lewis Bart Stone, stating,

> Our position is that [CDT Inc.] has submitted a valid claim for all remaining
> assets ("the Assets") held in escrow under the terms of the Escrow Agreement ....
> OML is not entitled to contest this claim under the Escrow Agreement and, absent
> the Turnover Petition, the Assets would normally have been transferred to CDT
> according to the terms of that agreement.  ... [W]e are not an interested party in
> the outcome of this action, having relinquished any claim to the Assets under the
> Escrow Agreement ....

Davis Decl. Ex. 7.  Also on October 12, 2007, OML issued a "Contest Notice in response to

Disbursement Notice dated 27 September 2007," whereby OML "consent[s] to a disbursement of

assets from the General Sub-account of the Escrow Fund" and notes that "such disbursement will

constitute all remaining assets of the General Sub-account."  Davis Decl. Ex. 8.  OML states that it

accepts CDT Inc.'s request for reimbursement of the fees of the Orrick firm, Opsys' counsel in the

California action (which fees are approximately $1.3 million (*see* Davis Decl. Ex. 9 (attaching

email of H. Charles to A. Zervoglos dated October 11, 2007 at 2)) but not the fees of CDT Inc.'s

counsel (which are approximately $574,000 (*id.*)), but that such dispute is academic as CDT Inc.

has the right to receive the full contents of the escrow.  Davis Decl. Ex. 8 at 1-2.

The California Proceedings

In December 2004 — the same month as CDT Inc.'s IPO — Sunnyside filed a complaint

against Opsys and CDT Limited (CDT Inc.'s second-tier subsidiary) asserting claims for breach of

the Fremont lease and for fraud.  Cal. Mem. & Order at 1, 6 (Heisenberg Aff. Ex. E).  On August

8, 2005, the California Court dismissed the claims for breach of contract against CDT Limited and

for fraud against both defendants, with prejudice.  *Id.* at 2.  After trial, Sunnyside obtained a jury

verdict against Opsys for $4,853,017.  The Judgment (Heisenberg Aff. Ex. A) was entered on

May 29, 2007.  Cal. Mem. & Order at 1.

9

Following the jury verdict, Sunnyside moved to add CDT Inc. as a party to the California action and the Judgment. *Id.* at 2-3. In opposition, CDT Inc. did not – as claimed by Sunnyside (Pet. ¶ 13) – assert that the purpose of the 2004 transaction and the Escrow Agreement was to *benefit* creditors, but instead explained that the 2004 transaction "protected creditors in at least three ways." CDT Inc. Opp. Mem. at 6 (Heisenberg Aff. Ex. G).

> First, 133,938 shares of CDT Inc. stock ... were held back to cover known and identified liabilities, as set forth in Schedule A to the Amended Settlement Agreement ... The list in Schedule A did not include the Fremont Lease. . . .

> Second, 422,610 shares of CDT Inc. stock (at $12 a share, $5,071,320) went into escrow as security for contingent and unidentified liabilities of Opsys (including the Reddy claim in Schedule B). . . .

> Third, the remaining CDT Inc. shares paid for Opsys were issued to [OML]..., to be distributed pursuant to a 'Deferred Consideration Agreement' between OML and Opsys' shareholders. . . .

Heisenberg Aff. Ex. G at 6-7; *see* Cal. Mem. & Order at 6.[6]

CDT Inc. further explained that it had deposited part of the consideration for the Opsys shares "into an escrow account as security for any unidentified liabilities of Opsys, including contingent liabilities." Heisenberg Aff. Ex. G at 12. This was security for CDT Inc., as ***it had "insisted on an escrow and a trust and set-asides*** ... to ensure that the former Opsys shareholders would continue to bear responsibility for such claims [undisclosed contingent liabilities]." *Id.* (citing Heisenberg Aff. Ex. H ¶¶ 19-32). There is no evidence that the 422,610 shares were placed in escrow at Opsys' insistence.

CDT Inc. also submitted the declaration of its Chief Financial Officer, Michael Black, who stated, "422,610 shares of CDT Inc. stock went into an escrow to cover the Reddy claim referred

---

[6]   The Deferred Consideration Agreement provides in essence that the assets of OML would be held in trust for certain creditors and debt holders of Opsys (such as Kodak) and, only if they were paid off, then be paid to the former shareholders of Opsys. Heisenberg Aff. Ex. H ¶ 29.

to in paragraph 16 above and unidentified liabilities, including unidentified contingent liabilities." Heisenberg Aff. Ex. H ¶ 28.

The California Court determined the purpose of the Escrow Assets. In denying Sunnyside's motion, Judge Patel stated that "a portion of the CDT, Inc. stock offered in exchange for the Opsys stock [*i.e.*, the Escrow Assets] *would indemnify CDT, Inc. for undisclosed or contingent liabilities*." Cal. Mem. & Order at 6 (construing Escrow Agreement § 4(e)). The court also rejected Sunnyside's argument that CDT Inc. had "invaded" the escrow account to finance the litigation, finding, instead, that "*the escrow shares were being used to cover a contingency as originally envisioned*." *Id.* at 10-11. On September 26, 2007, Sunnyside appealed this order to the Ninth Circuit.

<u>The New York Proceedings – The Summons With Notice Proceeding</u>

On September 19, 2007, Sunnyside served CDT Inc. and three of its subsidiaries with a Summons with Notice with annexed Notice of Claim in the Supreme Court of New York for the County of New York (No. 112617/07) (the "Summons with Notice Proceeding"). Sunnyside named as defendants Opsys, CDT Inc., Cambridge Display Technology Limited, CDT Oxford Limited, Sumitomo, OML and BNY (as escrow agent). Sunnyside evidently did not serve BNY, Sumitomo or OML. Sunnyside sought, *inter alia*, "to obtain the assets (shares of CDT stock) that are or were held in New York escrow for the purpose of satisfying claims against Opsys Limited." Summons with Notice at 3. On October 17, 2007, CDT Inc. removed the Summons with Notice Proceeding to this Court, receiving Index No. 07-CV-09320. On October 23, 2007, Sunnyside dismissed the proceeding as to all defendants except OML without prejudice pursuant to a stipulation between Sunnyside and the defendants that were served.

<u>The New York Proceedings – The Turnover Proceeding</u>

On October 5, 2007, Sunnyside initiated by way of Order to Show Cause a separate

proceeding in the New York Supreme Court ("Turnover Proceeding"), naming as respondents

CDT Inc., OML and BNY (as escrow agent). Davis Decl. Ex. 10. We understand that Sunnyside

also delivered to BNY a restraining notice dated October 4, 2007 (the "Restraining Notice"),

purporting to restrain BNY from transferring the Escrow Assets. *Id.* Ex. 11. On October 12, 2007,

CDT Inc., with the consent of respondents BNY and OML, removed the Turnover Petition to this

Court pursuant to 28 U.S.C. §§ 1332, 1441, and 1446, based on complete diversity of citizenship.

Dkt. No. 1.[7]

## ARGUMENT

## I.  THE TURNOVER PETITION SHOULD BE DISMISSED BECAUSE CDT INC., AND NOT SUNNYSIDE, IS ENTITLED TO THE ESCROW ASSETS

Sunnyside's Petition does not meet the exacting requirements of CPLR 5225(b) and 5227.[8]

As a leading commentator described, "The primary burden of the judgment creditor under CPLR

---

[7]  Sunnyside did not personally serve respondents or Opsys in the Turnover Proceeding. Rather, pursuant to the Order to Show Cause, Sunnyside delivered a copy of its papers to undersigned counsel, who is not authorized to accept service on CDT Inc.'s (or Opsys') behalf. CDT Inc. appears here specially pursuant to CPLR 320(c)(1) with respect to the Escrow Assets, and preserves all defenses based on the absence of personal jurisdiction and proper service. *See Cargill, Inc. v. Sabine Trading & Shipping Co.,*756 F.2d 224, 227-29 (2d Cir. 1985). CDT Inc. further reserves and does not waive its rights to assert any and all defenses to the Turnover Petition and any other proceedings, including those based on improper venue and forum.

Although the Order to Show Cause directed Sunnyside to deliver the Turnover Petition and associated papers to undersigned counsel "for respondents [CDT Inc.] and Opsys Limited," Opsys is not a named respondent to the Turnover Petition and was not required by the Order to Show Cause to submit opposition papers or take any other action in response to the Turnover Petition. As discussed herein, Opsys has no interest in the Escrow Assets. It has not moved to intervene in this action and has not submitted to the personal jurisdiction of this Court. Accordingly, it provides no response to the Turnover Petition.

[8]  N.Y. C.P.L.R. 5225(b) (McKinney 2007) permits a judgment creditor to commence a special proceeding against "a person in possession or custody of money or other personal property in which the judgment debtor has an interest, or against a person who is a transferee of money or other personal property from the judgment debtor, where it is shown that the judgment debtor is entitled to the possession of such property or that the judgment creditor's rights to the property are superior to those of the transferee." N.Y. C.P.L.R. 5227 provides in pertinent part: "Upon a special proceeding commenced by the judgment creditor, against any person who it is shown is or will become indebted to the judgment debtor, the court may require such person to pay to the judgment creditor the debt upon maturity, or so much of it as is sufficient to satisfy the judgment, and to execute and deliver any document necessary to effect payment; or it may direct that a judgment be entered against such person in favor of the judgment creditor. ..."

5225 is one of proof. The court will not direct the judgment debtor to pay over money, for example, unless it has been *clearly established* that the judgment debtor has money to pay over. Nor will it compel the judgment debtor to deliver property that has not *clearly* been shown to be in the judgment debtor's possession or control." David D. Siegel, *Practice Commentaries to CPLR 5225*, C5225:1, at 261 (McKinney 1995); *see Beauvais v. Allegiance Sec., Inc.*, 942 F.2d 838, 841 (2d Cir. 1991).[9]

### A. Because Opsys Has No Interest in the Escrow Assets, Sunnyside Cannot Reach Them Through This Proceeding

Sunnyside cannot demonstrate at all, much less "clearly," that the judgment debtor, Opsys, has an "interest" in, or is "entitled to the possession of," the Escrow Assets under CPLR 5225(b). Nor can Sunnyside demonstrate that BNY as escrow agent "is or will become indebted to" Opsys under CPLR 5227. Because Opsys has no proprietary interest in the Escrow Assets or right to require payment from BNY (as escrow agent), the Escrow Assets are beyond Sunnyside's reach.

### 1. Opsys Is Neither a Party to, nor an Intended Beneficiary of, the Escrow Agreement

As Sunnyside admits, Opsys is not a party to the Escrow Agreement. Mem. in Supp. of Pet. at 10. Opsys has no express rights to receive or compel payment under the Escrow Agreement, and so has no property interest upon which Sunnyside can execute its Judgment. Heisenberg Aff. Ex. D §§ 4, 5, 13. This was the holding in *United Int'l Holdings, Inc. v. The Wharf (Holdings) Ltd.*, 988 F. Supp. 367, 374 (S.D.N.Y. 1997), where the judgment creditor

---

[9] In support of its Opposition and Motion to Dismiss, CDT Inc. relies upon the pleadings and evidentiary materials submitted by Sunnyside as Exhibits to the Heisenberg Affirmation, as well as upon the Exhibits attached to the Davis Declaration. This Court may consider all of these materials under Rule 12(b)(6) because they are (i) exhibits to, or documents incorporated by reference into, the Petition (*Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991)), (ii) integral to Petitioner's claim (*id.* at 47-48), and/or (iii) subject to judicial notice under Federal Rule of Evidence 201 (*Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773-74 (2d Cir.1991)). Further, all the Exhibits are properly considered in determining the Motion under Rule 12(b)(1) for lack of standing, based on Sunnyside's failure to show that Opsys has an interest in the Escrow Assets. *E.g.*, *Rent Stabilization Ass'n of City of New York v. Dinkins*, 5 F.3d 591, 594 (2d Cir. 1993). Finally, because the Turnover Petition is a special proceeding in the nature of a summary judgment motion, this Court may consider all submissions of the parties in making its determination. *E.g.*, *Siegel, New York Practice* § 554, 556 at 952-54 (4th ed. 2005); Fed. R. Civ. P. 69(a).

13

sought turnover of funds that were paid into the debtor's bank account in satisfaction of obligations owed to the debtor's subsidiary under a swap agreement. *Id.* at 371-72, 374. This Court denied the turnover petition, finding that the creditor could not establish that the debtor had an "enforceable interest" in the payments under CPLR 5225(b) and 5227 where it was not a party to the swap agreement and had no right to compel payments. *Id.* at 374.

Sunnyside's assertion that Opsys is an "intended beneficiary" of the Escrow Agreement and so is somehow entitled to the Escrow Assets (Mem. in Supp. of Pet. at 10-11) is also without basis. Neither the Escrow Agreement nor any other agreement requires CDT Inc. to use the Escrow Assets to pay contingent and unknown claims against Opsys. Instead, the intent of the escrow was to protect and indemnify CDT Inc. against such claims that could lower the value of Opsys to CDT Inc. *E.g.,* Heisenberg Aff. Ex. J, 9/4/07 Black Letter at 2; Cal. Mem. & Order at 6 (the purpose of the escrow is "*to indemnify CDT Inc.* for undisclosed and contingent liabilities" of Opsys). Such a fund – created by a buyer to protect *it* against contingent liabilities of the seller – does not create an interest in favor of a third party creditor. The court in *United States v. American Vault Co.*, No. 77 CIV 260(CPS), 1980 WL 1566, *2-4 (E.D.N.Y. May 5, 1980) faced a similar issue when the United States sought to collect on a tax deficiency judgment from an entity (AVCI) that had purchased all of the assets of the debtor (AVC). The United States sought to collect the judgment from a reserve fund created by AVCI at closing to "protect [it] and the individual defendants against the possibility that *they* might have to pay any tax liability for AVC." *Id.* at *3. The court found that, because there was no express agreement to use the funds to pay taxes owed by AVC and no evidence of assurances to do so that were not equally consistent with a more limited purpose of the buyer to protect *itself* from transferee liability (*id.* at *3-4), the United States was not an intended beneficiary of the acquisition (or any other) agreement and so not entitled to the fund. *Id.* at *4.

14

The Escrow Agreement (Section 14) is subject to New York law, which has adopted the

Restatement (Second) of Contracts' test for intended beneficiaries, as follows:

> Unless otherwise agreed between promisor and promissee, a beneficiary of a
> promise is an intended beneficiary if recognition of a right to performance in the
> beneficiary is appropriate to effectuate the intention of the parties and either
> (a) the performance of the promise will satisfy an obligation of the promisee to
> pay money to the beneficiary; or (b) the circumstances indicate that the promisee
> intends to give the beneficiary the benefit of the promised performance.

*United Int'l Holdings*, 988 F. Supp. at 371 (quoting Restatement (Second) of Contracts § 302

(1979)); *see id.*, 988 F. Supp. at 371 ("When determining the intentions of the contracting parties,

the intention of the promisee governs."), citing *Fourth Ocean Putnam Corp. v. Interstate Wrecking

Co.*, 66 N.Y.2d 38, 44, 485 N.E.2d 208, 212, 495 N.Y.S.2d 1, 4-5 (1985). Any "intent to benefit a

third party must be shown on the face of the agreement." *In re Gulf Oil/Cities Serv. Tender Offer

Litig.*, 725 F. Supp. 712, 733 (S.D.N.Y. 1989).

Sunnyside can point to no evidence on the "face" of the Escrow Agreement (or elsewhere)

that CDT Inc. (the promisee) or any other party to the Escrow Agreement intended to benefit

Opsys, or that giving Opsys a right to assert a claim against the Escrow Assets would effectuate

CDT Inc.'s or any other parties' intent. Instead, the Escrow Agreement's express terms

demonstrate the contrary. Thus, Section 2 provides that the escrow "***shall be held in trust and

shall not be subject to lien or attachment of any creditor*** of any party hereto and shall be used

solely for the purposes and subject to the conditions set forth herein." Escrow Agreement § 2.

Section 4 identifies the only creditor (Damoder Reddy) whose claims are provided for in the

Escrow Agreement, and Sections 4 and 5 set forth in detail the process by which CDT Inc. and

OML may demand and receive disbursements of the Escrow Assets.

Sections 11 and 13 further contradict Sunnyside's theory. Section 11 states,

> ***Neither [CDT Inc.] or [OML] shall*** sell, assign, transfer, or encumber, or in any
> other manner anticipate or ***dispose of any portion of the Escrow Fund … until***

15

> *the same shall be actually paid over to and received by [CDT Inc.] or [OML],* as the case may be, pursuant to the terms hereof.

*Id.* § 11.  Section 13 states,

> *This Escrow Agreement shall* be binding upon and *inure to the benefit of* the respective successors, assigns and legal representatives of *[CDT Inc.], [OML] and [BNY].*

*Id.* § 13.  This Court has repeatedly held that such "succession" clauses which expressly identify to whose benefit the agreement inures and restrict assignability and encumbrances of the agreement are "inconsistent with the existence of an intention to confer a benefit upon a third party" and "manifest[] the parties' intention *not* to benefit third parties." *Piccoli A/S v. Calvin Klein Jeanswear Co.*, 19 F. Supp. 2d 157, 164 (S.D.N.Y. 1998) (granting motion to dismiss because "inurement clause, when taken together with a prohibition on assignments, ... suggest that the parties did not intend that third parties benefit from the contract.") (citing cases); *see Banco Espirito Santo de Investimento, S.A. v. Citibank, N.A.,* No. 03 Civ. 1537(MBM), 2003 WL 23018888, *9 (S.D.N.Y. Dec. 22, 2003) (existence of such "succession" clauses "further undermine[] the claim that the parties to those agreements intended to benefit [non-party claimant].")*, aff'd,* 110 Fed. App'x 191 (2d Cir. 2004); *accord United Int'l Holdings,* 988 F. Supp. at 373.

Sunnyside's reliance on a excerpt from Paragraph 35.1 of the 2002 Transaction Agreement is misplaced.  This provision states, in full,

> Any person (*other than the parties to this agreement*) who is given rights or benefits under clause 9 (Opsys Limited Option) of this agreement ... shall be entitled to enforce those rights or benefits against the parties in accordance with the Contracts (Rights of Third Parties) Act 1999.  Save as provided in Clause 9 (Opsys Limited Option) the parties to this agreement do not intend that any term of this agreement should be enforceable, by virtue of the Contracts (Rights of Third Parties) Act 1999, by any person who is not a party to this agreement.

Heisenberg Aff. Ex. B § 35.1.[10]

Here, Opsys *is* a party to the 2002 Transaction Agreement, and so by its terms is outside of the scope of Paragraph 35.1. Under CPLR 5225(b) and 5227, Sunnyside could not gain greater rights than had Opsys. Instead, Opsys' shareholders – which are represented by OML under the Escrow Agreement – are the clear intended beneficiaries of Paragraph 35.1. This is confirmed in the Amended Settlement Agreement (Heisenberg Aff. Ex. C), to which OML is a party, which provides for and attaches the Escrow Agreement.

Moreover, as discussed above, the parties expressly denied creditors any rights under the Escrow Agreement; this specific treatment of non-party rights controls over any inconsistency in the more general and prior transaction agreements. *See John Hancock Mut. Life Ins. Co. v. Carolina Power & Light Co.* 717 F.2d 664, 670 n.8 (2d Cir. 1983) ("New York law recognizes that definitive, particularized contract language takes precedence over expressions of intent that are general, summary, or preliminary.").

At most, Opsys would be an incidental beneficiary of the Escrow Agreement, as CDT Inc. *could* in its discretion use the Escrow Assets to compromise claims against Opsys. Because an incidental beneficiary has no rights under the Escrow Agreement, Sunnyside has no ability to obtain turnover of the Escrow Assets. *See Fourth Ocean Putnam Corp.,* 66 N.Y.2d at 44, 485 N.E.2d at 211-12, 495 N.Y.S.2d at 4-5 (finding plaintiff was merely an "incidental" beneficiary without rights under contract, even though work performed under contract satisfied plaintiff's obligation; work was intended to remedy plaintiff's default, and not to benefit plaintiff); *United Int'l Holdings,* 988 F. Supp. at 371 (finding creditor was not intended beneficiary of swap

---

[10] OML was not a party to the 2002 Transaction Agreement, and Section 35.1 was not amended in the 2004 Amended Settlement Agreement. Heisenberg Aff. Ex. C.

agreement between subsidiary of debtor and third party bank where there was no evidence that the subsidiary/promisee intended to benefit creditor, even assuming that the bank/promisor did).

    2.    Any Right of Opsys to Have its Creditors Paid From the Escrow
           Assets Is Outside of the Reach of CPLR 5225(b) and 5227

Even if Opsys had rights under the Escrow Agreement to have its creditors paid from the Escrow Assets (Mem. in Supp. of Pet. at 9, 10) – which it does not – the Petition must nonetheless be dismissed because CPLR 5225(b) and 5227 do not reach inchoate or unvested contractual rights to property. *See Sochor v. IBM Corp.*, 60 N.Y.2d 254, 260 & n.7, 457 N.E.2d 696, 699, 469 N.Y.S.2d 591, 594 (1983) (CPLR 5225(b) and 5227 do not reach proceeds of retirement plan where conditions required to result in distribution under the plan have not occurred and may never occur). An unidentified creditor of Opsys could receive a distribution of the Escrow Assets only from CDT Inc. or—if CDT Inc. had not already claimed the entirety of the escrow—from OML, if they determined at their discretion to pay such a claim after receiving the distribution from BNY. *See* Escrow Agreement §§ 4(e), 5, 11. Such an attenuated and speculative "interest" does not fall within CPLR Article 52. For the same reason, Sunnyside cannot show that BNY as escrow agent "is or will become indebted to" Opsys under CPLR 5227. *See Sochor*, 60 N.Y.2d at 260 n.7, 457 N.E.2d at 699, 469 N.Y.S.2d at 594 ("there is no merit to the contention … that the husband's interest is reachable as a 'debt' under CPLR 5227 and 5201 (subd. [a]).").[11]

Sunnyside's argument that Opsys has a "vested interest" in the Escrow Assets being paid to its creditors because CDT Inc. issued Disbursement Notices asserting ***CDT Inc.'s*** right to indemnification based on Sunnyside's claim against Opsys (Pet. ¶¶ 15-20) does not follow. Under Section 4(e) of the Escrow Agreement, CDT Inc.'s 2005 and 2007 Disbursement Notices directing

---

[11] Nor could Sunnyside bring its claim against BNY as "a transferee of money or other personal property from the judgment debtor" under CPLR 5225(b). Sunnyside does not claim that Opsys transferred anything to BNY, nor could it, because CDT Inc., not Opsys, transferred the stock to BNY. *See Sochor*, 60 N.Y.2d at 260 n.7, 457 N.E.2d at 699, 469 N.Y.S.2d at 594 (holding that pension fund administrator could not be a "transferee" under CPLR 5225(b) because the judgment debtor never contributed to the fund).

payment to it, as well as OML's concession that it has no interest in or claim to the Escrow Assets (Davis Decl. Exs. 2, 4, 6), ensure that Opsys has no claim to the Escrow Assets.

### B. CDT Inc. Has the Superior Claim to the Escrow Assets

Because OML has disclaimed any interest in the Escrow Assets, CDT Inc. now has exclusive rights to the Escrow Assets. Furthermore, CDT Inc.'s rights were secured by the Escrow Agreement long before the date of the Judgment and trump any competing claimant. As the California Court stated in rejecting Sunnyside's assertion that CDT Inc. improperly "invaded" the escrow to finance its defense of that litigation (Heisenberg Aff. Ex. E at 10-11), the purpose of the escrow is "to indemnify CDT Inc. for undisclosed and contingent liabilities" of Opsys (*id.* at 6, citing Escrow Agreement § 4(e)). Sunnyside admits that CDT Inc. claimed the entirety of the escrow long before entry of the Judgment against Opsys (*see* Pet. ¶ 16), and cites no authority in support of its conclusory assertions that CDT Inc.'s claim to the Assets is "not ripe." OML's Contest Notices delaying payment "until such time as the true cost of the claim can be established" (Davis Decl. Ex. 3, 5, 8) did not alter CDT Inc.'s contractual right to the Escrow Assets or provide for any scenario where the assets would be disbursed by BNY to a non-party. *See, e.g., Beauvais,* 942 F.2d at 841 (bank's pre-existing contractual right to funds held in judgment debtor's account would have priority lien over judgment creditor's claim to the account under CPLR 5225(b)).

Sunnyside's insistence that its May 29, 2007 Judgment was "first in time" and should be satisfied before CDT Inc.'s claims (Mem. in Supp. of Pet. at 13) is not supported by the factual chronology and also is contradicted expressly by the Escrow Agreement (*see* Section 2, which precludes any creditor from preempting CDT Inc.'s rights to the Escrow Assets, and Section 13, which requires *any* disbursement to be made first to CDT Inc. or OML). The Judgment, the Petition and the Restraining Notice create no lien on the Escrow Assets in favor of Opsys or Sunnyside or otherwise give Sunnyside's claim priority over CDT Inc.'s contractual right to the

Escrow Assets. *See Siegel, New York Practice* § 508, at 862, § 510, at 869, § 518, at 879; CPLR

5202(b), 5234(c).

## II.    SUNNYSIDE IS COLLATERALLY ESTOPPED FROM RE-LITIGATING THE CALIFORNIA COURT'S RULING THAT THE PURPOSE OF THE ESCROW ACCOUNT IS TO INDEMNIFY CDT INC.

Sunnyside has it exactly wrong when it claims that the California Court held that "the

liabilities [sic] Opsys Limited are to be satisfied out of the escrowed amounts." Pet. ¶ 2.  To the

contrary, the California Court found that the purpose of the escrow account was to indemnify

CDT, Inc.  Sunnyside is collaterally estopped from asserting otherwise.

The California Court discussed the escrow account in only two places.  In its factual

background discussion, the court found that, as part of the 2004 transaction, "it was agreed that a

portion of the CDT, Inc. stock offered in exchange for the Opsys Limited stock would ***indemnify***

***CDT, Inc.*** for undisclosed or contingent liabilities."  Cal. Mem. & Order at 6 (Heisenberg Aff.

Ex. E) (construing Escrow Agreement § 4(e)).  In the next paragraph (*id.*), the court stated:

> As part of the 2004 transaction, 133,938 shares of CDT, Inc. stock valued at a
> total of $1,607,256 were held back to cover known and identified liabilities.
> Bunzel Dec., Exh. D at 6 (clause 1.1(g)); Black Dec. ¶ 27.  The list of identified
> liabilities did not include the lease.  Bunzel Dec., Exh. D at 20–21.  Additionally,
> 422,610 shares of CDT, Inc. stock, valued at $5,071,320 went into escrow as
> security for contingent and unidentified liabilities.  Black Dec. ¶ 28, Exh. D at 9–
> 10 clause 1.1(h).  The remaining CDT, Inc. shares constituting the payment for
> the put option were distributed to Opsys management to be distributed between
> management and shareholders.  Black Dec. ¶ 29, Exh. B.  CDT, Inc. claims that
> no shares have yet been distributed to shareholders, and will not be until other
> creditors are paid off.

The court went on to reject Sunnyside's contention that CDT Inc. assumed Opsys' liability

on the lease with Sunnyside when it acquired Opsys' stock, stating:

> In support of this claim [that the lease was a contingent liability assumed by CDT
> Inc.], plaintiff asserts that CDT, Inc. has "invaded" the shares in escrow to finance
> this litigation.  Bunzel Dec. ¶ 11; Exh. G at 17–18 of 59.  However, the passage of
> the SEC filing that plaintiff cites in support of this position states only that the
> shares in escrow would be forfeited to cover any loss or other costs ***that may***

20

> *incur to CDT, Inc.* as a result of the claim.  There is nothing to suggest that CDT, Inc. "invaded" the escrow to "finance" this litigation.  *Rather, the escrow shares were being used to cover a contingency as originally envisioned.*  The fact that CDT, Inc. may have incurred some costs or losses as a result of a lawsuit involving one of its subsidiaries does not amount to an assumption of the subsidiary's liability.  *In any case, the contingent liabilities were ultimately the responsibility of Opsys Limited, not CDT, Inc.,* as indicated by the fact that CDT, Inc. withheld consideration owed to Opsys Limited in order to satisfy the contingencies.  Plaintiffs [sic] have therefore failed to show that CDT, Inc. expressly or impliedly assumed the liabilities associated with this litigation.

*Id.* at 10-11 (emphasis added).  The court said nothing further about the escrow account.

These passages make three points clear:  (1) the Escrow Assets exist to indemnify CDT Inc.; (2) CDT Inc. has the right to withdraw assets from the escrow to cover costs incurred as a result of claims against Opsys, notwithstanding Sunnyside's claim of a right to the assets; and (3) Opsys is responsible for its own liabilities, including Sunnyside's claim, not CDT Inc.

These points also contradict Sunnyside's revisionist claims.  The California Court did not hold that claimants such as Sunnyside are entitled to payment out of the escrow, or that CDT Inc. was required to satisfy claims against Opsys over its own costs incurred defending such claims.[12] To the contrary, it found that the shares in escrow would be forfeited "to cover any loss or other costs *that may incur to CDT, Inc.*"  *Id.* at 10-11.  OML has conceded as such, informing Judge Stone on October 12, 2007, that it has "relinquished any claim to the Assets under the Escrow Agreement."  Davis Decl. Ex. 7.

The California Court did not base its ruling, as Sunnyside suggests, on any finding that either Opsys or Sunnyside had rights in the escrow funds.  *See* Mem. in Supp. of Pet. at 7.  To the contrary, the California Court specifically ruled that "contingent liabilities were ultimately the responsibility of Opsys Limited, not CDT, Inc."  Cal. Mem. & Order at 11.  And it found that the purpose of the escrow was to indemnify CDT Inc.  *Id.* at 6.  Sunnyside's attempt to seize the

---

[12]  Indeed, the Escrow Agreement provides that CDT Inc. "shall have the right (but not the obligation)" to submit disbursement requests to the escrow agent.  Escrow Agreement § 4(e).

500180820v1

escrow funds, to which CDT Inc. is clearly entitled, is nothing more than an attempt to circumvent the California Court's ruling.

CDT Inc. and Sunnyside do agree on one point: "Opsys Limiteds [sic] ability to satisfy the Judgment out of the escrowed shares already has been resolved by the United States District Court for the Northern District of California." Mem. in Supp. of Pet. at 1. Under New York law, "an issue may not be relitigated if the identical issue was necessarily decided in a previous proceeding, provided that the party against whom collateral estoppel is being asserted had a full and fair opportunity to litigate the issue in the prior action." *Hickerson v. City of New York,* 146 F.3d 99, 104 (2d Cir. 1998); *accord Van Emrik v. Chemung County Dep't of Soc. Servs.,* 191 A.D.2d 143, 146, 600 N.Y.S.2d 157, 159 (1993). Here, the California Court held explicitly that the escrow "would indemnify CDT, Inc. for undisclosed or contingent liabilities" and rejected Sunnyside's claim that CDT Inc. was improperly drawing from the escrow account to reimburse its litigation expenses (Cal. Mem. & Order at 6, 10-11 (Heisenberg Aff. Ex. E)) – holdings that were necessary to its ruling that CDT Inc. is not responsible for, or a party to, the Judgment. Sunnyside is collaterally estopped from re-litigating this issue. *See, e.g., Sassower v. Abrams,* 833 F. Supp. 253, 265 (S.D.N.Y. 1993) (dismissing claims of misconduct against judicial officers and government officials based on collateral estoppel arising from other courts' rulings dismissing complaints asserting similar claims of misconduct against these officers).

## III.    CDT INC. IS NOT JUDICIALLY ESTOPPED FROM ASSERTING ITS RIGHT TO THE ESCROW ASSETS

Under New York law, "[a] party invoking judicial estoppel must show that (1) the party against whom judicial estoppel is being asserted advanced an inconsistent factual position in a prior proceeding, and (2) the prior inconsistent position was adopted by the first court in some manner." *AXA Marine & Aviation Ins. (UK) Ltd. v. Seajet Indus. Inc.,* 84 F.3d 622, 628 (2d Cir.

1996). Only a "clear inconsistency between [the party's] present and former positions" will result in estoppel. *Bridgeway Corp. v. Citibank,* 201 F.3d 134, 141 (2d Cir. 2000) (internal quotation and citation omitted); *see U.S. Fid. & Guar. Co. v. Treadwell Corp.*, 58 F. Supp. 2d 77, 92 (S.D.N.Y. 1999) (rejecting estoppel claim where claimed contrary position was not clearly inconsistent and, in any event, one of law, and not of fact). Sunnyside cannot meet these requirements.

Sunnyside's claim that CDT Inc. changed its position as to the escrow account has no support in the record. Contrary to Sunnyside's claims (*see* Mem. in Supp. of Pet. at 11), CDT Inc. never represented to the California Court that Opsys or its creditors could make direct claims against the escrow account to the detriment of CDT Inc. By noting that the escrow had been created as "security" (a word used in the Escrow Agreement) and to deal with creditors' claims, CDT Inc. never suggested that creditors had enforceable rights to access Escrow Assets.

The Escrow Agreement is a legal document, the full text of which the California Court had before it, and to which it rendered a legal interpretation. CDT Inc.'s alleged inconsistent statements as to the proper interpretation of the Escrow Agreement are not statements of fact, and so not subject to estoppel.

The statements of counsel are obviously argument. Most of the statements attributed to Mr. Black (Pet. at 4) are not about the escrow but about the shares issued directly to OML that were held in trust pursuant to the Deferred Consideration Agreement for the protection of Opsys' creditors and debt-holders. In contrast, the purpose of the shares placed in escrow under the Escrow Agreement was to indemnify CDT Inc., which, at its option, could use the shares to pay for litigation costs or to settle with Opsys' creditors. *See* Escrow Agreement § 4(e); *see also* Cal. Mem. & Order at 6. Where Mr. Black did generally discuss the escrow as "cover[ing] ... unidentified contingent liabilities [among other claims]" (Black Decl. ¶ 28), he never stated that

23

Opsys or its creditors had the right to payment from the escrow; certainly, he never stated that "the escrow was intended to benefit Opsys' creditors, such as Plaintiff's claim." Pet. at 4.

Sunnyside also relies on statements made by *Opsys* in opposing Sunnyside's motion to add CDT Inc. to the Judgment. Mem. in Supp. of Pet. 4.[13]  CDT Inc., however, cannot be estopped by a statement that it did not make. As the California Court recognized, Opsys, which is not a party to this proceeding, is a different entity than CDT Inc. and had separate counsel in California. Furthermore, Opsys never said in its opposition that it had any right to the escrow account or that it was the intended beneficiary of the escrow account.

According to Sunnyside, "respondents ... represented to the United States District Court for the Northern District of California that the escrow account was 'really where the plaintiff ought to be looking' to satisfy the judgment." Heisenberg Aff. ¶ 3; *see also* Mem. in Supp. of Pet. 2-3. In fact, at the hearing before the California Court, CDT Inc.'s counsel was referring to shares held directly by OML, not the Escrow, when he stated, "It's sitting in sort of escrow, sort of quasi escrow, basically sitting there because of creditor claims and the like, not been distributed to the former shareholders of Opsys Limited. I think, that's *really where the plaintiff ought to be looking* and that [sic: not] what they're attempting to do here." Tr. at 57 (emphasis added) (Heisenberg Aff. Ex. K). The "sort of quasi escrow" to which counsel referred was the OML shares, which are subject to the Deferred Consideration Agreement and will be paid to Opsys' former shareholders only if certain creditors and debt holders of Opsys are first paid in full. Those shares are not escrowed with BNY and are not the subject of this proceeding.

---

[13]  In addition, the quotation on page 5 of Sunnyside's Turnover Petition is not from CDT Inc.'s opposition, as Sunnyside claims, but from Opsys' opposition. *See* Opsys Opp. Mem. at 5 (Heisenberg Aff. Ex. F).

## CONCLUSION

For the foregoing reasons, Respondent CDT Inc. respectfully requests that this Court enter an order pursuant to Rule 12(b)(1) and 12(b)(6) denying the Turnover Petition, dismissing this proceeding and vacating the Restraining Notice.

Dated:  New York, New York
        October 25, 2007

                              Respectfully submitted,

                              PILLSBURY WINTHROP SHAW PITTMAN LLP

                              By: _____
                              Maria T. Galeno, Esq.
                              John E. Davis, Esq.
                              1540 Broadway
                              New York, New York  10036
                              Telephone: (212) 858-1000
                              Facsimile: (212) 858-1500

                              *Attorneys for Respondent*
                              *Cambridge Display Technology, Inc.*

OF COUNSEL:

Bruce A. Ericson, Esq.
Alice K. M. Hayashi, Esq.
Pillsbury Winthrop Shaw Pittman LLP
50 Fremont Street
San Francisco, CA 94105-2228
Telephone: (415) 983-1000
Facsimile: (415) 983-1200

500180820v1