UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SUNNYSIDE DEVELOPMENT COMPANY, LLC,

                       Petitioner,

-v-

BANK OF NEW YORK (as escrow agent),
CAMBRIDGE DISPLAY TECHNOLOGY, INC., and
OPSYS MANAGEMENT LIMITED,

                       Respondents.

---

Case No.
07-CV-8825 (LLS)

 

**PETITIONER'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT
OF ITS SUPPLEMENTAL TURNOVER PROCEEDING AND IN OPPOSITION TO
RESPONDENT'S MOTION TO DISMISS**

**TRAIGER & HINCKLEY LLP**
880 Third Avenue, 9th Avenue
New York, New York 10022
(212) 845-9094
Attorneys for Petitioner

# TABLE OF CONTENTS

<u>Page</u>

PRELIMINARY STATEMENT ........................................................................................ 1

FACTS ............................................................................................................................... 6

I.    THE 2002 AND 2004 TRANSACTIONS CREATING THE ESCROW ACCOUNT ...... 6

     A.    The 2002 Transaction, Where Opsys Limited Acquired a $15 Million
             Put Option on its Opsys UK Subsidiary............................................................ 7

     B.    The 2004 Transaction, Where Opsys Relinquished its $15 Million
             Put Right and Required Funds to be Placed in Escrow .................................... 7

     C.    The Escrow Agreement Provided That CDT "Administer" Claims
             Against Opsys Limited, On Behalf Of Opsys Limited. ..................................... 8

II.    THE POST-VERDICT PROCEEDINGS BEFORE THE CALIFORNIA COURT. ....... 9

     A.    Respondent's "Adequate Consideration" Defense: That the Escrow
             Money Was Property of Opsys Limited. .......................................................... 10

     B.    Respondent's "Adequate Provision For Creditors" Defense:  That
             Opsys Limited Could Use The Escrow Fund To Pay Its Liabilities................. 11

     C.    The California Court Adopted CDT's Arguments Concerning The Escrow
             Account. ............................................................................................................ 12

III.    CDT's COMPETING CLAIMS ON THE ESCROW, AND SUNNYSIDE'S
       PRIORITY OVER THOSE COMPETING CLAIMS. ................................................. 13

ARGUMENT ................................................................................................................... 14

I.    SUNNYSIDE NEED ONLY SHOW THAT OPSYS HAD RIGHTS IN
     THE ESCROW ACCOUNT......................................................................................... 14

     A.    Sunnyside Stands In The Shoes Of The Judgment Debtor, Opsys Limited. ...... 14

     B.    There is No Merit to CDT's Request That the Court Impose a
             Heightened Burden of Proof............................................................................. 14

# TABLE OF CONTENTS

Page

II.   RESPONDENT IS JUDICIALLY ESTOPPED FROM CONTESTING THAT OPSYS HAS AN ENFORCEABLE INTEREST IN THE ESCROW ACCOUNT…................. 15

    A.   Respondent's Arguments to the California Court that the Escrow Agreement was Constructed to Benefit Opsys and That Opsys's Creditors Were Beneficiaries. .......................................................................... 16

        1.   Respondent's Admissions That Opsys And Its Creditors Were Intended Beneficiaries. ........................................................ 17

        2.   Respondent's Admissions That Opsys Would Pay Its Liabilities Directly From The Escrow ................................................. 19

    B.   Respondent's Arguments To The California Court Are Clearly Inconsistent With Its Present Arguments. .......................................................... 20

    C.   CDT's Position Was Adopted By The California Court When It Rejected Sunnyside's Motion To Impose Successor Liability. ........................................ 22

III.   THE CALIFORNIA COURT'S LANGUAGE, WHILE NOT CREATING A COLLATERAL ESTOPPEL, PROVIDES ADDITIONAL BASIS FOR THE TURNOVER DECISION. ............................................................................... 23

IV.   SUNNYSIDE'S CLAIM IS SUPERIOR TO OPSYS'S COMPETING CLAIM TO REIMBURSE IT FOR ITS LEGAL FEES IN DEFENDING THE CALIFORNIA ACTION. ...................................................................................... 25

    A.   Sunnyside's Judgment Against Opsys Has Priority Over Any Claim Against Opsys By CDT............................................................................. 25

V.   ALTERNATIVELY, THE COURT SHOULD REQUIRE THE TURNOVER OF THE ESCROW ACCOUNT AS A FRAUDULENT CONVEYANCE............................... 26

CONCLUSION .................................................................................. 28

# TABLE OF AUTHORITIES

Page

*Adler v. Pataki*,
185 F.3d 35, 41 n.3 (2d Cir. 1999) ...................................................................... 22

*BAII Banking Corp. v. UPG, Inc.*,
985 F.2d 685, 697 (2d Cir. 1993) ........................................................................ 18

*Bass v. Bass*,
140 A.D.2d 251, 253, 528 N.Y.S.2d 558, 561 (1st Dep't 1988).............................. 16

*Bates v. Long Island Railroad Co.*,
997 F.2d 1028, 1037-38 (2d Cir. 1993) ....................................................15, 16, 22

*Beauvais v. Allegiance Securities Inc.*,
942 F.2d 838, 839 (2d. Cir. 1991) ....................................................................... 15

*Cleveland v. Policy Management Systems Corporation*,
526 U.S. 795 (1999)............................................................................................ 22

*Edwards v. Aetna Life Ins. Co.*,
690 F.2d 595, 599 (6th Cir. 1982) ....................................................................... 16

*Flickinger v. Harold C. Brown & Co.*,
947 F.2d 595, 600 (2d Cir. 1991) ........................................................................ 19

*Fourth Ocean Putnam Corp. v. Interstate Wrecking Co.*,
485 N.E.2d 208, 211-12 (N.Y. 1985) ............................................................. 17, 18

*HBE Leasing Corp. v. Frank*,
48 F.3d 623, 633 (2d Cir. 1995) .......................................................................... 26

*Karaha Bodas v. Perusahaan*,
313 F.3d 70, 83 (2d Cir 2002) ............................................................................. 14

*Katzier's Floor and Home Design, Inc. v. M-MLS.com*,
394 F.3d 1143, 1150 (9th Cir. 2004) .................................................................... 10

*Levin v. Tiber Holding Corp.*,
277 F.3d 243, 252 (2d Cir. 2002) ........................................................................ 19

*Levinson v. United States*,
969 F.2d 260, 264-65 (7th Cir. 1992) ................................................................... 22

*Locurto v. Giuliani*,
447 F.3d 159, 174 (2d Cir. 2006) ........................................................................ 25

*Matter of National Union Fire Ins. Co. of Pittsburgh, Pa. v. Eland Motor Car Co.*,
85 N.Y.2d 725, 729 (1995).................................................................................... 14

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Georgiadis*,
903 F.2d 109, 114 (2d Cir. 1990) ................................................................... 16, 22

*Mulvaney Mechanical, Inc. v. Sheet Metal Workers Intern. Assoc., Local 38*,
288 F.3d 491, 504 (2d Cir. 2002). ............................................................. 4, 15, 16

*New Hampshire v. Maine*,
532 U.S. 742, 749 (2001) ....................................................................................... 15

*Ray v. Alad Corp.*,
19 Cal.3d 22, 29 (1977) .................................................................................. 2, 9, 23

*Sanford v. Bennett*,
11 A.D.3d 758, 783 N.Y.S.2d 423 (3rd Dept. 2004) ............................................. 26

*Sochor v. IBM Corp.*,
60 N.Y.S. 254, 457 N.E. 2d 696, 469 N.Y.S.2d 591 (1983)................................... 25

*United Intl. Holdings, Inc. v. The Wharf (Holdings) Ltd.*,
988 F.Supp 367, 374 (S.D.N.Y. 1997)................................................................... 19

*United States v. U.S. Currency in the Amount of $119,984.00*,
304 F.3d 165, 177-78 (2d Cir. 2002) ..................................................................... 25

*Wight v. Bankamerica Corp.*,
219 F.3d 79, 89 (2d Cir. 2000) .............................................................................. 15

## Other Sources

N.Y. CPLR § 409(b) ............................................................................................... 15

N.Y. CPLR § 410.................................................................................................... 15

N.Y. CPLR § 5225(b) ..................................................................................... passim

N.Y. Debt. & Cred. Law, § 273-a........................................................................... 27

Restatement (Second) Contracts § 302 ................................................................ 16

United Kingdom Contracts (Rights Of Third Parties) Act 1999.............................. 17

Petitioner Sunnyside Development Company LLC ("Sunnyside") respectfully submits this Reply Memorandum of Law in further support of its Petition for a Turnover Order and in opposition to the motion of Respondent Cambridge Display Technology, Inc. ("CDT, Inc.") to dismiss the petition.

## PRELIMINARY STATEMENT

For all of its procedural complexity, the essential question in this case is simple:

> *Does Opsys Limited have the right to use the escrow account to pay its creditors?*

If Opsys Limited has that ability, then New York CPLR ¶¶ 5225 and 5227 permit Sunnyside to "stand in the shoes" of Opsys and compel the turnover of the property. Arguments can be made for either position. However, CDT cannot take both sides of the argument, as it has done.

| Was The Escrow Designed To Protect Opsys' Creditors? | |
| --- | --- |
| **THEN IN CALIFORNIA** | **NOW IN NEW YORK** |
| "the proceeds of the transactions were held in <u>escrow and trust for the benefit of creditors,</u> known and unknown."<br><br>(CDT Mem. to California, Ex. G at 2) | "<u>CDT Inc. did not . . assert</u> that the purpose of the 2004 transactions and the <u>Escrow Agreement was to benefit creditors</u>…."<br><br>(CDT Mem. to New York at 10) |
| "most of the consideration paid to Opsys and its shareholders would be escrowed or <u>placed in trust for the protection of Opsys' creditors,</u> rather than simply be transferred outright to Opsys' shareholders."<br><br>(Declaration of CDT's M.Black at p.3, Ex. H) | "the escrow was not designed to protect Opsys."<br><br>(CDT Mem. to New York, at 1) |
| CDT's counsel:   <u>Most of it is still sitting there either in a formal escrow</u> or in something that is the equivalent of an escrow.<br>Judge Patel:   That can be used to satisfy any judgment in this case?<br>CDT's Counsel: ..the money is there, <u>its basically there for the sake of creditors.</u><br><br>(Ex. K at 56-57) (emphasis added). | "CDT Inc. never suggested that creditors had enforceable rights to access Escrow Assets."<br><br>(CDT Mem. to New York, at 23) |

| Does Opsys Itself Have The Ability To Access The Escrow To Pay The Claims Itself? | |
|---|---|
| **THEN IN CALIFORNIA** | **NOW IN NEW YORK** |
| "CDT Inc. took steps to ensure that it would not assume Opsys' liabilities and that <u>Opsys would pay those liabilities itself</u>. . . . CDT Inc. deposited part of this consideration into an escrow account as security for any unidentified liabilities of Opsy, including contingent liabilities."<br><br>(CDT Mem. to California, Ex. G at 12) | "Opsys has no interest in the Escrow Assets, nor any claim on them."<br><br>(CDT Mem. to New York, at 2)<br><br>"Neither Opsys not Sunnyside is a potential claimant under the Escrow Agreement."<br><br>(CDT Mem. to New York at 2) |
| "<u>The purpose of the escrow is … to assure that</u> if any unknown liabilities did emerge, they would be <u>satisfied by Opsys Limited from the escrowed portion of the consideration</u>, and not by CDT."<br><br>(Opsys Mem. to California, Ex. F at 12-13) | "Opsys has no . . . right to require payment from BNY (as escrow agent)"<br><br>(CDT Mem. to New York at 13) |
| "The Transaction Agreement and Amended Settlement Agreement explicitly provided for the satisfaction of all of Opsys' identified liabilities, as well as providing for contingent liabilities and unidentified liabilities."<br><br>(CDT Mem. to California, Ex. G at 19) | "There is no agreement of CDT Inc. to pay Opsys' unknown or contingent liabilities from the Escrow Assets."<br><br>(CDT Mem. to New York at 2 |

Respondent's Memorandum in Opposition ("Resp. Mem.") wrongly addresses these questions anew, as if writing on a blank slate. However, as shown above, Respondent already answered this question before the California Court. Therefore the present attempt to re-litigate this question is both unnecessary and inappropriate. At issue in that prior California proceeding was whether CDT could be held liable on the judgment against Opsys Limited based upon successor liability theories. Under California law, the test for successor liability required a determination of whether (1) Opsys Limited had received "adequate consideration" in the 2004 transaction and (2) that consideration was "made available for meeting the claims of [judgment debtor's] unsecured creditors." *Ray v. Alad Corp.*, 19 Cal.3d 22, 29 (1977). To disprove those

elements, and avoid $6 million of successor liability, Respondent pointed the California Court to the escrow account, telling it that money was placed in escrow "in trust for the protection of Opsys' creditors." (Declaration of CDT's Michael Black ¶10 (Heisenberg Ex.H)). Respondent then explained that the escrow account was designed so that Opsys Limited would pay its own liabilities from the escrow shares. (CDT Mem. at 12 (Heisenberg Ex.G)).

The ability of Sunnyside to access the escrow was significant to the California Court. Seeking assurance that Sunnyside would have some recourse through the escrow, the California Court directly asked CDT's counsel twice at oral argument whether the escrow account could be used to pay the judgment. CDT's answer was **not** "no." Instead, CDT's counsel reassured the Court that "it's basically there for the sake of creditors" and "that's really where the plaintiff ought to be looking." (Heisenberg Ex.K at 57). When asked again by the Court if the escrow contained enough to satisfy the judgment, CDT's counsel noted only that the escrow might not have enough in it: "[at] the stock price, I don't think there is" (*Id*. at 65-66). In other words, the exact opposite of the position now advanced to this Court.

These assurances proved to be persuasive. The California Court rejected successor liability, adopting CDT's construction of these agreements, namely that the escrow was created *to satisfy the contingencies*:

> the contingent liabilities were ultimately the responsibility of Opsys Limited, not CDT, Inc., as indicated by the fact that CDT, Inc. withheld **consideration owed to Opsys Limited in order to satisfy the contingencies.**

(California Mem. and Order at 11.) Thus, the California Court adopted, in total, Respondent's argument (1) that the escrow is comprised of consideration "owed to Opsys Limited" in the 2004 transactions (i.e., that the assets in the escrow belong to Opsys Limited), and (2) that the escrow was "in trust for the benefit of creditors" to be used to "satisfy the contingencies."

As this demonstrates, the slate is hardly blank. CDT indelibly etched into that slate its formal position that Opsys Limited has an ability to pay creditors – particularly Sunnyside – out of the escrow account. Having convinced the California Court to adopt its view of the escrow agreement's function "to satisfy the contingencies," Respondent cannot now reverse course and argue (1) that Opsys Limited received nothing in 2004 because the escrow provides no protection to its creditors, and (2) that Opsys Limited cannot satisfy its own liabilities out of the escrow. CDT's conduct constitutes the quintessential judicial estoppel, which "precludes a party that successfully maintained a particular position in one legal proceeding, from assuming a contrary position in a later proceeding solely because of a change in interest." *Mulvaney Mechanical, Inc. v. Sheet Metal Workers Intern. Assoc., Local 38*, 288 F.3d 491, 504 (2d Cir. 2002).

The doctrine operates as an estoppel, and therefore it is not relevant whether the east coast branch of CDT's law firm (Pillsbury Winthrop) now can poke holes in the prior claims the firm's west coast branch sold in California. CDT is estopped from re-litigating the issue, and it matters not whether CDT's victory in California was the product of its impeccable legal analysis or of sophistry that confused the California Court into making a legally questionable interpretation of the escrow account.[1] What matters is that Respondent is to be held to only one position. Having succeeded in convincing the California Court that Opsys Limited had received the benefits of the escrow account, so that its creditors were not harmed, judicial estoppel prevents CDT from now trying to sell a contrary interpretation to this Court.

---

[1] It should be noted, Sunnyside disagrees with the California Court's conclusion that Opsys Limited received "equivalent value" in the 2004 transactions and that it made adequate provisions for Opsys's creditors. Those findings are being appealed. Regrettably, the California Court construed the 2004 transaction agreement and the escrow agreement based only upon CDT's conclusory assertions about it, without allowing Sunnyside the benefit of a full and fair opportunity to challenge those assertions. Sunnyside sought, but was denied discovery on these issues. For that reason, Respondent's various statements to the California Court were not subject to a full and fair challenge by Sunnyside.

Tellingly, CDT attempts to bury this dispositive threshold issue in the last pages of its Reply Memorandum. (Resp. Mem. 22-24). When CDT finally does address it, its arguments do not stand up to any scrutiny. For example, CDT now states that "CDT never suggested that creditors had enforceable rights to access Escrow Assets." (*Id*. at 23). How then would the escrow account "protect[] Opsys's creditors," as stated in the sworn testimony of CDT's Mr. Black, if neither Opsys nor its creditors have any enforceable rights therein? Obviously, the chance that CDT "could in its discretion" dip into the escrow account (Resp. Mem. at 2) and bestow its "grace and charity" to pay Opsys's creditors does not fit within any definition of "protection" to Opsys's creditors. And how would "Opsys [] pay those liabilities itself" (CDT Mem. at 12) if Opsys has no rights in the escrow, or an ability to draw on it? And how would Opsys have "received ample consideration for its UK assets" (CDT Mem. at 19) if it received no enforceable rights in 2004? Those statements made to the California Court simply are irreconcilable with CDT's current claims.

CDT's current argument boils down to a claim that it could not really have meant what it told the California Court because Opsys Limited is not a formal party to the escrow agreement. Yet, Opsys Limited required that the consideration owed it in the transaction be placed into the escrow, and the escrow agreement plainly anticipates that the parent, CDT, will act on behalf of its wholly-owned subsidiary in administering and resolving the Sunnyside claim – as indeed it has done. It is both logical and commonplace that a parent would act on behalf of its subsidiary.

Ultimately, CDT's east coast attorneys are left to assert that the numerous and repeated representations to the California Court by its west coast office meant nothing, claiming that "statements of counsel are obviously argument." (Resp. Mem. at 23). This completely misses the point. CDT advanced a construction of the parties' rights in the escrow agreement, founded

on the sworn testimony of its drafter, Mr. Black.  Even if viewed simply as "argument," CDT is held to that argument because the very purpose of the judicial estoppel doctrine is to prevent lawyers from making whatever arguments fit the whims of the immediate circumstances. Having staved off $6 million in successor liability by pointing the California Court to the escrow, it is only fair that CDT and Opsys are now held to those representations, even through the limited remedy of $1.5 million is inadequate.

Finally, it is critical to note that even CDT's "defense" requires a turnover.  If CDT succeeds in convincing this Court that Opsys Limited has no interest in the escrow account, then it will have removed the sole arguable basis for the California Court's finding that Opsys Limited received any consideration in the 2004 transactions.  In other words, CDT cannot avoid the only basis for the California Court's finding of "equal consideration," while simultaneously attempting to embrace the "equal consideration" conclusion.  That then also will have established a *prima facie* fraudulent conveyance based on the 2004 transaction: By CDT's admission, Opsys Limited relinquished its $15 million "put" option for its subsidiary, Opsys UK Limited ("Opsys UK"), in exchange for what CDT now argues were un-enforceable rights.  In those circumstances, CPLR §5225(b) still requires the Court to compel the party holding those fraudulently conveyed assets (the Bank of New York) to return the property.

Either way, the Bank of New York should turn over the assets as a remedy.

## FACTS

Although most of the background facts are not disputed, and already have been presented, the following additional facts are relevant to the argument.

## I.    THE 2002 AND 2004 TRANSACTIONS CREATING THE ESCROW ACCOUNT

Opsys Limited was an asset-rich high-tech company, when it entered into the lease with

Sunnyside in 2001, out of which the judgment liability arose. In 2002, Opsys Limited restructured itself into a holding company, creating two operating subsidiaries: Opsys UK and Opsys US Limited. Opsys Limited then transferred the bulk of its valuable intellectual property rights to Opsys UK.

### A.    The 2002 Transaction, Where Opsys Limited Acquired a $15 Million Put Option on its Opsys UK Subsidiary.

The 2002 Transaction Agreement provided two "put" rights and one "call" right. (Resp. Mem. at 5). CDT acquired from Opsys Limited a 16% stake in its Opsys UK subsidiary, in return for $2.5 million, and Opsys Limited obtained the right to put the remaining 84% of its Opsys UK stock to CDT in return for Opsys Limited receiving 1,326,837 shares of CDT stock. (Clause 3.1 (Heisenberg Ex.B)). At the $12.00 per shares IPO price, this Opsys UK put would have provided <u>Opsys Limited</u> with $15.9 million.[2] For its part, CDT acquired a "call" option to purchase Opsys UK from Opsys Limited for the same 1,326,837 shares of CDT stock. These reciprocal rights were referred to as the "Opsys UK Option." In addition to the Opsys UK option, Opsys Limited received the right to put its own shares to CDT under Clause 9 of the 2002 Transaction Agreement.

### B.    The 2004 Transaction, Where Opsys Relinquished its $15 Million Put Right and Required Funds to be Placed in Escrow.

Respondent ignores the Opsys UK Option, and therefore wrongly paints the 2004 transaction as a simple purchase of Opsys Limited shares from the Opsys shareholders, with consideration owed exclusively to Opsys's shareholders. However, the Opsys UK Option (among other rights) required Opsys Limited to be a party to the 2004 Transaction Agreement, and explains why Opsys Limited was entitled to receive benefits in the 2004 transaction.

---

[2] This $15.9 million valuation for Opsys UK was consistent with the price paid for the initial 16% of Opsys UK, where CDT paid $2.5 million, which implies a total value of at least $15.625 million. CDT acknowledges that the intellectual property had a book value of $12,802,000. (Black Dec. ¶11(a))

The 2004 transaction did not only involve the sale of Opsys Limited's stock. As mentioned above, Opsys Limited held the Opsys UK option, by which it could have put the remainder of its interest in Opsys UK for $15.9 million.[3]  Therefore, the 2004 Transaction Agreement was structured so as to provide Opsys Limited some consideration, and provided for the satisfaction of creditor claims prior to the consideration being released to Opsys's shareholders, Opsys Management Limited ("OML").  In the Transaction Agreement, Opsys Limited required OML to create the escrow agreement, providing that Opsys "shall procure that [OML] shall enter into the Escrow Agreement."  (Transaction Agreement, § 9.15(B) at p.9 (Heisenberg Ex.C)).  As recited in the Escrow Agreement, Opsys Limited required that the consideration owed it in the transaction be placed into the escrow:  "Opsys has exercised the Opsys Option, which requires that . . the 'Escrow Consideration' be placed in escrow hereunder and held as security for certain contingent liabilities of Opsys."  (Escrow Agreement Recital B, (Heisenberg Ex.D)).  That way, according to CDT in the California Action, Opsys ensured that it had made some provision for its creditors before making distributions to its shareholders.

C.    **The Escrow Agreement Provided That CDT "Administer" Claims Against Opsys Limited, On Behalf Of Opsys Limited.**

CDT's argument about the supposed significance of Opsys Limited not being a formal party to the escrow agreement ignores that the escrow agreement was drafted knowing that it would become effective only if CDT acquired control of Opsys Limited.  The escrow agreement therefore expressly provides that CDT will act on behalf of its wholly-owned subsidiary, Opsys Limited, in resolving the claims against Opsys Limited. (Escrow Agreement ¶ 6 at p.7 (Heisenberg Ex.D)).  It then provides that:

---

[3]      Sometime in 2005 Opsys Limited fraudulently transferred this 84% stake in Opsys UK (worth $15 million) to CDT Limited for absolutely no consideration.  By that transfer, Sunnyside has been deprived of the opportunity to levy against those shares.  If necessary, Sunnyside anticipates litigating this 2005 fraudulent transfer separately in the appropriate forum.

> In the event [OML] does not assume the defense of any such Claim as above provided, [CDT] shall have the full right to defend against any such Claim, and shall be entitled to settle or agree to pay in full such Claim.

(*Id.* ¶ 6 at p.8).

CDT's obligation to resolve the claim on behalf of Opsys Limited is apparent in other sections as well. Thus, when a claim is asserted against Opsys Limited, CDT's claim on the escrow is for the costs "incurred in resolving such Claim" (*id.* at ¶ 4(e)) and in "the resolution of the Claim." (*id.*)(emphasis added). Conversely, if OML chooses to resolve the liability on behalf of Opsys, it is entitled to draw on the escrow for that purpose. (*id.*) This language leaves unmistakable that the escrow account is – as CDT and Opsys acknowledged to the California Court – to pay the liabilities, even if the disbursement from escrow is technically made to the claims administrator (CDT) on behalf of Opsys Limited.

It is both logical and common place that a parent would act on behalf of its wholly-owned subsidiary. Indeed, CDT acknowledges that it acted precisely in that role when it defended and resolved another claim by Mr. Reddy against Opsys (Resp. Mem. at 8), and when it retained and paid counsel in California "on behalf of Opsys."[4] (Davis Dec. Ex.4).

## II.    THE POST-VERDICT PROCEEDINGS BEFORE THE CALIFORNIA COURT.

Following the jury's verdict against Opsys Limited, Sunnyside moved to add CDT Inc. as a party to the judgment pursuant to Rules 25(c) and 69(a) of the Federal Rules of Civil Procedure. Those post-judgment remedies are governed by California state law, which imposes successor liability where "no adequate consideration was given for the predecessor corporation's assets and made available for meeting the claims of its unsecured creditors." *Ray*, 19 Cal.3d at

---

[4]    Indeed, when CDT filed claims on the escrow account, it asked for payment of fees CDT incurred in the defense costs of California action "on behalf of "Opsys Limited." (Davis Dec. Ex. 4). Having made payments to defend on behalf of Opsys Limited, it also contemplates making payments on behalf of Opsys Limited to resolve the liabilities of Opsys Limited.

29.  Sunnyside also relied upon the Ninth Circuit's articulation of this standard in *Katzir's Floor and Home Design, Inc. v. M-MLS.com*:

> The requirement of inadequate consideration in a successor liability case is premised on the notion that when a successor corporation acquires the predecessor's assets without paying adequate consideration, the successor deprives the predecessor's creditors of their remedy.

*Katzir's Floor and Home Design, Inc. v. M-MLS.com*, 394 F.3d 1143, 1150 (9th Cir. 2004).

As is shown in their respective legal memoranda and sworn declarations submitted by them, CDT and Opsys Limited vigorously disputed imposition of successor liability.  Both maintained that the standard was not satisfied because (1) the consideration CDT paid in 2004 was paid to Opsys Limited so as to be available to Opsys Limited's creditors, and (2) CDT had made "adequate provision" for Opsys Limited's creditors.

**A.     Respondent's "Adequate Consideration" Defense: That the Escrow Money Was Property of Opsys Limited.**

CDT contended that Opsys received equivalent value because the consideration paid in the 2004 transaction was paid to Opsys Limited for use in paying off its creditors. CDT also wrote that these creditors were intended beneficiaries, for "the proceeds of the transactions were held in escrow and trust for the benefit of creditors, known and unknown."(CDT Mem. to California, Ex. G at 2)  As CDT's counsel told the California Court:  "There's no way CDT made Opsys creditors worse off by **putting money into Opsys**, by putting a lot of CDT stock, which is value in there." (Ex. K at 65)(emphasis added).  Thus, CDT took the position that the 2004 transaction value was not sent directly to Opsys' shareholders, but was property of Opsys, and available to Opsys' creditors.

That representation was not an isolated one.  CDT's Mr. Black explained these agreements to the California Court, that "[t]here was no purpose to place Opsys' creditors at any

disadvantage" as "most of the consideration **paid to Opsys** and its shareholders would be escrowed or placed in trust for the protection of Opsys' creditors." (Black Dec. ¶10 (Heisenberg Ex.H)).  Mr. Black went on to explain that "[t]he 2004 transactions . . . protected Opsys' creditors," and that one of the protections that Opsys's creditors enjoyed was that the funds went in to escrow "to cover" unidentified liabilities.  (*id*. at ¶¶ 26, 28).  Thus, CDT plainly recognized that the assets in the escrow fund were money owed to Opsys Limited in the first instance.

B.    **Respondent's "Adequate Provision For Creditors" Defense:  That Opsys Limited Could Use The Escrow Fund To Pay Its Liabilities.**

A natural consequence of CDT's first argument was that Opsys Limited itself would access its funds to pay these liabilities.  For example, under the heading "CDT Inc. did not agree to assume Opsys' liabilities," CDT told the California Court that it "took steps to ensure that it would *not* assume Opsys' liabilities and that **Opsys would pay those liabilities itself**." (*id*. at 12)(emphasis added).  It then specified:

> The 2004 Amended Settlement Agreement provided that all of Opsys' identified liabilities would be satisfied out of the consideration payable for the Opsys shares. CDT Inc. also deposited part of this consideration into an escrow account as security for any unidentified liabilities of Opsys, including contingent liabilities.

*Id*.  Thus, CDT plainly advised the Court that the escrow account would be used by Opsys itself to pay those liabilities. This argument also is irreconcilable with its current position that Opsys Limited has no ability to direct the escrow, and that only CDT, Inc. or OML could draw on the escrow.  If so, how would Opsys **itself** pay those liabilities?

Indeed, the pleadings show a uniform emphasis stressing that Opsys (as distinct from CDT) would be able to access the escrow account: "CDT set aside the portion of the consideration to ensure that (a) contingent liabilities would be satisfied *by Opsys* or its shareholders if the contingencies materialized.. . . " (Opsys Mem. at 5 (Heisenberg Ex.F)). The

11

emphasis on "by Opsys" is in the original, because Opsys wanted to establish for the California Court that it – and not CDT – had the ability to use the escrow account. Opsys put it most plainly:

> the purpose of the escrow plainly is . . . to assure that if any unknown liabilities did emerge, they would be satisfied by Opsys Limited from the escrowed portion of the consideration, and not by CDT.

*Id.* at 12-13. Today, however, CDT contends Opsys Limited lacks the ability to satisfy these unknown liabilities from the escrow.

**C.     The California Court Adopted CDT's Arguments Concerning The Escrow Account.**

Although it declined to provide Sunnyside with discovery into these transactions, the California Court adopted Respondent's arguments and its unchallenged affirmations about Opsys's creditor rights. By the standards for judicial estoppel, CDT prevailed on its arguments in the prior forum, having obtained a judgment based upon its position, allowing CDT to avoid the imposition of $6 million in successor liability.

Moreover, the California Court also adopted CDT's component arguments in resolving the elements of the successor liability test. Specifically, the California Court adopted CDT's arguments that it had not assumed Opsys's liabilities, and instead that Opsys Limited would pay those liabilities out of the escrow. (*id.* at 10-11). In addressing the escrow account, the Court noted that the escrow agreement was available "to satisfy the contingencies":

> the contingent liabilities were ultimately the responsibility of Opsys Limited, not CDT, Inc., as indicated by the fact that CDT, Inc. withheld **consideration owed to Opsys Limited <u>in order to satisfy the contingencies</u>.**

(California Mem. and Order at 11.)

12

### III. CDT's COMPETING CLAIMS ON THE ESCROW, AND SUNNYSIDE'S PRIORITY OVER THOSE COMPETING CLAIMS.

On February 2, 2005, CDT submitted a request to the Bank of New York for the escrow account to pay the Sunnyside suit. (Exhibit 2 to the Declaration of John E. Davis, filed herein on Oct. 25, 2007.) OML contested the claim, but, pursuant to the escrow agreement, the claim nevertheless became eligible for distribution on May 29, 2007 when Sunnyside obtained a judgment on the claim. CDT has submitted the certified copy of the judgment to the Bank of New York. (Davis Dec. Ex. 6). Sunnyside entered judgment in New York, and has served an execution against Opsys Limited, and therefore holds a valid and perfected judicial lien. See CPLR §5234(a).

Originally, the general escrow sub-account held 221,486 shares, worth $2.6 million. At present, 126,082 shares remain (Davis Dec. Ex. 4), meaning 95,404 shares (worth $1,144,848) already have been withdrawn for the California litigation. On top of this $1.1 million, CDT now seeks payment of yet an additional $1.4 million. Thus, CDT seeks to draw $2.5 million for legal fees in the California action, leaving nothing to pay the underlying liability. (In comparison to Respondents' $2.5 million in attorneys' fees, Sunnyside's total fees in prosecuting the California action were approximately $600,000).

The competing $1.4 million claim to the escrow funds comes from CDT, which seeks payment of "fees incurred on behalf of Opsys Limited relating to the Sunnyside litigation." (Davis Dec. Ex. 4). Apparently, CDT has paid the Orrick Herrington & Sutcliffe law firm $1,190,000 "on behalf of Opsys Limited" in the California Action, and has paid Pillsbury Winthrop law firm an additional $284,378 in the California litigation.

<u>**ARGUMENT**</u>

**I.    SUNNYSIDE NEED ONLY SHOW THAT OPSYS HAD RIGHTS IN THE ESCROW ACCOUNT.**

Sunnyside should prevail where, as here, it can establish that Opsys Limited has rights in the escrow account.  Under the CPLR article 52, Sunnyside can invoke those rights on behalf of Opsys Limited, and compel the payment of the Sunnyside claim. Sunnyside does not need to show that it was a third-party beneficiary.

**A.    Sunnyside Stands in the Shoes of the Judgment Debtor, Opsys Limited.**

Through the creditor provisions of CPLR article 52, "a party seeking to enforce a judgment 'stand[s] in the shoes of the judgment debtor in relation to any debt owed him or a property interest he may own.'" *Karaha Bodas v. Perusahaan*, 313 F.3d 70, 83 (2d Cir 2002), quoting *Bass v. Bass*, 140 A.D.2d 251, 253, 528 N.Y.S.2d 558, 561 (1st Dep't 1988).

As a judgment creditor, Sunnyside is entitled to a turnover of property under CPLR 5225(b) where it shows that the judgment debtor has rights in property owed to it. *Matter of National Union Fire Ins. Co. of Pittsburgh, Pa. v. Eland Motor Car Co.*, 85 N.Y.2d 725, 729 (1995).

**B.    There is No Merit to CDT's Request That the Court Impose a Heightened Burden of Proof.**

The right to a turnover is governed by the language of CPLR § 5225(b), which entitles a judgment creditor to relief upon a showing that the garnishee holds the debtor's property.  CDT erroneously hints at a heightened burden of proof standard.  Relying on stray dicta from a commentator, CDT asks this Court to ignore the straight-forward language of the CPLR and require a heightened burden of proof.

Curiously, the only case cited by CDT for this heightened language, *Beauvais v.*

*Allegiance Securities Inc.*, <u>never employs this language</u>.  As the Second Circuit stated, a turnover action is a simple two-step test:

> "First, it must be shown that the judgment debtor 'has an interest' in the property the creditor seeks to reach." If that showing is made, then the creditor must show that either the judgment debtor is entitled to possession of the property or that its own rights in the property are superior to the rights of the third party holding it.

*Beauvais v. Allegiance Securities Inc.*, 942 F.2d 838, 839 (2d. Cir. 1991). There is no additional burden to satisfy this test "clearly."  As a special proceeding, the turnover is ordered where the claim is established on the papers.  CPLR § 409(b).  If additional facts require trial, then the Court is to conduct an immediate hearing on those limited issues. CPLR § 410.

## II.    RESPONDENT IS JUDICIALLY ESTOPPED FROM CONTESTING THAT OPSYS HAS AN ENFORCEABLE INTEREST IN THE ESCROW ACCOUNT.

The Court need not even analyze CDT's dissection of Opsys's supposed lack of enforceable rights in the escrow account.  CDT has acknowledged that right to the California Court, and now is estopped from denying it.  As is explained below, the estoppel applies to prevent an inconsistent result of having this Court deny Sunnyside a right, the existence of which was important to the California Court's decision.

"Judicial estoppel is designed to prevent a party who plays fast and loose with the courts from gaining unfair advantage through the deliberate adoption of inconsistent positions in successive suits." *Wight v. Bankamerica Corp.*, 219 F.3d 79, 89 (2d Cir. 2000).  Its purpose is "to protect the integrity of the judicial process." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (citation omitted).  Judicial estoppel "precludes a party that successfully maintained a particular position in one legal proceeding, from assuming a contrary position in a later proceeding solely because of a change in interest." *Mulvaney*, 288 F.3d at 504. It applies "(1) to preserve the sanctity of the oath by demanding absolute truth and consistency in all sworn

15

positions and (2) to protect judicial integrity by avoiding the risk of inconsistent results in two proceedings." *Bates v. Long Island Railroad Co.*, 997 F.2d 1028, 1037-38 (2d Cir. 1993). "If the second tribunal adopted the party's inconsistent position, then at least one court has probably been misled." *Edwards v. Aetna Life Ins. Co.*, 690 F.2d 595, 599 (6th Cir. 1982).

The elements of the doctrine are simple: "[A] party requesting judicial estoppel must demonstrate both that (1) the party against whom estoppel is sought has pursued an inconsistent factual position in an earlier proceeding, and (2) this prior inconsistent position was somehow adopted by the first court." *Mulvaney*, 288 F.3d at 504. It applies particularly where a party has previously has taken a position about its rights to property, and then attempts to change that position. *Bass v. Bass*, 140 A.D.2d 251, 253, 528 N.Y.S.2d 558, 561 (1st Dep't 1988).

Here, both aspects are established. <u>First</u>, as shown in section II.A, *infra*, Respondent took the position (1) that the escrow is created "for the benefit" of creditors, and (2) that Opsys Limited had the legal ability to satisfy the claims out of the escrow account. Respondent took these positions in both their Memoranda of Law, at oral argument, and in the sworn testimony of Mr. Black. See *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Georgiadis*, 903 F.2d 109, 114 (2d Cir. 1990)(judicial estoppel applies to "testimony or pleadings successfully maintained in a prior judicial proceeding."); *Bates*, 997 F.2d at 1038 (doctrine "demand[s] absolute truth and consistency in all sworn positions."). <u>Second</u>, as shown in section II.B, this position was adopted by the California Court, which ruled in CDT's favor on the successor liability issue.

A.    **Respondent's Arguments to the California Court that the Escrow Agreement was Constructed to Benefit Opsys and That Opsys's Creditors Were Beneficiaries.**

There is no doubt that CDT established in the California Action all the bases for concluding that Opsys and its creditors had an interest in the escrow account.

1.    **Respondent's Admissions That Opsys And Its Creditors Were Intended Beneficiaries.**

Under New York law, a third party is an intended (as opposed to incidental) beneficiary of a contract:

> if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.

Restatement (Second) Contracts § 302; see also *Fourth Ocean Putnam Corp. v. Interstate Wrecking Co.*, 485 N.E.2d 208, 211-12 (N.Y. 1985).[5]

Here, there is no doubt about that intention. In the California Action, CDT, Opsys and the agreement's draftsman, Michael Black, each vouched that CDT and Opsys had created the escrow account to "benefit" and provide for any subsequent creditor claims. Indeed, it was critical to their defense that they had made provision for Opsys's creditors. CDT acknowledged, "the proceeds of the transactions were held in escrow <u>for the benefit of creditors</u>." (CDT Mem. at 2 (Heisenberg Aff. Ex G))(emphasis added). CDT's principal, Mr. Black, swore under oath "most of the consideration paid to Opsys and its shareholders would be escrowed or <u>placed in trust for the protection of Opsys' creditors</u>, rather than simply be transferred outright to Opsys' shareholders."(Declaration of CDT's M.Black at p.3, Ex. H) (emphasis added). Or, as CDT's counsel told the California court during the oral argument "it's basically there for the sake of

---

[5]    New York law governs the Escrow Agreement itself. However, the 2004 Transaction Agreement, which required the creation of the Escrow Agreement (it is an exhibit to the Transaction Agreement), is governed by United Kingdom law. There, the parties expressly provided that non-parties to the Escrow Agreement would have rights under the Contracts (Rights Of Third Parties) Act 1999. (Heisenberg Ex.B, at §35.1). That Act permits the parties to provide enforceable rights in "a person not a party to a contract." http://www.opsi.gov.uk/acts/acts1999/19990031.htm

creditors." (Heisenberg Ex.K at 57). Accordingly, this "intention to benefit" was established throughout the California action.[6]

CDT introduced additional evidence of such an intention by the parties to benefit Opsys and its creditors. First, Opsys required its own shareholders to create the escrow in the 2004 Transaction Agreement required, providing that Opsys "shall procure that [OML] shall enter into the Escrow Agreement." (Transaction Agreement, § 9.15(B) at p.9 (Heisenberg Ex.C)). Second, the Escrow Agreement itself acknowledges Opsys' role in requiring the escrow:

> Pursuant to the Transaction Agreement, Opsys has exercised the Opsys Option, which requires that. . the "Escrow Consideration"[] be placed in escrow hereunder and held as security for certain contingent liabilities of Opsys.

(Notably, CDT has not submitted this "Opsys Option Exercise Agreement" that required the deposit into escrow and established rights.) This evidence clearly refutes CDT's current argument that "[t]here is no evidence that the 422,610 shares were placed in escrow at Opsys' insistence." (Resp. Mem. at 10).

CDT's arguments about Opsys's and creditors rights established, under the circumstances, that all of the parties – CDT, Opsys and OML agreed to use the escrow account to satisfy creditor claims. *Fourth Ocean*, 66 N.Y.2d at 44, 485 N.E.2d at 212, 495 N.Y.S.2d at 5 ("Essential to the status as an intended beneficiary . . . is that the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance."); *BAII Banking Corp. v. UPG, Inc.*, 985 F.2d 685, 697 (2d Cir. 1993) ("A beneficiary of a promise is an intended third party beneficiary when, inter alia, recognition of a right to performance in the

---

[6]    In lone opposition to this sworn testimony, CDT improperly refers to a self-serving letter Mr. Black wrote after the fact, and after CDT avoided successor liability in California. (Resp. Mem. at 7). The Court should disregard such un-sworn hearsay statements, particularly where Mr. Black's sworn testimony is to the contrary.

beneficiary is appropriate to effectuate the intention of the parties and the performance will satisfy an obligation of the promisee to pay money to the beneficiary.").

CDT cites *United Intl. Holdings, Inc. v. The Wharf (Holdings) Ltd.*, 988 F.Supp 367, 374 (S.D.N.Y. 1997), in support of its argument that Opsys cannot be deemed an intended beneficiary of the escrow account. However, the case actually reinforces the critical distinction between the two cases. In *United Int'l*, the court concluded "[t]here is no indication that a benefit was intended for the Wharf." In contrast to that absence of evidence, here, Respondent and CDT filled the California record with sworn testimony by the agreement's draftsman, establishing the intention to benefit Opsys and its creditors.

### 2.    Respondent's Arguments That Opsys Would Pay Its Liabilities Directly From The Escrow.

CDT and Opsys also established other evidence of Opsys's standing. Under New York law a third party is conclusively deemed an intended beneficiary of the agreement where performance is to be rendered directly to a third party under the terms of an agreement. *Flickinger v. Harold C. Brown & Co.*, 947 F.2d 595, 600 (2d Cir. 1991). Here, the California Court found that the escrow as established "in order to satisfy" Opsys's liability. (Mem. and Order at 11). Therefore, the agreement contemplates a direct performance to the creditors, even as the mechanism also entails the ability for Respondents to "indemnify" themselves for discharging that liability on behalf of Opsys. *Levin v. Tiber Holding Corp.*, 277 F.3d 243, 252 (2d Cir. 2002) ("Where the terms of the contract necessarily require the promisor to confer a benefit upon a third person, then the contract contemplates a benefit to that third person, and this is ordinarily sufficient to justify third-party-beneficiary enforcement of the contract, even though the contract also works to the advantage of the immediate parties thereto.").

### B.    Respondent's Arguments To The California Court Are Clearly Inconsistent With Its Present Arguments.

CDT's present argument about the escrow's purpose and function is inconsistent with its earlier position in the most basic manner:  In California, CDT repeatedly told the Court that creditors were protected and had rights.  Today, it tells this Court that creditors have no protection and have no rights.  A clearer inconsistency is hard to imagine.

Respondent now states that "CDT, Inc. never represented to the California Court that Opsys or its creditors could make direct claims against the escrow account."  (Resp. Mem. at 23).  However, that claim is quickly shown false, as CDT specifically advised the Court that the escrow was created "for the benefit of creditors" (CDT Mem. at 2 (Heisenberg Ex.G)) so "*Opsys would pay those liabilities itself*." (*id*. at 12).  This acknowledgement of Opsys's own ability to use the escrow account was not the product of an oversight.  CDT expressly made a distinction between CDT and Opsys because it was legally significant to show that Opsys Limited received valuable consideration in 2004.  Therefore, it was repeated throughout the briefing.  (Opsys Mem. at 5 (Heisenberg Ex.F)) ("CDT set aside the portion of consideration to ensure that (a) contingent liabilities would be satisfied *by Opsys* or its shareholders if the contingencies materialized.") (emphasis in original). Thus, the very first aspect of the question – whether Opsys has the ability to use the escrow account – was resolved.

CDT also represented that the funds placed into escrow consisted of consideration payable to Opsys itself.  Thus, Respondents argued that "Opsys received ample consideration for its UK assets." (CDT Mem. at 19 (Heisenberg Ex.G)), and that the escrow account was created by the settlement agreement "as security for any unidentified liabilities of Opsys" (CDT Mem. at 12).  To make sure that there was no mistake, Opsys wrote that the purpose of the escrow was "to assure that if any unknown liabilities did emerge, they would be satisfied by Opsys Limited

from the escrowed portion of the consideration, and not by CDT." (*Id*. at 12-13). Thus, the record is plain that liabilities paid from escrow would be paid by "Opsys Limited . . not by CDT." (*id*.)

Moreover, the pleadings before the California Court were not limited to mere "argument" of counsel, as CDT now tells the Court.  CDT also submitted a Declaration from its 2004 transaction negotiator, Mr. Black, explaining how the escrow agreement protected Opsys Limited and its creditors.  CDT tries to distance itself from the declaration, stating that "**[m]ost** of the statements attributed to Mr. Black [] are not about the escrow" account.  (Resp. Mem. at 23).  Leaving aside the curious characterization – "attributed to Mr. Black" – of a sworn Declaration drafted by CDT and submitted by it, Mr. Black's sworn testimony about the escrow is clear and unqualified:  paragraph 26 of his Declaration states that the escrow **protects** creditors, and does so by covering unidentified liabilities. Yet, accepting CDT's current arguments construing the escrow would provide creditors with **no protection**.

CDT goes through additional contortions in an attempt to limit and disavow its representations to the California Court.  While it now claims that all of its statements pertained to the OML shares held under the deferred compensation agreement, that attempted explanation does not fly.  The OML shares in the deferred compensation agreement allowed claim only by specifically <u>identified</u> creditors (not Sunnyside) and so are irrelevant to Sunnyside.  Because the OML shares are available only for identified creditors, CDT's representation -- that "the proceeds of the transactions were **held in escrow and trust for the benefit of creditors**, known and **unknown**"— clearly was not limited to the OML shares held for known claims.  (CDT Mem. (Ex. G at 2)).  Similarly, CDT's counsel never drew the distinction CDT now urges, and in any event, it would make no sense for counsel to tell the California Court that Sunnyside "really

should be looking" to a fund as to which Sunnyside has no conceivable right. Once again, CDT's after-the-fact attempts to sidestep its prior representations do not hold up.

### C.    CDT's Position Was Adopted By The California Court When It Rejected Sunnyside's Motion To Impose Successor Liability.

"[J]udicial estoppel applies only when a tribunal in a prior separate proceeding has relied on a party's inconsistent factual representations and rendered a favorable decision." *Adler v. Pataki*, 185 F.3d 35, 41 n.3 (2d Cir. 1999); *Bates v. Long Island R.R. Co.*, 997 F.2d at 1038. This element is satisfied where, as here, the party against whom the estoppel is claimed obtained an order as a result of the inconsistent position. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v.* 903 F.2d at 114.

The requirement that the estopped party "prevail in some manner" simply protects issues of fairness, as a party is permitted to change its position where it has lost in the earlier action. *Cleveland v. Policy Management Systems Corporation*, 526 U.S. 795 (1999); *Levinson v. United States*, 969 F.2d 260, 264-65 (7th Cir. 1992) ("[T]he party to be estopped must have convinced the first court to adopt its position; a litigant is not forever bound to a losing argument.")

In this case, CDT prevailed on its arguments, and it is not necessary for the California Court to have made specific factual findings on the issue. In any event, the California Court did indeed rely upon and adopt Respondent's arguments in its overall rejection of successor liability. Specifically, two components of the California Court's decision adopted CDT's contentions.

First, the California Court found that CDT had satisfied the "equal value," prong of the successor liability test. CDT's contention was that it had provided Opsys with equivalent value in the 2004 transaction, and the only value in the 2004 transaction that CDT identified that arguably was provided to Opsys was the creation of the escrow account. (CDT Mem. at 6 (Heisenberg Ex.G); Opsys Mem. at 5 (Heisenberg Ex.F)). Thus, when the California Court

adopted CDT's defense on of "equal value" prong of successor liability it relied upon and adopted, *a fortiori*, CDT's contention that Opsys had enforceable rights.

Second, the California Court accepted CDT's defense to the second prong of successor liability because it had provided consideration "available for meeting the claims of [judgment debtor's] unsecured creditors." (*Ray v. Alad Corp.*, 19 Cal.3d at 29).  CDT's contention was that it had provided for creditors by making the escrow fund available for meeting those claims. (CDT Mem. at 6 (Heisenberg Aff. Ex.G)).  Thus, when the California Court ruled that CDT prevailed on this element, it adopted CDT's contentions about Opsys's and the creditor's rights in the escrow.

## III.  THE CALIFORNIA COURT'S LANGUAGE, WHILE NOT CREATING A COLLATERAL ESTOPPEL, PROVIDES ADDITIONAL BASIS FOR THE TURNOVER DECISION.

CDT's arguments concerning the supposed collateral estoppel effect of the decision are equally misguided.  Far from attempting "to relitigate these determinations," Sunnyside merely is attempting to hold CDT to the representations it made to the California Court that resulted in its success there.  To the extent that there is an issue concerning the specific language used by the California Court in ruling for CDT, then the California Court's decision is clear: "the contingent liabilities were ultimately the responsibility of Opsys Limited, not CDT, Inc., as indicated by the fact that CDT, Inc. withheld consideration owed to Opsys Limited in order to satisfy the contingencies." (Mem. and Order, at p. 11 (Heisenberg Ex.E)).  For that reason, there is no question that the California Court determined that the escrow account need be used to "satisfy the contingencies."  That is what Sunnyside seeks here, so Sunnyside is not seeking to relitigate previously decided issues.

CDT clings to the California Court's passing notation that the escrow account also "indemnified" CDT in the event that it had to pay Opsys's liabilities. While CDT now contends that this language somehow overrides the more specific language about the escrow's purpose, the language is actually further support for that interpretation. The creation of a fund that ensures that CDT will have funds to satisfy a liability – discharging liabilities and "indemnifying" itself for a payment – is entirely consistent with the Court's decision that the escrow account be used to "satisfy the contingencies." That is because the Escrow Agreement expressly assumes that CDT would be acting on behalf of Opsys Limited (which had become nothing more than a shell holding company). The escrow agreement would only become effective if CDT acquired Opsys, and the Escrow Agreement provides that Opsys's 100% parent, CDT, would defend Opsys and administer the claims:

> In the event [OML] does not assume the defense of any such Claim as above provided, [CDT] shall have the full right to defend against any such Claim, and shall be entitled to settle or agree to pay in full such Claim.

(Heisenberg Ex.D, ¶6 at p.8).

Thus, when CDT argues that the escrow account only permits distribution to CDT or OML, they ignore that this distribution is made on behalf of Opsys, and is earmarked to a discharge of Opsys' liability — hence the "indemnify" language of the California Court. An indemnification only comes into play where CDT has paid Opsys's liability, as otherwise there would be no loss to it against which to be "indemnified." Therefore, it is not surprising that the Escrow Account provides that the disbursement of the Escrow Account is made to the entity defending Opsys Limited, acting on behalf of Opsys Limited itself. Indeed, CDT acknowledges that the process worked in that precise manner with respect to the Reddy arbitration, where it drew on the escrow to pay Mr. Reddy's claim. (Resp. Mem. at 8).

In any event, the California Court's decision does not create a collateral estoppel, because a predicate to that doctrine is a "full and fair" determination on the issues.[7]

## IV.    SUNNYSIDE'S CLAIM IS FULLY VESTED AND SUPERIOR TO CDT'S COMPETING CLAIM FOR REIMBURSEMENT OF ITS LEGAL FEES IN DEFENDING THE CALIFORNIA ACTION.

CDT argues that Opsys's ability to draw on the escrow agreement is not subject to levy as it is "inchoate or unvested." (Resp. Mem. at 18). However, the cases on which CDT relies do not sustain this defense. CDT's attempt to analogize to the area of unvested pension funds is clearly inapplicable. In *Sochor v. IBM Corp.*, 60 N.Y.S. 254, 457 N.E. 2d 696, 469 N.Y.S.2d 591 (1983), the New York Court of Appeals held that a wife could not levy against her husband's potential retirement benefits, because they were not vested – the husband would receive no benefits if he died prior age 65, or if he failed to submit an application. That law has no relation to Opsys's claim, which is fully vested under the terms of the Escrow Agreement. CDT filed a timely claim on February 5, 2005 (Davis Dec. Ex. 2), which, under the terms of the Escrow Agreement, became fully vested for payment upon the claim becoming fixed by the Sunnyside judgment. (Davis Dec. Ex. 6). Thus, there is no further action required for the escrow agent to pay Sunnyside's Judgment.

### A.    Sunnyside's Judgment Against Opsys Has Priority Over Any Claim Against Opsys By CDT.

Sunnyside is a judgment creditor, and holds a perfected judgment lien by virtue of having served an execution to the sheriff. It therefore has express priority over CDT's claims against

---

[7]    The California Court's decision does not create a collateral estoppel. *Locurto v. Giuliani*, 447 F.3d 159, 174 (2d Cir. 2006) ("An opportunity to litigate is neither full nor fair when a litigant is denied discovery, available in the ordinary course, into matters going to the heart of his claim") citing *United States v. U.S. Currency in the Amount of $119,984.00*, 304 F.3d 165, 177-78 (2d Cir. 2002). Sunnyside requested, but did not receive, discovery into the facts at issue, and was not provided with the opportunity to cross-examine CDT's witnesses Mr. Black and Mr. Fyfe about the contents of their declarations. CDT itself demanded discovery and due process. (E.g., CDT Mem. at 1 (Heisenberg Ex.G)(arguing that "due process requires at least an evidentiary hearing (following appropriate discovery)").

Opsys Limited for payment of its attorneys' fees. CPLR § 5234(a) and (b) (judgment creditors have priority over non-judgment creditors with respect to claims on the judgment debtor's property). As such, there is no doubt that Sunnyside's claim against Opsys is superior over CDT's other "inchoate" claims. *Sanford v. Bennett*, 11 A.D.3d 758, 783 N.Y.S.2d 423 (3rd Dept. 2004) (granting judgment creditor's turnover petition "[b]ecause petitioner holds a money judgment against Bennett while respondents allege only an inchoate claim against him" and "petitioner's claim as a judgment creditor would still be superior.").

## V.    ALTERNATIVELY, THE COURT SHOULD REQUIRE THE TURNOVER OF THE ESCROW ACCOUNT AS A FRAUDULENT CONVEYANCE.

Finally, Sunnyside should prevail even if this Court were inclined to accept CDT's arguments to disregard the earlier California proceeds. As a transaction in which Opsys Limited received no enforceable rights in exchange for relinquishing a $15 million put option, CDT has established a prima facie fraudulent conveyance. CPLR §5225 allows a judgment creditor to obtain property fraudulently conveyed. *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 633 (2d Cir. 1995).

CDT now contends that in 2004 Opsys Limited relinquish its right to receive from CDT $15 million, and that in exchange it received **no enforceable rights** - all the while a defendant in the California Action. Under CDT's version of the facts, this is a classic fraudulent conveyance in violation of Section 273-a of the N.Y. Debt. & Cred. Law, which states that:

> Every conveyance[8] made without fair consideration when the person making it is a defendant in an action for money damages or a judgment in such an action has been docketed against him, is fraudulent as to the plaintiff in that action without regard to the actual intent of the defendant

---

[8]    The release of the option is a conveyance under Section 270, which defines "conveyance" as "every payment of money, assignment, release, transfer, lease, mortgage or pledge of tangible or intangible property, and also the creation of any lien or incumbrance." N.Y. Debt. & Cred. Law, § 270 (McKinney's 1990).

if, after final judgment for the plaintiff, the defendant fails to satisfy the judgment.

N.Y. Debt. & Cred. Law, § 273-a (McKinney's 1990). Although Sunnyside has had no discovery on any of these post-judgment issues, Sunnyside submits that CDT's own sworn admissions about these two aspects are sufficient to resolve the turnover petition against CDT.

CDT contends that Sunnyside cannot proceed under CPLR §5225(b) against the Bank of New York as "a transferee of money or other personal property from the judgment debtor," because Opsys did not transfer the monies to BNY. (Resp. Mem. at 18, n. 11). However, the California Court already resolved that argument against CDT – in large measure based upon CDT's own admissions. The consideration owed to Opsys Limited was in escrow "in order to satisfy the contingencies." (Mem. and Order at 11).[9]

---

[9] Sunnyside believes the existing Petition and record is sufficient to encompass the fraudulent conveyance relief against the New York escrow account. Nonetheless, if the Court believes a new petition against CDT is required to prosecute the 2004 fraudulent conveyance, Sunnyside is prepared to commence an additional supplemental proceeding against CDT.

## **CONCLUSION**

The Judgment Debtor is a wholly owned subsidiary of a multi-billion dollar corporation. It is justly indebted to Sunnyside for almost $5 million in unpaid rent.  Rather than pay its obligation, the Judgment Debtor has spent millions of dollars in legal fees seeking to avoid its obligation, paying those fees from an escrow fund that was touted as protecting creditors such as Sunnyside.  Respondents should be held to their repeated representations to the California District Court.  The $1.5 million remaining in escrow – which is but a fraction of the judgment amount – should be ordered turned over forthwith.

Dated:  New York, New York
         November 1, 2007

                                        TRAIGER & HINCKLEY LLP


                                        By: s/ _____
                                            Christoph C. Heisenberg (CCH-8736)
                                            George R. Hinckley Jr. (GRH-7511)

                                            880 Third Avenue, 9th Floor
                                            New York, New York 10022-4730
                                            Tel. (212) 845-9094
                                            Attorneys for Petitioner

# APPENDIX A

# THE ESCROW ACCOUNT AGREEMENT

B. Pursuant to the Transaction Agreement, Opsys has exercised the Opsys Option, which requires that the Reddy Escrow Shares and the General Escrow Shares issuable upon exercise of the Opsys Option registered in the name of the Escrow Agent (the "Escrow Consideration") be placed in escrow hereunder and held as security for certain contingent liabilities of Opsys;

**Source:** Escrow Agreement Recital

# STATEMENTS BY CDT, INC.

28   the company it bought and then dismantled most of that company.   The fourth exception

1   applies to attempts to defraud creditors; here, in contrast, the proceeds of the transactions

2   were held in escrow and trust for the benefit of creditors, known and unknown.

**Source:** CDT, Inc. Mem. at 1-2, filed May 7, 2007

2   a.   **CDT Inc. did not agree to assume Opsys' liabilities.**

3   CDT Inc. never agreed to assume Opsys' liabilities, whether expressly or by

4   implication.  Instead, before the exercise of the Opsys Limited Option and its purchase of

5   Opsys' stock, CDT Inc. took steps to ensure that it would *not* assume Opsys' liabilities and

6   that Opsys would pay those liabilities itself.  The 2002 Transaction Agreement provided

7   that the Opsys Limited Option could not be exercised unless Opsys' aggregate liabilities,

8   including its contingent liabilities, were less than $1.25 million.  The 2004 Amended

9   Settlement Agreement provided that all of Opsys' identified liabilities would be satisfied

10   out of the consideration payable for the Opsys shares.  CDT Inc. also deposited part of this

11   consideration into an escrow account as security for any unidentified liabilities of Opsys,

12   including contingent liabilities.

**Source:** CDT, Inc. Mem. at 12, filed May 7, 2007

1   applies to attempts to defraud creditors; here, in contrast, the proceeds of the transactions

2   were held in escrow and trust for the benefit of creditors, known and unknown.

**Source:** CDT, Inc. Mem. at 2, filed May 7, 2007

# STATEMENTS BY OPSYS LIMITED

13    In the settlement, the parties recognized that, as with all acquisitions, Opsys Limited had

14    potentially unknown liabilities.  Because satisfaction of Opsys Limited's liabilities was a

15    precondition to exercise of the put option, the Amendment Agreement included a provision

16    whereby CDT would withhold in escrow 422,610 of the stock consideration otherwise payable to

17    Opsys Limited shareholders.  CDT set aside the portion of the consideration to ensure that (a)

18    contingent liabilities would be satisfied *by Opsys* or its shareholders if the contingencies

19    materialized, and (b) CDT did not assume Opsys Limited's liabilities.

**Source**: Opsys Ltd's Mem. at 5, filed April 23, 2007

25    assumption of liabilities.  Plaintiff's position is nonsensical.  The purpose of the escrow plainly is

1    just the opposite: to assure that if any unknown liabilities did emerge, they would be satisfied by

2    Opsys Limited from the escrowed portion of the consideration, and not by CDT.  The escrow

3    evidences an intent *not* to assume liabilities.

**Source**: Opsys Ltd's Mem. at 12-13, filed April 23, 2007

# STATEMENTS BY THE AGREEMENT'S DRAFTSMAN

1    purpose of obtaining certain assets (Opsys' UK assets) but not other assets (Opsys' US

2    assets); and sound tax planning.  There was no purpose to place Opsys' creditors at any

3    disadvantage.  To the contrary, and as further explained in paragraphs 26 through 29 below,

4    steps were taken so that most of the consideration paid to Opsys and its shareholders would

5    be escrowed or placed in trust for the protection of Opsys' creditors, rather than simply be

6    transferred outright to Opsys' shareholders.

17    26.    The 2004 transactions as structured protected Opsys' creditors in at least

18    three ways, as described in paragraphs 27, 28 and 29 below.

23    28.    Second, 422,610 shares of CDT Inc. stock went into an escrow to cover the

24    Reddy claim referred to in paragraph 16 above and unidentified liabilities, including

25    unidentified contingent liabilities.

**Source**:  Aff. of Michael Black, CDT's 2004 Transaction Agreement Draftsman

# APPENDIX B

# THE OPSYS TRANSACTIONS

